# EXHIBIT D

MONROE COUNTY CLERK'S OFFICE                THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 3182186

Book   Page   CIVIL

Return To.                              No. Pages:  29
JENNIFER MORGAN LEVY
4 Little Spring Run                     Instrument: MISCELLANEOUS DOCUMENT
Fairport, NY 14450

Control #·         202208310608
Index #:           E2022006830

Date. 08/31/2022

Doe, Jane                               Time: 12.06:45 PM

Roberts Wesleyan College

Total Fees Paid:                 $0.00

Employee· CW

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK  DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK



1 of 29

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF MONROE

Jane Doe[1],
                Plaintiff

      v.

Roberts Wesleyan College,

                Defendant

Index No. E202206830

Hon. Elena F. Cariola

**Jury Trial Demanded**

## SECOND AMENDED COMPLAINT

Plaintiff Jane Doe, by and through her attorney, J. Morgan Levy, Esq., for her complaint against defendant, Roberts Wesleyan College respectfully states:

## INTRODUCTION

1.     This is an action seeking declaratory, injunctive, and equitable relief, as well as monetary damages, to redress defendant Roberts Wesleyan College's (hereinafter "Roberts" or "The College") violations of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681, et seq. ("Title IX") and its implementing regulations at 34 C.F.R. § 106, et seq. ("Title IX Regulations"), for its violations of New York Human Rights Law ("NYHRL") § 296 (4) for permitting harassment on the basis of sex, and for breach of contract, breach of covenant of good faith and fair dealing, negligence, intentional infliction of emotional distress and estoppel and reliance.

---

[1] Plaintiff is referred to by pseudonym, motion to proceed anonymously is filed herewith.

2.     Defendant Roberts's unlawful conduct was knowing, malicious, willful, and wanton and/or showed a reckless disregard for Jane Doe's protected rights, which has caused and continues to cause her to suffer substantial economic and non-economic damages.

3.     A non-exhaustive list of Roberts's wrongful and unfair actions include:

- Immediately disclosing, *to her rapist*, the fact of Jane Doe's meeting with Roberts Title IX staff, providing him notice of her intent to file a report against him before police had an opportunity to interview him about the assault.
- Failing to provide Jane Doe with an accommodation that could allow her to participate fully in the investigation process given her disabling PTSD resulting from her assault.
- Knowingly distributing statements about Jane Doe's prior sexual history despite the information being protected from disclosure by "Rape Shield" protections.
- Failing to respond to her report her rapist violated the College's no contact order.
- Failing to complete its investigation into Jane Doe's complaint prior to her and her rapist's graduations from Roberts.
- Failing to hold a hearing regarding Ms. Doe's complaint prior to her and her rapist's graduations from Roberts.
- Failing to employ individuals competent and prepared for the highly sensitive task of Title IX Coordinator whilst simultaneously encouraging students to seek the Title IX Coordinator's assistance if sexually assaulted.

## JURISDICTION AND PARTIES

4.     Plaintiff resides in the Town of Greece, County of Monroe, and State of New York.

5.     Roberts is located in the Town of Chili, in the County of Monroe and State of New York.

6.     Roberts is a private, post-secondary school.

7.     Roberts is a recipient of federal funds and is therefore subject to Title IX.

8.     Roberts is an "educational institution" as defined in 20 USCS §1681(c) and a "postsecondary institution" as defined by 34 CFR § 106.30(b).

9.     Roberts is an "educational institution" as defined by New York State Human Rights Law (NYSHRL) N.Y. Exec. Law § 292 (39).

2

10.     This court has jurisdiction over Roberts pursuant to Sections 301 of the New York

Civil Practice Law and Rules (C.P.L.R.) in that Roberts is within Monroe County, New York

State.

11.     This court has subject matter jurisdiction over this action by virtue of the

NYSHRL, N.Y. Exec. Law § 297 (9).

12.     Venue is proper in this county pursuant to C.P.L.R. 501 because at the time Ms.

Doe commenced this action, she was a resident of this county.


## BACKGROUND FACTS AND CIRCUMSTANCES

### I.    A Senior, About to Begin Her Teaching Career

13.     Ms. Doe, a self-described "rule follower," was drawn to attend Roberts when

researching colleges because her family, friends, and fellow church community members

attended the school, and she understood it would be a safe place to learn the skills she needed to

become a teacher.

14.     Ms. Doe and Roberts entered into a contract under which she paid tuition and fees

to Roberts in consideration of educational services and programs Roberts provided to Ms. Doe.

15.     Ms. Doe paid approximately $75,000 in tuition to Roberts in tuition and supplies

in connection with this contract.

16.     While a student at Roberts, Ms. Doe excelled academically while playing soccer

on the junior varsity team and participating in student council.

17.     Ms. Doe began the 2021 academic year looking forward to finishing her

undergraduate degree, beginning her career as a teacher and then continuing her education at

Roberts and obtaining a master's degree.

3

## II. The Assault

18.     On October 26, 2021, Ms. Doe visited the residence hall room of a male student (herein after "respondent"[2]) who, at the time, was enrolled in a master's degree program at Roberts.  Ms. Doe planned to watch a television show with respondent in his single on-campus residence hall room, a room provided to him because he was employed by Roberts as a resident assistant.

19.     Prior to going to respondent's room, Ms. Doe contacted her own resident assistant to ensure she was not violating the schools' rules "visiting hours."

20.     While in respondent's room, respondent raped Ms. Doe.

### III. Roberts's Lengthy and Contradictory Policies

21.     Roberts promises to its students, through its adoption, publication, and distribution of the following policies, Title IX Sex Discrimination: Dating Violence, Domestic Violence, Sexual Assault, Stalking and Title IX Sexual Harassment (Administrative Policy #120), Sexual Misconduct and Title IX Compliance Policy (Administrative Policy #108), and Sexual Harassment Prevention Policy (Administrative Policy #109) and Non-Discrimination & Non-Harassment (Administrative Policy #116), it will prevent and respond to harassment and discrimination.

22.     While each of these policies is listed under the "Sexual Misconduct Policy" heading of Roberts Title IX Website[3], only two, Administrative Policy #120 and Administrative Policy #108 apply to students.

23.     Copies of Administrative Policy #120 and Administrative Policy #108 (hereinafter together, "the policies") are included at Exhibit 1.

---

[2] Plaintiff is prepared to disclose this male student's name to the court if necessary.
[3] https://www.roberts.edu/title-ix/sexual-misconduct-policy/ Last accessed August 16, 2022, 12:30PM.

4

FILED: MONROE COUNTY CLERK 08/29/2022 01:04 PM

NYSCEF DOC. NO. 10

INDEX NO. E2022006830

RECEIVED NYSCEF: 08/29/2022

24.    Each of the policies indicate their applicability to all students and employees.

25.    Each of the policies contain Roberts's promise to eliminate sexual harassment, including sexual violence and to remedy its effects.

26.    Both policies also states that it is **the policy** under which allegations of sexual violence, including sexual assault, are handled by Roberts.  *See* Exhibit 1, Administrative Policy # 108, page 2 and Administrative Policy 120, page 4.

27.    While both policies instruct students that it is **the policy** that applies to allegations of sexual violence, the definitions of key terms, timelines, and procedures used to report, investigate, and respond to complaints of sexual harassment are different under each.

28.    In example, Administrative Policy #108 indicates that the time frame for resolution is within sixty (60) days of the report, and Administrative Policy #120 indicates the time frame for resolution is within "90 school/calendar/business days" of the Formal Complaint.  Exhibit 1, Administrative Policy 108 pg. 20, and Administrative Policy 120, pg. 7.

29.    Together, the policies are **85 pages** long.  In addition to the policies, students are also accountable to a **56-page** Student Handbook, including information about student behavioral expectations and references to the policies.

30.    A copy of the Student Handbook is attached at Exhibit 2.

31.    Roberts does not just distribute the policies to Roberts's students but also actively trains students on the policies during students' orientation to the institution.

32.    The policies and Roberts's training sessions encourage Roberts's students, like Ms. Doe to report harassment based on protected categories, such as sex.

33.     Administrative Policy 120, the policy Roberts purports to have followed in its response to Ms. Doe's report, enthusiastically encourages students to report sex-based harassment, on at least three separate pages.

### III. A Confusing Reporting Experience and Lack of Accommodation

34.     In accordance with her understanding of the policies, Ms. Doe reported respondent raping her to her resident advisor and another Roberts's employee, Resident Director Bostanic the very same day.

35.     Ms. Doe also sought to make a report to Ms. Monika Robertson, a Roberts employee, who serves as Roberts's Title IX Coordinator (herein after, "TIXC".)

36.     Ms. Robertson is an official with authority to address alleged discrimination and to institute corrective measures.

37.     Ms. Doe understood that as TIXC, Ms. Robertson would assist her in determining whether to make a formal a report and what steps she should take next.

38.     Instead, Ms. Robertson provided Ms. Doe with vague and confusing information and failed to sufficiently explain the investigation process.

39.     Ms. Robertson could not answer Ms. Doe's questions regarding how the investigation would progress, a fact noted by not just Ms. Doe, but also by Ms. Doe's Resident Assistant, during her subsequent interview with investigators.  The investigation report completed months later, included Ms. Doe's resident assistant's perspective of this meeting, explaining the meeting with Ms. Robertson was "really hard" and there was "a lot of miscommunication" between Ms. Robertson and Ms. Doe.  Ms. Doe's resident assistant further explained that Ms. Robertson provided vague descriptions and at one point in the meeting, commented that if Ms. Doe decided not to proceed with the Title IX Process, she and respondent

6

could reach a "beautiful reconciliation where both parties agree", which the resident assistant felt was misleading.

40.　　Roberts's TIXC's suggestion that a "beautiful reconciliation" could be achieved if Ms. Doe did not go forward with a formal complaint against respondent had a devastating impact on Ms. Doe, exacerbating the shame, self-doubt, and confusion she, like so many other rape survivors, experience.

41.　　While meeting with Ms. Robertson, Ms. Doe clearly instructed her NOT to take any steps in response her report until Ms. Doe spoke with the Monroe County Sheriff's Office and understood her options in the criminal process.

42.　　The right of victims of sexual assault to make a report to law enforcement is clearly articulated by Roberts in the policies.

43.　　Despite this instruction, Ms. Robertson contacted the respondent the very next day.

44.　　Because of Ms. Robertson's outreach, respondent promptly sent a message to Ms. Doe asking why he was being contacted by the TIXC, further traumatizing Ms. Doe and causing her significant emotional distress.

45.　　Ms. Robertson's disclosure to respondent also provided him an opportunity to discuss the encounter with individuals he would later identify as witnesses. These witnesses would later share one, very consistent, and fabricated account of what occurred with investigators.

46.　　Ms. Robertson's disclosure also provided respondent the opportunity to create and hone his version of the encounter before he was contacted by police.

7

47.     After Ms. Robertson informed respondent of Ms. Doe's report, false rumors about Ms. Doe began to circulate around Roberts including:

   a) Ms. Doe attended a party immediately after her assault.

   b) Ms. Doe needed to leave a party she attended after the assault because of a "pregnancy scare".

   c) Ms. Doe made prior reports of sexual misconduct to Roberts.

   d) A student about whom Ms. Doe had made a report of sexual misconduct to Roberts left Roberts and killed himself shortly afterwards.

   e) Ms. Doe told friends that she enjoyed the assault.

48.     When Ms. Doe attempted to meet with Ms. Robertson to share the severe emotional distress Ms. Robertson's disclosure to respondent caused her, Ms. Robertson refused to allow Ms. Doe to bring another Roberts's staff member to the meeting for support; claiming Ms. Doe was only allowed one "advisor" at meeting with Ms. Robertson because they were meeting about "a Title IX matter."

49.     Ms. Robertson's rationale was nonsensical as Ms. Doe had not filed a Title IX complaint at this time and therefore any Title IX policies regarding advisors did not apply.

50.     Ms. Robertson further stated that if she met with Ms. Doe, she would need to call respondent in for a meeting too.

51.     Despite this being neither required by Roberts's policy, nor Title IX regulations, Ms. Robertson's threat of having further conversations with respondent dissuaded Ms. Doe from meeting with Ms. Robertson about the impact of her disclosure.

52.     Nevertheless, Roberts became aware of the harassing rumors spreading through campus about Ms. Doe because witnesses reported these rumors during the investigation process.

8

53.     Roberts did not offer Ms. Doe support or resources upon its receipt of these reports of sexual harassment.

54.     When Ms. Doe reported fear of interacting with respondent because he lived close to Ms. Doe on-campus residence, Ms. Robertson offered no accommodation to address her fear of residing in close proximity to her rapist.

55.     Ms. Doe had no choice but to move home during the second semester of her senior year.

56.     Ms. Doe was referred to the counseling center by Ms. Robertson, however Ms. Robertson did not share why she was referring Ms. Doe to the center.  Ms. Doe arrived and told the story of what happened to her all over again, only to be referred to an off-campus resource with the appropriate expertise in sexual assault.

57.     Upon information and belief if Ms. Robertson had shared the reason for which she was referring Ms. Doe, the counseling center could have more promptly referred her to the correct resource without her having to share her story again.

### IV. Formal Report and Investigation

58.     The policies promise a prompt, thorough and impartial investigation will follow complaints of sex-based harassment.

59.     On December 13, 2021, Ms. Doe filed a formal complaint of title ix sexual harassment with Roberts.

60.     After making her formal complaint, Ms. Doe requested Ms. Robertson arrange for her to meet with investigators assigned to her case, in person, rather than via telephone or video conference because Ms. Doe knew talking about what happened to her would be emotionally challenging for her.

61.     Ms. Doe had, at this time, been diagnosed with PTSD and requested in person meetings with investigators upon recommendation of her medical provider.

62.     Ms. Robertson should have understood that Ms. Doe's request was a request for an accommodation due to her disabling medical condition.

63.     Both Administrative Policy #108 and the Student Handbook promise to provide students with disabilities accommodations in the conduct process. Exhibit 2, Student Handbook, page 25, Exhibit 1, Administrative Policy #108, pages 15, 20.

64.     While Administrative Policy #120 does not directly reference Roberts's accommodation obligations to complainants, Roberts's nevertheless has an obligation to accommodate requests for accommodations on the basis of disability from complainants participating in the Administrative Policy #120 process.

65.     Ms. Robertson never asked Ms. Doe why she requested to meet the investigators in person.

66.     Instead, Ms. Robertson set up a video conference for the interview with no explanation why she was unable to accommodate Ms. Doe request for an in-person meeting.

67.     When Ms. Doe joined the video-conference on the day of her interview she learned her interview was not held in person because investigators had been hired from out of state and were located in Massachusetts and Colorado.

68.     During the investigation, Ms. Doe did not understand how investigators would use evidence she submitted including whom would be entitled access. When she expressed frustration with not being told how the evidence exchange would work, she was admonished to "just read the policy."

10

69.     When Ms. Doe's advisor became suddenly and unexpectedly ill and was hospitalized and therefore unable to join Ms. Doe for a second interview requested by the investigators Ms. Doe attempted to convey this fact to Ms. Robertson.

70.     Rather than informing Ms. Doe during this conversation that her advisor's unavailability was a legitimate reason to delay the interview, as stated in its policies, Ms. Robertson interrupted Ms. Doe "reminding" her that any further delays were her fault and saying that Ms. Doe needed to find a new advisor if she couldn't get in touch with her current one.

71.     Concerned and upset that she would not be able to provide the investigators information they needed, Ms. Doe decided to move forward with her interview despite her inability to contact her advisor.  Unfortunately, early in the interview Ms. Doe became emotional due to the lack of support.

72.     Investigators later characterized of her emotional response during this meeting as "defensive, evasive and hostile." Ms. Doe objected to this depiction of her, particularly given the investigators' intentional exclusion of Ms. Doe and her resident assistant's description of Ms. Robertson's ineptitude (which strongly contributed to Ms. Doe's emotional response to the investigation in general and to this meeting.)

73.     Nevertheless, Roberts left the language in the report characterizing Ms. Doe as "defensive, evasive and hostile" and refused to include the explanation for this hostility; that Ms. Robertson failed to inform Ms. Doe that her advisor's absence was a legitimate reason to request a delay for the interview, Ms. Robertson's blaming Ms. Doe for a potential delay (despite her advisor's medical emergency) and Ms. Robertson's general ineptitude in her dealings with Ms. Doe.

11

74. The investigation report also documented and further spread rumors about Ms. Doe prior sexual history that permeated campus after Ms. Robertson disclosed Ms. Doe initial report to respondent.

### V. No Contact Order Violation

75. Respondent was issued a "*no contact order*" on November 4, 2021, informing him he was not permitted to contact Ms. Doe directly or through a third party, until the grievance process has concluded, and he was informed the order was no longer in effect.

76. In April 2022 Ms. Doe learned respondent had followed her sister, a fellow Roberts's student whose physical appearance is almost identical to Ms. Doe, while her sister was on campus.

77. Upon learning of respondent's action in following Ms. Doe' sister, Ms. Doe was scared for her own physical safety and for the physical safety of her sister.

78. Ms. Doe reported respondent's following her sister to Ms. Robertson and shared her concern for her and her sister's safety.

79. Ms. Doe explained her belief that respondent either followed her sister because he believed her to be Ms. Doe or did so to intimidate Ms. Doe.

80. Ms. Robertson did not inform Ms. Doe of any steps she would take to respond to her report of the violation of the no contact order.

81. When directly questioned, Ms. Robertson could not articulate the consequences respondent may face because of his violation of the no contact order.

82. Upon information and belief Ms. Robertson did not respond to Ms. Doe's report of the no contact order violation in any manner.

12

83.     Ms. Robertson's decision not to pursue the matter was so outrageous and inconsistent with typical safety procedures that a member of Roberts's Campus Safety Office reported to Ms. Doe's parents that he was concerned about Ms. Robertson's lack of follow up.

84.     Ms. Doe suffered severe emotional distress and fear for her safety and that of her sister after learning that no action would be taken in response to respondent's violation of the no contact directive.

### VI. Delay

85.     The policies promise a prompt, thorough and impartial investigation will follow complaints of sex-based harassment.

86.     Administrative Policy #120 promises "When a member of the College community chooses to make a formal report of an incident of sexual misconduct, then the College will [. . .] take prompt and appropriate action to respond."

87.     Roberts Policy 120 continues, "The Grievance Process will be concluded within a reasonably prompt manner, and **no longer than ninety (90) school/calendar/business days** after the filing of the Formal Complaint, provided that the Process may be extended for a good reason, including but not limited to the absence of a party, a party's advisor, or a witness; concurrent law enforcement activity; or the need for language assistance or accommodation of disabilities."

88.     The final investigative report for Ms. Doe complaint was not completed until June 6, 2022, 175 calendar and 119 business days after Ms. Doe's formal report.

89.     Both Ms. Doe and respondent graduated from Roberts on May 14, 2022, prior to the investigation being completed.

90.     The Grievance Process has still not been concluded as of the writing of this complaint, more than 245 calendar and 167 business days after Ms. Doe's formal report.

13

## VII. A Sham Hearing

91.     Roberts Student Handbook, declares: "For the purposes of Student Conduct at Roberts Wesleyan College, a student is defined as any person who is registered for, or enrolled in, a traditional undergraduate program, either full-time or part-time, on the residential campus." See Exhibit 2, Student Handbook page 22.

92.     Upon information and belief, respondent was not charged with violating Roberts's Administrative Policy 120 until after the investigation concluded, on or about June 3, 2022.

93.     At the time respondent was charged with violating Roberts' policies he was neither a student, nor an employee at Roberts.

94.     As respondent was not a student when he was charged with violating student conduct policies, Roberts knew it could not hold respondent accountable for his behaviors in this matter.

95.     Nevertheless, Roberts held a hearing on June 20, 2022.

96.     The hearing was held via Zoom and marred by technical and procedural challenges.

97.     During the hearing respondent clearly acknowledged:

   a)  He, and not Ms. Doe, initiated every aspect of the sexual encounter.

   b)  He believed he had consent for penile vaginal intercourse, in part, because Ms. Doe had given consent to other, different, sexual activities earlier in the encounter.

   c)  He believed he had consent for penile vaginal intercourse, in part, because Ms. Doe should have known when he said, "I'm going to get a condom" it meant he would have penile vaginal sex with her immediately upon his return.

14

d) Ms. Doe facial expression was "flat" when he returned with the condom and immediately before penile vaginal intercourse.

e) Ms. Doe **said nothing** before or during the penile vaginal sex.

98.    No information was shared during the hearing that could have led a reasonable decision maker to conclude that Ms. Doe consented to respondent's penetration of her vagina by his penis, particularly considering Roberts's definition of consent:

> *Affirmative Consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate Consent.*
>
> *[. . .]*
>
> *Consent to any sexual act or prior consensual sexual activity between or with any Party does not necessarily constitute Consent to any other sexual act.*
>
> *[. . .]*
>
> *Consent may be initially given but withdrawn at any time.*

Exhibit 2, Administrative Policy #120, pages 44-5.

99.    After hearing no news regarding the hearing board's decision, on August 2, 2022, Ms. Doe delivered a letter to Roberts demanding it act on her complaint.

100.    On August 12, 2022, Roberts issued its decision, finding Respondent "not responsible" for violating its policies.

101.    Roberts came to this conclusion despite respondent clearly articulating a lack of affirmative consent during the hearing, as more fully described above.

15

102.   Upon information and belief, Roberts found respondent "not responsible" because it understood it could not hold him accountable for his behaviors given its error in charging him with a violation of its policies only after he had already graduated from Roberts.

103.   Upon information and belief, Roberts found respondent "not responsible" because it was concerned respondent would bring a legal challenge against Roberts for attempting to charge him with violating Roberts's policies after his graduation, and he would be successful.

### IX. Hostile Environment to Survivors

104.   Many more women than men are subject to sexual assault in college, as data recently published in the Federal Register confirms:

> One in five college women experience attempted or completed sexual assault in college; some studies state one in four. One in 16 men are sexually assaulted while in college. One poll reported that 20 percent of women, and five percent of men, are sexually assaulted in college.

> 85 FR 30026, 30076 (internal references omitted.)

105.   Roberts's campus climate is hostile to sexual assault survivors.

106.   Upon information and belief, most survivors of sexual assault at Roberts are women.

107.   While the policies encourage reporting of sexual violence, Roberts also, simultaneously, promises to punish students who engage in sex before marriage. *See* Exhibit 2, Student Handbook, page 24.

108.   There is no "amnesty" policy in the Student Handbook assuring students who may be considering reporting sexual assault, they will not be charged with violating the "sexual activity" policy in the Student Handbook.

16

109. Upon information and belief Robert's threat of punishment for engaging "sexual activity" creates a chilling effect on is students' willingness to report incidents of sexual harassment and assault.

110. Even when students such as Ms. Doe do report sexual violence, Roberts refuses to hold accused students responsible for violating its policies.

111. According to data published on the New York State Education Department website[4] in accordance with New York's comprehensive sexual assault prevention legislation, "Enough is Enough", ***Roberts has only found one student responsible for violating its sexual assault policies in all the years reported***.

---

[4] http://www.nysed.gov/information-reporting-services/chapter-76-laws-2015-enough-enough-annual-aggregate-data-report, last accessed August 16, 2022, 2:26PM

17

## FIRST CAUSE OF ACTION

### Deliberate Indifference Sexual Harassment
### in Violation of
### Title IX, 20 U.S.C. § 1681, *et seq.*

112.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

113.    Roberts receives federal financial assistance from the United States government.

114.    Ms. Doe experienced harassment because of her sex that was so severe, pervasive, and objectively offensive that it deprived her of access to the educational opportunities and/or benefits provided by Roberts when it failed to appropriately respond to her report that respondent raped her in his residence hall room, on Roberts' property.

115.    Roberts's grossly inadequate response to Ms. Doe's October 2021 report of sexual harassment was clearly unreasonable in light of the known circumstances and was, therefore, deliberately indifferent.

116.    Roberts's failure to appropriately investigate an allegation of sexual harassment and abuse despite its knowledge that Title IX applied to it, coupled with its failure to ever hold a student responsible for sexual assault according to publicly available data, evidences a systemic failure to adequately prevent or respond to instances of sexual assault/violence and sexual harassment within its educational program and activities.

117.    As a direct and proximate result of Roberts's systemic failures, Ms. Doe was subject to further harassment via the spread of rumors regarding her prior dating and sexual history and an allegation that she became pregnant as more fully described above.

118.    The harassment Ms. Doe experienced occurred in a context that was subject to Roberts's control and where Roberts could have taken remedial action.

119.     Roberts had actual knowledge of the harassment Ms. Doe experienced because Ms. Doe reported respondent's rape to Roberts's TIXC in October 2021, made a Formal Complaint to the TIXC in December 2021 and because the harassment she experienced was noted in the investigation report commission by Roberts.

120.     As a direct and proximate result of Roberts's deliberately indifferent response to its actual notice of sexual harassment, plaintiff suffered economic and non-economic damages including but not limited to a loss of educational opportunities; loss of future income, medical costs, was forced to move off campus, unable to continue her education at Roberts as she had planned and was damaged.

121.     Plaintiff is entitled to economic and non-economic damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

### SECOND CAUSE OF ACTION

**Sexual Harassment
in Violation of
New York Human Rights Law**

122.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

123.     Roberts is an "educational institution" as defined by NYSHRL § 292 (39).

124.     Ms. Doe suffered harassment because of her sex that was so severe, pervasive, and objectively offensive that it deprived her of access to the educational opportunities and/or benefits provided by Roberts, as more fully described above.

125.     Roberts knew about the sexual harassment Ms. Doe experienced and did nothing to prevent or stop it.

19

126. The aforesaid acts by defendants violated Ms. Doe's rights under N.Y. Exec. Law § 296 (4).

127. As a result of Roberts's actions, conduct, and omissions, including but not limited to those described above, Roberts permitted harassment of Ms. Doe because of her sex.

128. The harm Ms. Doe experienced was proximately caused by Roberts's acts and/or omissions.

129. Roberts's acts and/or omissions proximately caused Ms. Doe to suffer economic and non-economic damages including but not limited to a loss of educational opportunities; loss of future income, medical costs, severe emotional distress, psychological injury, and mental anguish; degradation; and embarrassment.

130. Plaintiff is therefore entitled to monetary damages, punitive or exemplary damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

### THIRD CAUSE OF ACTION

#### Breach of Contract

131. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

132. Roberts entered a contract with Ms. Doe to provide educational opportunities and experiences to her in consideration of payment of tuition to Roberts.

133. In the contract Roberts promises to Ms. Doe it will respond to complaints of sexual harassment in a manner consistent with the law and its own policies.

134. Through its policies, Roberts actively encouraged Ms. Doe to report sexual harassment and promised it would investigate her complaint according to its policies.

20

135.    Plaintiff fulfilled her obligations pursuant to her contract with Roberts.

136.    Plaintiff relied upon her contract with Roberts.

137.    Roberts did not fulfill its obligations pursuant to the contract.

138.    Roberts failed to respond to Ms. Doe's report of sexual harassment as required by law and its policies when it's TIXC:

    a.    Failed to provide Ms. Doe requested accommodations.

    b.    Disclosed Ms. Doe's report of sexual assault to respondent prior to Ms. Doe's making a formal report to Roberts and after Ms. Doe requested the TIXC allow her the opportunity to speak with the police prior to taking any action.

    c.    Failed to respond by offering supportive resources or informing Ms. Doe of her options for making a report upon receipt of actual notice of retaliatory sexual harassment Ms. Doe suffered when rumors about her sexual promiscuity began to surface in response to her report.

    d.    Included in its investigation report information regarding Ms. Doe's prior sexual history and allegations of promiscuity despite being prohibited from doing so pursuant to "rape-shield" protections.

    e.    Failed to inform Ms. Doe that her advisor's unavailability was a legitimate reason for a delay in the process and instead suggested Ms. Doe was at fault for "any further delays."

    f.    Failed to respond to Ms. Doe's report of respondent's violation of the "no contact order."

    g.    Failed to complete its investigation and grievance process within the timelines established by the policies.

21

     h.   Failed to complete its investigation and grievance process prior to respondent's graduation from Roberts.

139.    Roberts failed to conduct a prompt, thorough and impartial investigation into Ms. Doe's allegations of sexual harassment.

140.    Roberts's breech was egregious.

141.    Roberts's actions, conduct, and omissions proximately caused Ms. Doe to suffer damages including but not limited to loss of tuition paid; loss of future earnings; and consequential damages; together with punitive or exemplary damages, in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

### FOURTH CAUSE OF ACTION

#### Breach of Covenant of
#### Good Faith and Fair Dealing

142.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

143.    The covenant of good faith and fair dealing is implied in every contract.

144.    In determining if there was a breach of the implied covenant of good faith and fair dealing, the essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain.

145.    Based on the foregoing facts, Roberts breached and violated the duty of good faith and fair dealing implied in its contracts with Ms. Doe for all the reasons set forth in the Third Cause, including by, inter alia, failing to provide Ms. Doe with a full and fair investigatory and adjudicatory process.

22

146. As a direct, proximate, and foreseeable consequence of these breaches, Ms. Doe's academic and career prospects, earning potential and reputation have been severely harmed. She has sustained significant damages.

147. As a result of the foregoing, Ms. Doe is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorney fees and costs.

### FIFTH CAUSE OF ACTION

### Negligent Hiring and Supervision

148. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

149. Roberts has a duty to employ qualified and competent staff who can provide proper supervisory care to its students.

150. The reasonable standard of proper supervisory care for a title ix coordinator to its student, includes responding to notice of sexual harassment in a manner not deliberately indifferent, providing supportive measures, and adequately explaining options for making a formal complaint and the process through which the complaint will be investigated. Proper supervisory care also includes promptly and thoroughly investigating complaints in a manner consistent with the law and the institution's policies.

151. Ms. Doe reported sexual harassment to Roberts's TIXC as more fully detailed above when she reported respondent's rape and again when she reported respondent's violation of the no contact order.

152. Roberts's TIXC had actual notice of additional sexual harassment Ms. Doe suffered in retaliation for her report of sex-based harassment when witnesses in the investigation reported the harassment to investigators, as more fully detailed above.

23

153.    Roberts's TIXC did not respond to Ms. Doe's reports of harassment, nor its actual notice of sexual harassment with proper supervisory care, as more fully detailed above.

154.    Public data demonstrates during all years reported, Roberts's process for responding to allegations of sex-based harassment, a process controlled by its TIXC, has never resulted in a student being found responsible for violating its policies.

155.    Roberts's knew or should have known that its TIXC did not respond to Ms. Doe case with the proper level of supervisory care.

156.    Roberts's actions, conduct, and omissions proximately caused Ms. Doe to suffer economic and non-economic damages including but not limited to a loss of educational opportunities; severe emotional distress, psychological injury, and mental anguish; degradation; and embarrassment.

157.    Plaintiff is therefore entitled to economic and non-economic damages, or exemplary damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## SIXTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

158.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

159.    Defendant Roberts's conduct in failing to appropriately respond to Ms. Doe's reports of harassment constitutes extreme and outrageous conduct.  Specifically,

a)    Ms. Robertson's suggestion that Ms. Doe come to a "beautiful reconciliation" with her rapist less than a day after her rape when Ms. Doe reported the assault.

24

b) Ms. Robertson's disclosure of Ms. Doe report of sexual assault to respondent prior to Ms. Doe's making a formal report to Roberts and after Ms. Doe requested that Ms. Robertson allow her the opportunity to speak with the police prior Ms. Robertson taking any action.

c) Roberts's failure to respond by offering supportive resources or informing Ms. Doe of her options for making a report when it received actual notice of retaliatory sexual harassment Ms. Doe suffered when rumors about her sexual promiscuity began to surface after her report.

d) Ms. Robertson's suggestion that Ms. Doe was at faults for "any further delays" in the investigation process when Ms. Doe's advisor was unavailable due to a medical emergency.

e) Roberts's failure to appropriately respond Ms. Doe reported respondent violated the "no contact order" by following Ms. Doe' sister on campus.

f) Roberts's failure to complete its investigation prior to Ms. Doe and the respondent graduating from Roberts.

g) Roberts's failure to hold a hearing to adjudicate Ms. Doe's complaint prior to her graduation from Roberts.

160.    When Ms. Robertson, a Roberts's employee, engaged in the actions described above, Roberts disregarded a substantial probability of those actions causing Ms. Doe severe emotional distress.

161.    Roberts's actions did cause Ms. Doe to suffer severe emotional distress.

162.    Roberts's actions, conduct, and omissions proximately caused Ms. Doe to suffer economic and non-economic damages including but not limited to a loss of educational

25

opportunities; severe emotional distress, psychological injury, and mental anguish; degradation; and embarrassment.

163.    As a result of the foregoing, Ms. Doe is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION

### Estoppel and Reliance

164.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

165.    Roberts's policies and procedures constitute representations and promises that Roberts expected or should have reasonably expected would induce action or forbearance by Ms. Doe.

166.    Roberts expected or should have expected Ms. Doe to accept Roberts's offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises, including that Roberts would provide Ms. Doe with a fundamentally fair investigation and hearing should she raise complaints of sex-based harassment.

167.    Ms. Doe relied to her detriment on Roberts's express and implied promises and representations.

168.    As a direct, proximate, and foreseeable consequence of the above-referenced conduct, Ms. Doe academic and career prospects, earning potential, and reputation have been severely harmed.  She has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, past and future economic losses,

26

loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

169. As a result of the foregoing, Ms. Doe is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment:

(a) in the form of compensatory, punitive, or exemplary damages in an amount to be proven at trial,

(b) that includes such other, further, or different relief as the Court may deem just and proper, together with attorneys' fees, costs, and disbursements of the action.

Dated: August 22, 2022
    Rochester, New York

                      Attorney for Plaintiff

By: _____
             J. Morgan Levy, Esq.
             4 Little Spring Run
             Fairport, New York 14450
             T: (585) 678-1160
             E: morgan@jmorganlevyfirm.com

27

VERIFICATION

I, ███████████, being duly sworn, deposes and says:

1.     I am a Plaintiff in the within action.

2.     I have reviewed the contents of this complaint and verify that the statements contained herein are true to the best of my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true.

3.     I am aware that if any of the statements contained in the complaint are willfully false, I am subject to punishment.

Sworn to before me this

22 of August. 2022

Notary Public

JENNIFER M. LEVY
Notary Public, State of New York
Reg. No. 02LE6415051
Qualified in Monroe County
Commission Expires 04/05/2025

28

# EXHIBIT 1

Roberts Wesleyan College                                Administrative Policy # 108
Policy and Procedure

SUBJECT:        Sexual Misconduct and Title IX Compliance Policy

Applies to:     All Employees and Students          Effective: October 30, 2015
                                                     Reviewed & updated: December 2017
                                                     Edited: July 2018

I.      **Policy**: The College is committed to creating and maintaining an academic and work
environment that respects each person and nurtures the trust of its mission. The College has general
expectations of students and employees and expects all to behave in a manner that supports the
College's Mission and Ethos, including respecting and protecting the personal rights of others.

The College seeks to create and maintain an environment free from intimidation or injury generated
by sexual harassment, including sexual violence. The College will act to eliminate such practices from
our community and to remedy their effects. All members of the College community are entitled to a
professional working and learning environment and are accountable and responsible for maintaining
a respectful and trusting environment.

This Policy prohibits all forms of sexual misconduct in any program or activity offered or sponsored
by the College.  Sexual misconduct is varying extremes of discrimination and wrongdoing based on
one's gender, sexuality, sexual orientation, and/or gender identity or expression.  Sexual misconduct
includes sexual harassment, non-consensual sexual contact, non-consensual sexual intercourse, dating
violence, domestic violence, stalking, sexual exploitation, and indecent exposure as defined further in
Section III below.  Such behavior destroys the trust and respect at the core of our academic mission.
Such actions are condemned by the College and in many instances may be violations of NYS and
federal laws.  Members of the RWC community who are determined to have committed these acts
will be subject to sanctions from the College and/or may be subject to sanctions as the result of a
criminal process.  Repeat violations will result in more stringent sanctions; however, as more fully
described below, permanent separation of a student or termination of employment or volunteer
status may result after a first offense.

Any individual who has experienced sexual misconduct, including sexual harassment, sexual
violence, domestic violence, dating violence, stalking, or any other type of sexual misconduct
defined in this Policy has the option to make a report to law enforcement, to initiate the College's
internal complaint process described in this Policy, to do both or to do neither.  This Policy also
describes support resources and accommodations available to members of the College community
who experience sexual harassment, including sexual violence, whether or not that individual decides
to pursue a formal report on campus.

When a member of the College community chooses to make a formal report of an incident of sexual
misconduct or related retaliatory behavior, then the College will use the procedures outlined below
to take prompt and appropriate action to respond.

II.     **Title IX, Title IX Coordinator and Title IX Officer:**  Title IX of the Education Amendments
Act of 1972 prohibits discrimination on the basis of sex in education programs or activities by
recipients of federal financial assistance. All sexual misconduct complaints and grievances made

1

under Title IX, including allegations of sexual violence, will be handled under this Policy.
The College's Title IX Coordinator is the Risk Manager. She can be reached by calling 585.594.6222 or by emailing robertson_monika@roberts.edu.  The Title IX Coordinator is:

- responsible for intake of Title IX complaints or allegations;
- oversight of the investigation and resolution of all reports of sexual harassment, including sexual assault;
- knowledgeable and trained in relevant state and federal laws and the College's policies and procedures;
- available to advise any individual, including a Reporting Individual, a Respondent, or a third party, about the courses of action available at the College, both informally and formally, and the courses of action available externally, including reports to law enforcement;
- available to provide assistance to any College community member regarding how to respond appropriately to reports of sexual assault and harassment;
- responsible for communicating complaints and outcomes with the Title IX Officer.

The College's Title IX Officer is the Vice President for Student and Organizational Development.  She can be reached by calling 585-594-6350 or by emailing loganr@roberts.edu.  The Title IX Officer is:

- responsible for monitoring full compliance with Title IX requirements and timelines specified in the complaint procedures; and
- ensuring required reports are compiled.

**III.    Definitions:**   In administration of this Policy, the College adheres to the following definitions:

Reporting Individual – the person who initiates the complaint. The College may act as the Reporting Individual in circumstances where the impacted individual does not wish to participate in the process.

Respondent – the person alleged to have violated this policy.

Jurisdiction - The jurisdiction of the College generally includes conduct that occurs:

- on College property,
- off College property at College-sponsored events
- off College property but involving two or more students of the College, and
- off-campus conduct that is likely to have a substantial adverse effect on, or poses a threat of danger to, any member of the College community or the College, including
  - activities that take place at events hosted by organizations recognized by the College
  - study abroad and internship programs
  - conduct that has continuing effects on campus or in an off-campus education program or activity.

This includes conduct which occurs by way of electronic means as well as in person.

2

Sexual Harassment

Any unwelcome sexual advance, request for sexual favors or other unwelcome verbal or physical conduct of a sexual nature when:

- submission to or rejection of such conduct is made, either explicitly or implicitly, a term or condition of an individual's employment, evaluation of academic work or participation in any aspect of a College's program or activity; *or*
- submission to or rejection of such conduct by an individual is used as the basis for decisions affecting the individual; *or*
- such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance, *i.e.*, it is sufficiently serious, pervasive or persistent as to create an intimidating, hostile, humiliating, demeaning or sexually offensive working, academic, residential or social environment under both a subjective and objective standard.

The first two types of conduct described above constitute quid pro quo, or "this for that", harassment (for example: "I'll give you this if you give me that" or "Because you won't do this, I am denying you that"), and the third constitutes harassment that creates a hostile environment.  A single isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe.  The more severe the conduct, the less need there is to show a repetitive series of incidents to create a hostile environment, particularly if the harassment is physical.

Sexual harassment also includes gender-based harassment, which may include acts of verbal, nonverbal or physical aggression, intimidation or hostility based on sex or sex stereotyping, even if those acts do not involve conduct of a sexual nature.  Sexual harassment:

- May be blatant and intentional and involve an overt action, a threat or reprisal, or may be subtle and indirect, with a coercive aspect that is unstated.
- Does *not* have to include intent to harm, be directed at a specific target or involve repeated incidents.
- May be committed by anyone, regardless of gender, age, position or authority.  While there is often a power differential between two persons, perhaps due to differences in age, social, educational or employment relationships, harassment can occur in any context.
- May be committed by a stranger, an acquaintance or someone with whom the Reporting Party has an intimate or sexual relationship.
- May be committed by or against an individual or may be a result of the actions of an organization or group.
- May occur by or against an individual of any sex, gender identity, gender expression or sexual orientation.
- May occur in the classroom, in the workplace, in residential settings or in any other setting.
- May be a one-time event or can be part of a pattern of behavior.
- May be committed in the presence of others or when the parties are alone.
- May affect the Reporting Party and/or third parties who witness or observe harassment and are affected by it.

Examples of conduct that may constitute sexual harassment as defined above may include a severe, persistent or pervasive pattern of unwelcome conduct that includes one or more of the following:

3

- Physical conduct:
  - unwelcome touching, sexual/physical assault, impeding, restraining or blocking movements
  - unwanted sexual advances within the employment context
- Verbal conduct:
  - making or using derogatory comments, epithets, slurs or humor
  - verbal abuse of a sexual nature, graphic verbal commentaries about an individual's body, sexually degrading words used to describe an individual, suggestive or obscene letters, notes or invitations
  - objectively offensive comments of a sexual nature, including persistent or pervasive sexually explicit statements, questions, jokes, or anecdotes
- Visual conduct:
  - leering, making sexual gestures, displaying of suggestive objects or pictures, cartoon or posters in a public space or forum
  - severe, persistent or pervasive visual displays of suggestive, erotic or degrading sexually oriented images that are not pedagogically appropriate
- Written conduct:
  - letters, notes or electronic communications containing comments, words or images described above
- Quid pro quo ("this for that") conduct:
  - direct propositions of a sexual nature between those for whom a power imbalance or supervisory or other authority relationship exists
  - offering employment benefits in exchange for sexual favors
  - making submission to sexual advances an actual or implied condition of employment, work status, promotion, grades or letters of recommendation, including subtle pressure for sexual activity, an element of which may be repeated requests for private meetings with no academic or work purpose
  - making or threatening reprisals after a negative response to sexual advances

<u>Non-Consensual Sexual Contact or Non-Consensual Sexual Intercourse -</u> Non-consensual sexual contact and non-consensual sexual intercourse are serious violations and are prohibited. In some instances, these forms of sexual misconduct involve violence or threats. Allegations involving violence or threats are taken very seriously and the College applies the severest sanctions for these violations. In addition, conduct involving violence or threats may be felony offenses.

a) Non-Consensual Sexual Contact is any intentional sexual touching ("sexual touching" includes but is not limited to touching breasts, genitals, and buttocks, including disrobing or exposure), however slight, with any object, by a man or woman upon a man or woman, either directly or through the clothing, without effective consent, by force or threat of force (this includes the use of coercion, threat of retaliation, or rendering someone incapable of consent) or when that individual is incapacitated.

b) Non-Consensual Sexual Intercourse is any sexual penetration (anal, oral or vaginal), however slight, with any body part (e.g., penis, tongue, finger) or object, or oral penetration involving mouth to genital contact or with an object used in a sexual manner, by a man or woman upon a man or woman without effective consent, by force or threat of force (including the use of coercion, threat of retaliation, or rendering someone incapable of consent) or when that individual is incapacitated.

4

<u>Dating violence</u> - violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the person against whom the violent act is/acts are committed.  The existence of such a relationship shall be determined based on the reporting party's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.  Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating violence does not include acts covered under the definition of domestic violence.  Under the Clery Act and the Campus SaVE Act, the College will record and report all relevant incidents of dating violence.

<u>Domestic violence</u> - a felony or misdemeanor crime of violence committed by:

- a current or former spouse or intimate partner of the person against whom the violence is committed;
- a person with whom the person against whom the violence is committed shares a child in common;
- a person who is cohabiting with, or has cohabited with, the person against whom the violence is committed as a spouse or intimate partner;
- a person similarly situated to a spouse of the person against whom the violence is committed under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred; or
- any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred.

This definition does not apply to roommates who have not expressed interest in entering into, or who have not entered into, a dating or sexual relationship. Under the Clery Act and the Campus SaVE Act, the College will record and report all relevant incidents of domestic violence.

<u>Stalking</u> - a course of conduct directed at a specific person that would cause a reasonable person to fear for his or her safety or the safety of others or suffer substantial emotional distress.

- Course of conduct means two or more acts, including but not limited to, acts in which the stalker directly, indirectly or through third parties, by any method, device or means, follows, monitors, observes, surveils, threatens or communicates to or about a person, or interferes with a person's property.
- Reasonable person means a reasonable person under similar circumstances and with similar identities to the victim.
- Substantial emotional distress means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

Stalking includes the concept of cyber-stalking, a form of stalking in which electronic media such as the Internet, social networks, blogs, cell phones, texts or other similar devices or forms of contact are used to pursue, harass or to make unwelcome contact with another person in an unsolicited fashion. Under the Clery Act and the Campus SaVE Act, the College will record and report all relevant incidents of stalking.

<u>Sexual Exploitation</u> - occurs when a person takes non-consensual or abusive sexual advantage of another to benefit anyone other than the one being exploited, and that behavior does not otherwise

5

constitute another form of sexual misconduct. Examples of sexual exploitation include, but are not limited to, prostitution, non-consensual video or audio-recording of sexual or other private activity, exceeding the boundaries of consent (*e.g.*, video recording a person using a bathroom, posting on the Internet a sexually explicit photo), engaging in voyeurism, or engaging in consensual sexual activity with another person while knowingly infected with human immunodeficiency virus (HIV) or other sexually-transmitted disease (STD) without informing the other person of such infection.

Indecent Exposure - A person commits indecent exposure if that individual exposes the individual's genitals in a public place or in any place where there are present other persons under circumstances in which one knows or should know that this conduct is likely to offend, affront or alarm.

Affirmative Consent - A knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity or gender expression. The following are guidelines for evaluating the effectiveness of consent:

- Consent to any sexual act or prior consensual sexual activity between or with any party does not necessarily constitute consent to any other sexual act.

- Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

- Consent may be initially given but withdrawn at any time. Individuals choosing to engage in sexual activity must evaluate consent in an ongoing manner and communicate clearly throughout all stages of sexual activity.

- Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs or other intoxicants may be incapacitated and therefore unable to consent.

- Consent cannot be given when it is the result of any coercion, intimidation, pressuring, force or threat of harm, or by taking advantage of the incapacitation of another individual.

- When consent is withdrawn or can no longer be given, sexual activity must stop.

- New York state law establishes that an individual less than 17 years old is incapable of consent.

Incapacity –Incapacitation occurs when an individual lacks the ability to fully, knowingly choose to participate in sexual activity because the individual lacks conscious knowledge of the nature of the act (e.g., to understand the who, what, when, where, why or how of the sexual interaction) and/or is physically helpless.  Incapacitation includes impairment due to drugs or alcohol (whether such use is voluntary or involuntary), the lack of consciousness or being asleep, being involuntarily restrained, if

any of the parties are under the age of 17, or if an individual otherwise cannot consent.

Consumption of alcohol or other drugs alone is insufficient to establish incapacitation. The impact of alcohol and drugs varies from person to person, and evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs impact an individual's:

- decision-making ability;
- awareness of consequences;
- ability to make informed judgments; and
- capacity to appreciate the nature and the quality of the act.

Evaluating incapacitation also requires an assessment of whether a Respondent knew or should have known that the Reporting Individual was incapacitated. Individuals engaging in sexual activity should continually evaluate incapacitation throughout the encounter.

There is no single standard or level of alcohol or drug consumption that leads to incapacitation. This level varies for different people, and may depend in part on their age, gender, height, weight, metabolism and whether and how much they have recently eaten. This provision does not mean that individuals cannot affirmatively consent to sexual activity or contact when they have been drinking or using drugs. Such individuals may still affirmatively consent through words or actions that clearly indicate interest in engaging in the activity.

The initiator of sexual contact will be in violation of this policy if it is determined that he or she knew or should have known that the other person's judgment was substantially impaired at the time consent was obtained or sexual contact was initiated.  Possession, use and/or distribution of any of the so-called "date rape" drugs (including Rohypnol, Ketomine, GHB, Burundanga and others) is prohibited, and administering any of these drugs to another is a violation of this Policy.

Force - the use or threat of physical violence or intimidation to overcome an individual's freedom to choose whether or not to participate in sexual activity. Demonstration of use of force <u>does not require</u> that a Reporting Individual resists the sexual advance or request. However, resistance by the Reporting Individual will be viewed as a clear demonstration of non-consent.

Coercion - the improper use of pressure to compel another individual to initiate or continue sexual activity against that individual's will. Coercion can include a wide range of behaviors, including intimidation, manipulation, threats, and blackmail. A person's words or conduct are sufficient to constitute coercion if they wrongfully impair another individual's freedom and ability to choose whether or not to engage in sexual activity. Examples of coercion include threatening to "out" someone based on sexual orientation, gender identity or gender expression, and threatening to harm oneself if the other party does not engage in the sexual activity.

Retaliation - acts or attempts to retaliate or seek retribution against a person who has made a report of alleged sexual misconduct, whether or not he or she pursues any formal recourse related to such report or the Reporting Individual, Respondent or any individual or group of individuals involved in the complaint, investigation, and/or resolution of an allegation of sexual misconduct.  Retaliation can be committed by any individual or group of individuals, not just a Respondent or Reporting Individual. Retaliation can take many forms, including threats, intimidation, pressuring, continued abuse, violence or other forms of harm to others.

7

Bystander Intervention - A safe and positive course of action that may be carried out by an individual to prevent harm or intervene where there is a risk or an act of violence. Bystander intervention includes recognizing situations of potential harm, understanding institutional structures and cultural conditions that facilitate violence, overcoming barriers to intervening, identifying safe and effective intervention options, and taking action to intervene.

## IV. What to do if you are a Victim of Sexual Misconduct

A person who experiences sexual violence will have a number of options for recourse against the accused individual: to make a report on campus, to make a report to law enforcement, to do both or to do neither.  First and foremost, the College wants you to get the immediate help you need by following these procedures immediately:

- Go to a safe place. Call a friend, a campus advocate, a family member or someone else you trust and ask her or him to be with you.
- Go immediately to see medical personnel either at the Student Health Center or a local hospital Emergency Department. An individual considering campus and/or law enforcement options against a Respondent should visit a Sexual Assault Forensic Examiner (SAFE) Nurse (also referred to as a Sexual Assault Nurse Examiner) within 96 hours of the incident. Detailed contact information for such health care providers is listed below.
- Although it may be difficult following a sexual assault, individuals who are considering or may consider legal action should take certain initial steps in order to preserve the option to pursue any type of criminal charges or campus disciplinary process:
  o Do not shower, bathe, douche, or brush teeth, and save all clothing worn at the time of the assault.
  o Place each item of clothing in a separate paper bag. Do not use plastic bags.
  o Do not disturb anything in the area where the assault occurred.
- Write down as much as you can remember about the circumstances of the assault, including a description of the assailant.
- Talk confidentially with a counselor who is trained to assist victims with the emotional and physical impacts of an assault and/or sexual harassment. See contact information for confidential on- and off-campus resources listed below.
- The College encourages victims to contact appropriate authorities as soon as that individual is prepared to make a report of the incident, including contacting:
  o Monika Robertson, the Title IX Coordinator, at 585.594.6222 or emailing robertson_monika@roberts.edu;
  o Campus Safety by calling 585.594.7777; or on-campus extension 7777
  o Local law enforcement by dialing 911;
  o New York State Police's 24/7 hotline staffed by specially-trained responders at 1.844.845.7269

## V. Victim Resources and Confidentiality versus Privacy

A.      VICTIM RESOURCES

The College's first priority when alleged sexual misconduct occurs is to provide safety and solace for victims, which may include medical treatment, counseling, academic accommodations, and interim

8

measures.  All victims of sexual misconduct have the right to determine whether or not they wish to formally file a report with the College or law enforcement.  The College strongly encourages individuals who are considering whether to make a formal report to seek out one of the confidential resources on or off campus in order to have a safe and confidential venue to discuss options. This document is aimed at helping you understand how confidentiality applies to different resources that may be available to you.

In general, the Wellness Center Counselors, Chaplain, and Student Health Services Staff are confidential reporters who are not required to report incidents of sexual misconduct. Their responsibility is to provide victim assistance. **All other campus faculty and staff are considered responsible employees who are required to report sexual harassment and misconduct, including sexual violence, of which they become aware to the Title IX Coordinator, and can assist students in reporting incidents of sexual misconduct.**

Privileged and Confidential Resources
===

**On campus**, these confidential resources will not report alleged violations of this Policy to College officials or law enforcement without your permission, except for as dictated by law, such as when an individual is a threat to him or herself or others and the mandatory reporting of child abuse. At the College, this includes:

- The Counseling Center, located in the upper level of the Voller Athletic Center (across from the mailroom). You can reach the Counseling Center by calling 585.594.6882 (or Campus Safety at x. 7777 or 585.594.7777).  Counselors can provide confidential support for you, including informing you of common emotional reactions and discussing coping methods that may assist you immediately following the assault and later. Talking about your concerns with a counselor in a safe and supportive environment may help you sort through your feelings and decide what to do. You do not need to disclose your name if you call the Counseling Center for information. Counselors will not reveal your identity to anyone without your permission.  When classes are in session, the Counseling Center is open Monday through Friday from 9:00 a.m. to 5:00 p.m. During the semester there is a counselor on-call for after-hours emergencies.  You can access the counselor on-call through your resident director or Campus Safety.  The Counseling Center is closed over breaks and during the summer.  Visit the website for more information: http://www.roberts.edu/student-experience/counseling-center.aspx

- The Campus Pastor can serve as a confidential resource.  You can contact the Pastor by visiting the office, located in the upper level of the Voller Athletic Center or calling 585-594-6530.

- The Student Health Center, located in Suite 231 of upper Voller Athletic Center. You can also reach the Health Center by calling 585.594.6360. Health Center staff can assist you with initial assessment after an incident of sexual violence.  In Fall and Spring semesters, Physician Assistants are in the Health Center from 8:00 – 11:30 a.m. on Monday, Wednesday, and Friday and from 1:30 -5:00 p.m. on Tuesday and Thursday.  During the Summer, students may still call the Health Center Monday through Wednesday from 8:00 a.m. to 1:00 p.m. for referrals to other health care providers and resources. Visit the website at https://www.roberts.edu/student-experience/health-center.aspx

**Off-campus** options to <u>confidentially</u> disclose sexual violence include:

- <u>Counselors and Advocates -</u> Members of the College community may contact any of the following local resources for confidential support:

  - Restore Sexual Assault Service's 24 hour/day, confidential rape crisis hotline:
    - 585.546.2777 (Monroe County)
    - 800.527.1757 (Genesee, Livingston, Orleans & Wyoming Counties)
  - Willow Domestic Violence Center's 24 hour/day confidential hotline (585.232.7353) for victims of domestic violence. Willow offers a shelter, counseling, support groups, children's services, court advocacy, Latina services, dating violence education, and transition programs. All services are free.
  - Safe Journey (585.425.1580), which serves women and children in transition from domestic violence who need individual or group counseling, advocacy or community ιeferrals as they heal from abuse.
  - The Victim Resource Center of the Finger Lakes, Inc., a private, non-profit domestic, sexual, stalking, dating violence and child abuse services agency that provides a 24 hour a day/7 day a week bilingual (Spanish/English) toll-free hotline at 866.343.8808 or 800.456.1172.

- <u>Medical Care -</u> Individuals who have experienced sexual violence should visit the Student Health Center, a local Emergency Department or the local medical provider of their choice for confidential emergency care, whether or not they have any intention of pursuing an on-campus complaint or complaint with law enforcement.  (Visits to a hospital, urgent care center, or other medical provider are subject to a fee after insurance coverage.) An individual considering campus and/or law enforcement options against a Respondent (accused individual) should visit a Sexual Assault Forensic Examiner (SAFE) Nurse (also referred to as a Sexual Assault Nurse Examiner).  SAFE Nurses provide free medical care for victims of sexual assault, and are specially trained in conducting sexual assault exams and collecting and preserving forensic evidence of the assault for possible prosecution of the assailant.  Obtaining medical care or a sexual assault examination in no way binds anyone to pursue a complaint process.  Options for seeking medical care include:

  - proceed directly to the Emergency Department at Strong Memorial Hospital (601 Elmwood Avenue in Rochester / 585.275.4551), which has a Sexual Assault Forensic Examination (SAFE) Center; *or*
  - proceed directly to the Emergency Department at Highland Hospital (1000 South Avenue in Rochester / 585.341.0725) to access a SAFE Nurse; *or*
  - call 585.922.4000 to access a SAFE Nurse at Rochester General Hospital (1425 Portland Avenue in Rochester); *or*
  - call Restore Sexual Assault Service's 24 hour/day, confidential rape crisis hotline at 585.546.2777 (Monroe County) or 800.527.1757 (Genesee, Livingston, Orleans & Wyoming Counties) for assistance locating a SAFE Nurse at other area hospitals and/or to request an escort to the hospital; *or*
  - call Campus Safety at 585.594.7777 or dial 7777 from a campus phone for assistance; *or*
  - call 911 for an ambulance.

A medical exam conducted by a SAFE Nurse (commonly referred to as a "rape kit") has two goals: (1) to diagnose and treat the full extent of any injury or physical effect and (2) to properly collect and preserve evidence. The exam may include testing and prophylactic treatment for HIV/AIDS, sexually transmitted infections ("STIs"); a vaginal examination; examining for injuries; and drawing blood. There is a limited window of time (typically 72 to 96 hours) following an incident of sexual assault to preserve physical and other forms of evidence.  Gathering such evidence does <u>not</u> commit an individual to pursue legal action against the assailant, but is important for preserving that option.

- o  If you suspect that you may have been given a rape drug, inform the hospital or clinic where you receive medical care and/or ask to provide a urine sample. Rape drugs, such as Rohypnol and GHB, are more likely to be detected in urine than in blood.

Hospitals are not required to report non-identifying information to the College or anyone else. However, hospitals providing care to individuals reporting sexual assault are required to:

- o  collect and maintain the chain of custody of sexual assault evidence for not less than 30 days *unless* the patient signs a statement directing the hospital not to collect it;
- o  advise the individual seeking medical treatment related to sexual assault of the availability of local rape crisis services or victim assistance organizations to accompany the individual through the sexual offense exam;
- o  contact a local rape crisis or victim assistance organization to establish the coordination of non-medical services to individuals reporting sexual assault who request such coordination and services; and
- o  provide emergency contraception upon the patient's request.

Even if an individual who has experienced sexual violence does not have injuries requiring emergency attention, the College encourages that individual to seek medical care as soon as possible.

Most health care providers will encourage an individual seeking medical treatment related to a sexual assault to authorize collection of evidence.  (Note: If the individual has not seen medical personnel at the time a report is received by the College, the individual will be immediately advised to do so. The College will provide transportation, if needed.)Be aware that medical office and insurance billing practices may reveal information to the insurance policyholder, including medication and/or examinations paid for or administered. The NYS Office of Victim Services may be able to assist in compensating victims/survivors for health care and counseling services, including emergency compensation.  More information may be found at: http://www.ovs.ny.gov/files/ovs_rights_of_cv_booklet.pdf, or by calling 1- 800-247-8035. Options are explained here: http://www.ovs.ny.gov/helpforcrimevictims.html.

Please note that even individuals who can typically maintain confidentiality are subject to exceptions under the law, including when an individual is a threat to him or herself or others and the mandatory reporting of child abuse.

The College will provide assistance to students and employees about existing counseling, health, mental health, victim advocacy, legal assistance, visa and immigration assistance, student financial aid, and other services available for victims in the community.

B.    CONFIDENTIALITY VERSUS PRIVACY

Even College offices and employees who cannot guarantee <u>confidentiality</u> will maintain your <u>privacy</u> to the greatest extent possible.  The information you provide to a non-confidential resource will be relayed only as necessary to investigate and/or seek a resolution and to notify the Title IX Coordinator or designee, who is responsible under the law for tracking patterns and identifying systemic issues. The College will limit the disclosure as much as possible, even if the Title IX Coordinator determines that the request for confidentiality cannot be honored (as discussed further below).

VI.    Reporting Individual's Bill of Rights

All Roberts Wesleyan College students or employees who report conduct allegedly in violation of the College's Sexual Misconduct and Title IX Compliance Policy or invoke the processes described in this Policy have the right to:

- make a report to local law enforcement and/or state police;
- have disclosure of domestic violence, dating violence, stalking, and sexual assault treated seriously;
- make a decision about whether or not to disclose a crime or violation and participate in the judicial or conduct process and/or criminal justice process free from pressure by the institution;
- participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard;
- be treated with dignity and to receive from the institution courteous, fair, and respectful health care and counseling services, where available;
- be free from any suggestion that the Reporting Individual is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations;
- describe the incident to as few institution representatives as practicable and not be required to unnecessarily repeat a description of the incident;
- be protected from retaliation by the College, any student, the accused and/or the Responding Party, and/or their friends, family, and acquaintances within the jurisdiction of the College;
- access to at least one level of appeal of a determination;
- be accompanied by an advisor of choice who may assist and advise a Reporting Individual, accused or Responding Party throughout the judicial or conduct process including during all meetings and hearings related to such process; and
- exercise civil rights and practice of religion without interference by the investigative, criminal justice or judicial or conduct process of the institution.

VII.    Reporting Sexual Misconduct

**Reporting Timeframe**

Any individual may file a complaint of sexual misconduct at any time.  Early reporting is encouraged to preserve information and advise victims of rights, options, and resources available to them pursuant to this policy and federal and state laws.

**How to Report**

Any member of the College community or any visitor or guest who feels he or she has been subjected to conduct in violation of this policy or who feels he or she has been accused of a violation of this policy should report the incident promptly to any of the following designated members of the community with whom he or she feels comfortable.  A Reporting Individual can enlist the help of any other member of faculty or staff whom he or she trusts when making a report.  Except in limited circumstances, the victim has the right to decide whether to make a report on campus, to law enforcement, to do both or to do neither.

- <u>Title IX Coordinator</u> - Individuals are strongly encouraged to report any sexual misconduct to Monika Robertson, the College's Title IX Coordinator, who can provide assistance in addressing the incident through consultation and investigation. One can reach Monika by calling 585.594.6222, emailing robertson_monika@roberts.edu or contacting a faculty or staff member for assistance.  This option remains available when the accused is an employee.

- <u>Campus Safety</u> - Roberts Wesleyan Campus Safety officers understand the College's policy and resources available to help and guide victims reporting sexual misconduct. Campus Safety officers can be reached 24 hours a day by calling 585.594.7777 (or ext. 7777 from a campus phone).

- <u>Reporting to Law Enforcement</u> - Call 911 or the New York State Police's 24/7 hotline at 1.844.845.7269. Law enforcement officers are specially trained in investigating sexual offenses and supporting victims with reporting a sexual offense.  Law enforcement officers have the authority to commence a criminal investigation, which may lead to prosecution for a crime. Campus Safety maintains a close relationship with local law enforcement agencies and can assist in making contact if requested.

- <u>Monroe County Sheriff's Office Victims Assistance</u> - The Monroe County Sheriff's Office employs experienced and professional victim counselors, all of whom have in-depth knowledge of the Criminal Justice System and the challenges of coping with trauma.  These counselors can provide initial crisis and assessment to determine the appropriate steps for long-term assistance.  The Victim's Assistance Counselor is located at the Monroe County Sheriff's Office C-Zone substation located at 2330 South Union Street, Spencerport, or by calling 585.753.4455.  Campus Safety can assist you with making contact.

- The following agencies also provide assistance to individuals who pursue criminal complaints:

    o Willow Domestic Violence Center: 585.232.5200 (http://www.willowcenterny.org/) – services are free
    o Monroe County District Attorney Victim/Witness Assistance Bureau: 585.753.4573

> > (http://www.monroecounty.gov/da-assistance.php) – services are free
> > o  Society for the Protection and Care of Children - Family Violence Program: 585.325.6101 (http://www.spcc-roch.org/) – services are free
> > o  The Legal Aid Society of Rochester, NY, Inc.: 585.232.4090 (http://www.lasroc.org/) – available for those who qualify based on income and county of residence
>
> To learn more about these programs, visit the website for the New York State Office of Victim Services (http://www.ovs.ny.gov/), which funds local victim assistance programs, and/or the New York State Police website (http://troopers.ny.gov/).

These same reporting options are available for bystanders.  The College strongly encourages bystanders to step up on behalf of another person's well-being when it is safe to do so.

## Public Awareness/Advocacy Events

If you disclose an incident of sexual misconduct, including domestic violence, dating violence, sexual assault or stalking, through a public awareness event such as "Take Back the Night," candlelight vigils, protests, or other public event, the College is not obligated to begin an investigation. However, the College may use the information you provide to inform the need for additional education and prevention efforts on campus and in College programs, and may provide you information about available support services and accommodations.

## Anonymous Disclosure

New York State Hotline for Sexual Assault and Domestic Violence: 1.800.942.6906

## Requesting Confidentiality — How the College Will Weigh the Request and Respond

If the Title IX Coordinator receives a report of an act covered by this Policy, but the individual impacted requests confidentiality or otherwise asks that an investigation not be pursued, the Title IX Coordinator will make every effort to balance this request with the College's commitment and obligation to provide a safe and non-discriminatory environment for all members of the community. Honoring such a request may limit the College's ability to conduct a thorough investigation and take appropriate disciplinary action.  Accordingly, the Title IX Coordinator will consider many factors when determining whether or not the College can honor the request for confidentiality, including but not limited to whether:

- the alleged perpetrator has a history of violent behavior or is a repeat offender;
- the information provided suggests an increased risk that the alleged perpetrator will commit additional acts;
- the alleged perpetrator used a weapon or force;
- the sexual violence was committed by multiple perpetrators;
- the incident represents escalation, such as a situation that previously involved sustained stalking;
- the information provided suggests that the act is part of a larger pattern at a specific location or by a particular group;
- the individual impacted is a minor; and
- information can be obtained by means other than from the impacted individual (e.g., by

personal or security cameras, witnesses, or through physical evidence).

The College may seek consent from you prior to conducting an investigation. You may decline to consent to an investigation, and that determination will be honored unless the College determines that its failure to act may result in harm to you or other members of the College community. If we determine that an investigation is required, we will notify you and take immediate action to assist you, including academic, housing, transportation, employment, and other reasonable and available accommodations regardless of any other choices you make regarding internal or external processes. The Title IX Coordinator can help you evaluate and implement any such accommodations.

In addition, to the extent possible, the College will only share information with people responsible for handling the College's response. In appropriate cases, the course of action may include steps to limit the effects of the alleged misconduct and prevent its recurrence that do not involve formal disciplinary action against a Respondent or revealing the identity of the Reporting Individual. This could include proactive steps, such as training or awareness efforts, to combat sexual violence in a general way that does not identify you or the situation you disclosed.

## Alcohol or Drug Amnesty Clause in Sexual Misconduct Reporting

The health and safety of every student at the College is of utmost importance. The College recognizes that students who have been drinking and/or using drugs (whether such use is voluntary or involuntary) at the time that violence, including but not limited to domestic violence, dating violence, stalking or sexual assault, occurs may be hesitant to report such incidents due to fear of potential consequences for their own conduct. The College strongly encourages students to report domestic violence, dating violence, stalking or sexual assault to institution officials. A bystander acting in good faith or a Reporting Individual acting in good faith that discloses any incident of domestic violence, dating violence, stalking or sexual assault to College officials or law enforcement will not be subject to the College's code of conduct action for violations of alcohol and/or drug use policies occurring at or near the time of the commission of the domestic violence, dating violence, stalking or sexual assault.

## Good Faith Reporting and False Allegations

Lack of corroborating evidence should not discourage individuals from filing a complaint. Because of the nature of discrimination (including allegations of sexual and other forms of harassment), allegations often cannot be substantiated by direct evidence other than the Reporting Individual's own statement. No action will be taken against an individual who makes a good faith allegation even if, after investigating, the allegation is not substantiated. However, a person found to have made an allegation or complaint he/she knew to be false will be subject to disciplinary action.

## Simultaneous College and Law Enforcement Investigations

When a Reporting Individual reports to both law enforcement and the College, there will be some coordination of the simultaneous investigations.

At the request of law enforcement, the College may agree to defer its fact-gathering until after the initial stages of a criminal investigation. Such deferral should not last more than ten days, although it may be extended at the request of law enforcement. During that time, the College will continue to offer support to the Reporting Individual, including discussing Title IX rights, procedural options,

and needed interim measures to ensure safety and well-being.  The College will promptly resume its fact- gathering as soon as law enforcement has completed its initial investigation.

The College will timely share information in simultaneous investigations except that law enforcement may manage sharing of information so as not to impede its ongoing investigation.  In addition, the College's ability to share information related to its own investigation and/or adjudication of certain offenses involving a student or students will be governed by the Family Educational Rights and Privacy Act, which prohibits disclosure of student education records containing personally identifiable information except under certain circumstances.

The College's Policy, definitions, and standard of review differ from New York criminal law. Neither law enforcement's determination whether to prosecute a Respondent nor the outcome of any criminal prosecution determines whether sexual assault or harassment has occurred under this Policy. Proceedings under this Policy may be carried out prior to, simultaneously with or following civil or criminal proceedings off campus.  See Appendix A for New York criminal definitions for sexual offenses.

## Institutional Reporting
### *Crime Reporting*

A federal law referred to as the Clery Act requires the College to report reports of crimes allegedly occurring within certain geographic locations. Such crimes will be included in the College's Clery Act Annual Security and Fire Safety Report in an anonymized manner that neither identifies the specifics of the report nor the identity of the victim/survivor.

### *Timely Warning to Community*

The Clery Act also requires the College to issue timely warnings of reported Clery Act crimes allegedly occurring within relevant geography that represent a serious or continuing threat to students and employees (subject to exceptions when potentially compromising law enforcement efforts and when the warning itself could potentially identify the victim/survivor). A victim/survivor will never be identified in a timely warning.

### *Reporting to Parents in Limited Circumstances*

The Family Educational Rights and Privacy Act allows institutions to share information with parents when (1) there is a health or safety emergency, or (2) when the student is listed as a dependent on either parents' prior year federal income tax return. Generally, the College will not share with parents information about a report of sexual misconduct without the permission of the victim/survivor.

## Age/Status and Consent

All members of the College must be aware of the power and authority context that exists in an academic setting and the potential exploitation that may arise.  This could include the status of faculty or staff over students and supervisors over employees. Differences in age or status create power differentials that complicate the ability to demonstrate that any sexual relationship is fully consensual.

16

The College strongly discourages any form of dating relationship between faculty or staff and students.

## VIII.   Interim Measures

Upon receipt of a report of sexual misconduct, the College will evaluate and, in its discretion, impose reasonable and appropriate interim measures designed to eliminate the reported hostile environment and protect the parties involved. Any such measure will be aimed at reducing the burden on the Reporting Individual.  The College will implement interim measures promptly and at no cost to the parties. If the accused and a Reporting Individual observe each other in a public place, it shall be the responsibility of the accused to leave the area immediately and without directly contacting the Reporting Individual.

A Reporting Individual or Respondent may request separation or other protection, or the College may choose to impose interim measures at its discretion to ensure the safety of all parties, the broader College community, and/or the integrity of the investigative and/or resolution process. The College will maintain as confidential any accommodation(s) or protective measure(s) provided to the Reporting Individual to the extent that maintaining such confidentiality will not impair its ability to provide the accommodation(s) or protective measure(s). Any individual who becomes aware of the failure of another individual to abide by any restrictions imposed by an interim measure are encouraged to report their concerns to the Title IX Coordinator or Campus Safety. The College will take immediate and responsive action to enforce a previously implemented measure.

Potential interim measures that may be applied to the Reporting Individual and/or the Respondent include:
- access to counseling services and assistance in setting up an initial appointment, on and off campus;
- imposition of an on-campus "no contact" directive, which requires the Respondent to immediately leave any public place in which the Reporting Individual and Respondent observe each other without directly contacting the Reporting Individual;
- rescheduling of exams and assignments;
- providing alternative course completion options;
- changing class schedules, including the ability to transfer course sections or withdrawal from a course without penalty;
- changing work schedules or job assignments;
- changing a student's College's-owned housing;
- assistance from College's support staff in completing housing relocation;
- limiting an individual's or organization's access to certain College's facilities or activities pending resolution of the matter;
- voluntary leave of absence;
- providing an escort to ensure safe movement between classes and activities;
- providing medical services;
- providing academic support services, such as tutoring;
- College-imposed leave or separation; and/or
- any other remedy that can be tailored to the involved individuals to achieve the goals of this Policy.

## Review of Certain Interim Measures

*No Contact Orders*

With respect to no contact orders, both parties shall, upon request, be afforded a prompt review, reasonable under the circumstances, of the need for and terms of a no contact order, including potential modification, and shall be allowed to submit evidence in support of their request.

*Other Interim Measures*

With respect to changes to academic, housing, employment, and transportation arrangements in order to help ensure safety, prevent retaliation, and avoid an ongoing hostile environment, both parties shall, upon request, be afforded a prompt review, reasonable under the circumstances, of the need for and terms of such interim measure that directly affects the party, and shall be allowed to submit evidence in support of their request.

## Interim Suspensions

If the Title IX Coordinator, in consultation with the Director of Campus Safety and Dean of Students, determines that a student alleged to have violated this Policy presents a continuing threat to the health and safety of the community, an interim suspension may be imposed on that student until the resolution process is completed.  This action assumes no determination of responsibility and the investigation will be completed as soon as possible under the circumstances and consistent with the College's time frame for investigations.

*Review of Interim Suspensions*

Both parties shall, upon request, be afforded a prompt review, reasonable under the circumstances, of the need for and terms of an interim suspension, including potential modification, and shall be allowed to submit evidence in support of their request.

## Imposed Leave

Similarly, the College may impose leave on any employee.  The terms of all such leaves shall be determined in the College's sole discretion.

## Retaliation Prohibited

Retaliation against a person for making a report under this policy, for filing a complaint, for supporting a Reporting Individual or Respondent or for participating in an investigation is strictly prohibited and will not be tolerated. Retaliation is any action taken in consequence or retribution for making a complaint or participating in a complaint.  Retaliation is a serious offense that can lead to disciplinary action, independent of the merits of the original misconduct allegation.

18

## IX. Resolution of a Complaint:

### Complaints

The College encourages reporting of all incidents of sexual misconduct to the Title IX Coordinator or any other employee or staff member, who can help you report to the Title IX Coordinator.  Formal complaints alleging a violation(s) of this Policy may be made orally or in writing, and may come directly from a Reporting Individual or through the report of any non-confidential employee, and must include, at a minimum, the time, place, and nature of the alleged offense and the name of the Respondent.

A complaint against an underline employee may be submitted to the Title IX Coordinator, Sexual Harassment Officer, Campus Safety or Director of Human Resources.

A complaint against a student may be submitted to the Title IX Coordinator, Dean of Students, Sexual Harassment Officer, Campus Safety or Athletics Senior Woman Administrator.

When a complaint is made, the College must respond and evaluate it regardless of any action being pursued by the authorities.  All aggrieved persons are entitled, whether or not an individual decides to proceed with the internal process or is found responsible in the internal process, to pursue their complaint with law enforcement.  The College will assist in contacting law enforcement if requested to do so.

**The Reporting Individual may withdraw their complaint or involvement in the College process at any time.**

After receiving a complaint, the Title IX Coordinator will determine if the conduct alleged by the Reporting Individual falls within this Policy. The Title IX Coordinator's evaluation will include an assessment of any risk of harm to individuals or to the campus community and will take necessary action to address those risks (such as interim protective measures to provide for the safety of the individual and the campus community). As necessary, one or more additional campus officials may also be involved in this evaluation. This evaluation will typically be aided by a preliminary meeting between the Title IX Coordinator and the Reporting Individual.   The purpose of the preliminary meeting is to:

- assess the nature and circumstances of the allegation;
- address the immediate physical safety and emotional well-being of the Reporting Individual;
- notify the Reporting Individual of the right to contact law enforcement (or not) and seek medical treatment;
- notify the Reporting Individual of the importance of preservation of evidence;
- provide the Reporting Individual with information about on- and off-campus resources;
- notify the Reporting Individual that the institution can provide assistance in initiating legal proceedings in family court or civil court;
- notify the Reporting Individual of the range of interim measures and responses;
- provide the Reporting Individual with an explanation of the procedural options;
- assess for pattern evidence or other similar conduct by Respondent;
- enter the report into the College's daily crime log;
- assess the reported conduct for the need for a timely warning under the Clery Act;

- discuss the Reporting Individual's expressed preference for the manner of resolution and any barriers to proceeding; and
- explain the College's policy prohibiting retaliation.

The Title IX Coordinator will continue to evaluate the need for interim measures to protect or support the parties to the process and any involved third parties on an ongoing basis.

The College handles complaints as swiftly and yet as carefully, confidentially, and conscientiously as possible. The College believes complaints are best handled in a time frame that permits prompt, accurate reporting and investigation of all information.

## Time Frame for Addressing a Complaint

When a complaint is referred for resolution as described below, the College seeks to conclude its investigation of each report of sexual misconduct within sixty (60) days of the report (exclusive of any appeal) and, in general, a Reporting Individual and Respondent can expect that the process will proceed according to this time frame. However, because circumstances may arise that require an extension possibly beyond the overall sixty (60) day timeline—the time frame expressed is meant to be a guideline rather than a requirement. Circumstances that may require extension of the timeline include the complexity of the allegations, the number of witnesses involved, the availability of the parties or witnesses, the effect of a concurrent criminal investigation, any intervening school break or vacation or other unforeseen circumstances. In the event of such an extension, the College will provide written notice to all parties of the reason and the expected adjustment in time frames. The College will make its best efforts to complete the process in a timely manner by balancing principles of thoroughness and fundamental fairness with promptness.

## Evaluation of Response Options

If after reviewing a complaint the Title IX Coordinator determines that no action can be taken because the Respondent is not a member of the College community, the Title IX Coordinator will assess the information given and provide appropriate recommendations and resources to the Reporting Individual.

When the Title IX Coordinator determines that the act, if proven, does not fall within this Policy, no further action will be pursued and the Reporting Individual will be advised by the Title IX Coordinator of other avenues of recourse and support as appropriate.

When the Title IX Coordinator determines that the alleged act falls within this Policy, the Title IX Coordinator will analyze and discuss with the Reporting Individual the most appropriate response option, which may be non-disciplinary resolution, informal resolution or formal resolution through an investigation.

The Title IX Coordinator will work with students involved in sexual misconduct cases to evaluate reasonable and available accommodations and implement them as requested and needed.

## Non-disciplinary Resolution

Non-disciplinary resolution does not involve disciplinary action against a Respondent. The

College will make the decision to pursue a non-disciplinary response after gathering information about the nature and scope of the conduct. The College can reach this decision at any time, however, participation in a non-disciplinary response is voluntary, and a Reporting Individual can request to end a non-disciplinary response at any time.

Where the Title IX Coordinator concludes that this type of resolution may be appropriate, the College, in consultation with the Reporting Individual, will take immediate and corrective action through the imposition of individual and/or community remedies designed to maximize the Reporting Individual's access to RWC's educational and extracurricular activities.

Examples of potential **remedies for individuals** include the interim measures discussed above.

Potential **remedies for the community** include targeted or broad-based educational programming or training.

Informal Process

Informal problem-solving approaches are available for the resolution of some sexual misconduct complaints. Informal approaches may include, but are not limited to, discussion of the claim with the alleged offender individually or with the applicable supervisor, or mediation.  Mediation may take place with individuals designated by the College. The College will not compel a Reporting Individual to engage in mediation. The Reporting Individual and Respondent do not have to be in the presence of each other during the mediation process. At any time during the process or if an informal resolution is not achieved, either the Reporting Individual or Respondent may request that the complaint proceed to formal resolution. The designated individual handling the informal process will prepare a summary memorandum to document the process. **In most instances, the informal process is not utilized if physical contact is involved in the complaint. In no case will the informal process be used when there is an allegation of sexual violence or assault.**

Formal Process

After the Title IX Coordinator determines that a complaint should proceed to the formal process (or a complaint following a different resolution path is directed to the formal process), an investigation team comprised of personnel with training on Title IX compliance and investigations (Team) will convene as quickly as practicable.  The Team will typically be comprised of two individuals who are currently assigned based on a variety of factors including expertise and availability.

The Title IX Coordinator will issue a notice to each party describing the date, time, location, and factual allegations known from the report concerning the alleged conduct in violation of this Policy, a reference to the specific conduct provisions the alleged conduct may violate, and possible sanctions.  The investigation schedule may be adjusted to meet the needs of any party involved or depending on the nature and/or complexity of the complaint.  The Team will conduct a fact-finding investigation that will typically include meeting individually with the Reporting Individual, Respondent(s), and any individuals the Team considers likely to have relevant knowledge or information related to the complaint.

The Reporting Individual, Respondent(s), and witnesses may each bring an advisor to any interviews or meetings in which they are involved. The advisor shall not address or question the

Team or advocate on behalf of the party the advisor is supporting. However, each party may request to take breaks to consult with their advisor or simply to gather themselves (with or without their advisor's support) before the interview proceeds.

During meetings with the Team, the Reporting Individual, Respondent, and witnesses will have the ability to provide the Team with information (including written information such as text messages, Facebook messages, communications from Snapchat, videos, etc.) they believe is relevant to the complaint. The Team will also ask for suggestions as to other individuals with whom the parties or witnesses believe the Team should meet. The Team will consider such suggestions and meet with individuals at its discretion. Witnesses may bring a neutral advisor to any interview in which they are involved. The Team will strive to complete these investigation meetings within thirty (30) days of the complaint.

At the conclusion of the Team's individual meetings with the parties and witnesses, the Team will prepare a summary of each interview. Each individual interviewed will have an opportunity to review and suggest revisions to their respective summary, and to suggest other sources of information for the Team to review and consider which the Team may do at its discretion.

Following the party and witness review of the unique summary of their interview(s), the Team will prepare a written Investigation Report containing a summary of the investigation and findings of fact. In order to make its findings of fact, the Team will examine the information gathered, including any related documents or other physical or tangible evidence, and apply the preponderance of evidence standard (i.e. whether it is more likely than not) to determine whether or not that the actions in question occurred. The Team will in most cases complete the report within fifteen (15) days after concluding their interviews.

Upon completion of the Investigation Report, the parties will have an opportunity to review the entire report, after which they will have up to two business days to submit a written response to the Team, including additional questions they would like asked of parties and/or witnesses. The Team will meet to consider the written responses and requested questions, if any, to determine whether the suggested questions should be asked and how to incorporate the responses into the Investigation Report.

The Team will then expand the Investigation Report to include party responses and its recommended finding(s) as to Respondent's responsibility for a violation or violations of this Policy.

The Team will then meet with the Title IX Coordinator to present the Investigation Report, including its findings of fact and recommended finding(s) of responsibility. The Title IX Coordinator will review the report and will discuss with the Team any additional investigation that may be advisable. In that event, the Title IX Coordinator and the Team will agree to the scope of additional investigation, which the Team will carry out. The Team will then supplement its Investigation Report accordingly and present a final Investigation Report to the Title IX Coordinator within seven (7) days of concluding any additional investigation.

If, at the conclusion of the investigation, the Team has found a violation of this Policy and the Title IX Coordinator agrees with this finding, the Title IX Coordinator will determine the appropriate disciplinary action or sanctions. The Title IX Coordinator will share the recommended disciplinary action or sanctions with the Title IX Officer/VP for Student and Organizational Development. The

Title IX Officer/VP will review and approve any disciplinary actions. In the event that the Title IX Officer/VP does not approve, the Title IX Officer/VP will share the reasons for the disapproval with the Title IX Coordinator, who will consider those reasons when making a final determination.

No later than five (5) days after the Title IX Officer/VP reviews the Team and Title IX Coordinator's determinations as to responsibility and appropriate sanctions, the Title IX Coordinator will send the parties simultaneous written notice of the: determination of responsibility, if any; sanctions to be imposed on the Respondent (only sharing with the Reporting Individual those sanctions that directly relate to the Reporting Individual), if any; other steps the College has taken or will take to remedy the misconduct or hostile environment and prevent recurrence, if any; the rationale for the decision and specific sanction(s) imposed; and procedures to appeal the decision.  The Title IX Coordinator will also notify the Reporting Individual (but not the Respondent) of any individual remedies offered or provided to the Reporting Individual.

## Rights of Parties Involved in Sexual Misconduct Cases

Throughout any proceeding under this Policy, the Reporting Individual and the Respondent will have:

- The same opportunity to have access to an advisor of their choice, who may accompany the party to any meeting related to the complaint and/or resolution process subject to the College's limitations on the role of such advisor.

- The right to a prompt response to any complaint and to have their complaint investigated and adjudicated in an impartial, timely, and thorough manner by individuals who receive annual training in conducting investigations of sexual violence, the effects of trauma, impartiality, the rights of the Respondent, including the right to a presumption that the Respondent is "not responsible" until a finding of responsibility is made pursuant to the provisions of this article and the institution's policies and procedures, and other issues including, but not limited to domestic violence, dating violence, stalking or sexual assault.

- The right to an investigation and process that is fair and that is not conducted by individuals with a conflict of interest.

- To receive written or electronic notice, provided in advance pursuant to the college policy and reasonable under the circumstances, of any meeting they are required to or are eligible to attend, of the specific rule, rules or laws alleged to have been violated and in what manner, and the sanction or sanctions that may be imposed on the Respondent based upon the outcome of the judicial or conduct process, at which time the designated hearing or investigatory officer or panel shall provide a written statement detailing the factual findings supporting the determination and the rationale for the sanction imposed.

- The right to a meaningful opportunity to be heard, including the right to review and present relevant information related to the case and in the case file or otherwise in the possession or control of the College.

- The right to continue the College process at the same time a criminal justice investigation is proceeding, except for temporary delays as requested by external municipal entities while law enforcement gathers evidence.  Temporary delays will typically not extend beyond ten (10)

days except when law enforcement specifically requests and justifies a longer extension of time. Parties will be notified in writing of the reason for any such extension of this timeframe.

- The right to exclude their own prior sexual history with persons other than the other party in the judicial or conduct process or their own mental health diagnosis and/or treatment from admittance in the institution disciplinary stage that determines responsibility.  Past findings of domestic violence, dating violence, stalking, or sexual assault may be admissible in the disciplinary stage that determines sanction.

- When there has been a finding of responsibility, the right to make or submit an impact statement to the Title IX Coordinator as s/he considers appropriate sanctions.

- The right to simultaneous (among the parties) written notification of the outcome of a conduct proceeding, including the factual findings, sanction(s), and rationale for the determination and sanction(s) imposed.

- Access to at least one level of appeal of a determination.

- The right to choose whether to disclose or discuss the outcome of a conduct or judicial process.

- The right to protection of all information obtained during the course of this process from public release until a final determination on appeal, if any.

## X. Sanctions:

Those students found responsible for violating this policy may be suspended or expelled.

Students found responsible for any level of sexual misconduct face sanctions ranging from (but not limited to) a warning to social probation (including reprimands, educational activity, and revoking of privileges), suspension (required withdrawal) or permanent separation, depending on the nature of a particular violation and/or an individual student's overall conduct record.   A first offense can result in immediate expulsion.

Employees found responsible for any level of sexual misconduct face discipline ranging from (but not limited to) a written warning to required educational training, work restrictions, suspension without pay, or dismissal, depending on the nature of a particular violation and/or whether or not it is a repeat offense. A first offense can result in immediate termination.

## XI. Appeals:

The parties have equal opportunity to appeal the determination of the complaint.  Requests for appeals of decisions must be made in writing to the Title IX Officer/Vice President for Student and Organizational Development within three (3) business days of the written decision.  Acceptable grounds for an appeal are limited to:

- the sanctions imposed are substantially disproportionate to the violation found to have been committed; and/or
- procedural error(s) that could significantly impact the outcome of a case.

24

Previously unavailable relevant information that could significantly impact the outcome of the determination must be brought to the attention of the Title IX Coordinator, who will reconvene the Team to determine whether the information would have affected the outcome.

If the Title IX Officer determines it appropriate, interim suspensions or conditions may be imposed during the time of an appeal or until the time to appeal has passed.

When the Office of the Vice President for Student and Organizational Development receives a request for an appeal, the Vice President for Student and Organizational Development (or designee) will provide the request to a panel of three individuals (including the Vice President for Student and Organizational Development) to determine whether the appeal will be accepted based upon the two criteria set forth above.  The panel will then initiate one of the following actions:

- Reject the request for appeal due to insufficient reason(s).
- Analyze the materials related to the appeal and render a decision.

In the event that an appeals panel has been convened, the non-appealing party will be permitted to read the appeal and invited to submit a response within forty-eight (48) hours of notification of the non-appealing party's review of the appeal.

After considering the information submitted in support of and in opposition to the appeal, if any, the panel will take one of the following actions:

(1) deny the appeal thereby affirming the decision of the Team and Title IX Coordinator;

(2) remand the complaint to the original Team for further consideration on the grounds that there was a procedural irregularity that could be corrected in a review;

(3) direct the complaint to a new Team due to an extraordinary case where, in the opinion of the panel, the matter would be best addressed by a newly-constituted Team; or

(4) remand the matter to the Title IX Coordinator with a recommendation that the sanction(s) be modified, together with an explanation of why the original sanction(s) is deemed inappropriate.

When the panel takes action pursuant to section (1) above, the Vice President for Student and Organizational Development will issue simultaneous written notice of the outcome of the appeal to each party (copying the Title IX Coordinator), including the rationale for the decision.

When the panel takes an action specified in (2), (3) or (4) above, the Vice President for Student and Organizational Development will provide the Title IX Coordinator written notice of the panel's decision, including the rationale for the decision.  The Title IX Coordinator will then provide the parties written notice of the next steps in the process and/or of any sanction(s) modified pursuant to (4) above.

Decisions made during the appeal process are final, and there is no right to appeal from a decision made after remand of a matter related to (2) or (4) above.

25

In the case where option (3) is determined, a new investigation team will be formed and the investigation process will begin in consultation with the Title IX Coordinator.

The record of the appeal will consist of the letter of appeal; any written statements from the parties; and any written notices related to action on and/or outcome of the appeal. This record will be kept with the written record of the original decision.

## XII.    Transcript Notations and Record Retention

### Transcript Notations

New York law requires the College to make specific notations on the transcripts of Respondents found responsible for the following conduct prohibited by this Policy: sexual assault, dating violence, domestic violence, and stalking.

- Students suspended after a finding of responsibility will receive the following notation on their transcript: "suspended after a finding of responsibility for a code of conduct violation." Such notations are eligible for removal one year after the conclusion of the suspension if the suspended student seeks removal of the notation by appealing to the Title IX Officer/Vice President for Student and Organizational Development. A student seeking removal of the notation should contact the Office of the Title IX Officer/Vice President for Student and Organizational Development for appeal procedures.

- Students expelled after a finding of responsibility will receive the following notation on their transcript: "expelled after a finding of responsibility for a code of conduct violation." Such notation shall not be eligible for removal.

- Students who withdraw pending resolution of alleged violations of this Policy will receive the following notation on their transcript: "withdrew with conduct charges pending." Such notation shall not be eligible for removal unless the charges are later resolved.

- If the College vacates a finding of responsibility for any reason, any such transcript notation shall be removed.

### Disciplinary Records

Disciplinary files are confidential in nature. The files for sexual misconduct cases will include: notices sent to the parties, documentation regarding no contact orders and other interim measures, the investigative report and supporting materials, and appeal materials.

Disciplinary files will be maintained for seven (7) years after the most recent reported incident. Disciplinary files for students who withdraw from the College or are suspended or expelled for disciplinary reasons are maintained for an indefinite length of time depending upon the circumstances. The College reserves the right to notify parents of dependent students when student conduct action has resulted in serious disciplinary sanctions.

## XIII. Academic and Intellectual Freedom:

The College seeks to maintain the freedom of all members of the College to express their ideas and opinions. Adherence to the principle of freedom of expression and academic freedom requires that thoughts presented as ideas or the advocacy of ideas in an educational setting, if they are germane to the subject matter being addressed, are protected. This applies to the ideas of employees and students alike. The maintenance of intellectual freedom through the open expression of ideas will sometimes be unavoidably hurtful.  Knowing this to be true, the College aspires to create and maintain an environment where it is understood that derogatory or debasing comments play no meaningful role in the free exchange of ideas, and may inhibit that exchange, thereby denying some individuals full participation in the learning experience.  Within this framework, the College believes all members of the community have a responsibility to foster an environment of awareness and respect.

## XIV. Title IX Inquiries and External Title IX Complaints

Inquiries or complaints concerning Title IX may be directed to the U.S. Department of Education's Office for Civil Rights:

> U. S. Department of Education, Office for Civil Rights
> New York Office
> 32 Old Slip, 26th Floor
> New York, New York 10005-2500
> Phone: 646.428.3800
> Fax: 646.428.3843
> Email: OCR.NewYork@ed.gov
>
> OCR National Headquarters
> U. S. Department of Education
> Office of Civil Rights, Customer Service Team
> Mary E. Switzer Building
> 330 C. Street, S. W.
> Washington, D. C. 20202
> Tel: 800.421.3481
> Fax: 202.205.9862

APPENDIX A
NEW YORK CRIME DEFINITIONS

The Violence Against Women Act (VAWA) and its proposed regulations require the inclusion of certain New York State definitions in a campus's Annual Security Report and also require that those definitions be provided in campaigns, orientations, programs and trainings for employees and students. Definitions required include: consent; dating violence; domestic violence; sexual assault; and stalking.

**CONSENT:** Lack of consent results from: forcible compulsion; or incapacity to consent; or where the offense charged is sexual abuse or forcible touching, any circumstances, in addition to forcible compulsion or incapacity to consent, in which the victim does not expressly or impliedly acquiesce in the actor's conduct. Where the offense charged is rape in the third degree, a criminal sexual act in the third degree, or forcible compulsion in circumstances under which, at the time of the act of intercourse, oral sexual conduct or anal sexual conduct, the victim clearly expressed that he or she did not consent to engage in such act, and a reasonable person in the actor's situation would have understood such person's words and acts as an expression of lack of consent to such act under all the circumstances. A person is incapable of consent when he or she is: less than 17 years old; or mentally disabled; or mentally incapacitated; or physically helpless; or committed to the care and custody of the state department of correctional services, a hospital, the office of children and family services and is in residential care, or the other person is a resident or inpatient of a residential facility operated by the office of mental health, the office for people with development disabilities, or the office of alcoholism and substance abuse services, and the actor is an employee, not married to such person, who knows or reasonably should know that such person is committed to the care and custody of such department or hospital.

- **CONSENT, ABBREVIATED:** Clear, unambiguous, and voluntary agreement between the participating to engage in specific sexual activity.

**DATING VIOLENCE:** New York State does not specifically define "dating violence." However, under New York Law, intimate relationships are covered by the definition of domestic violence when the act constitutes a crime listed elsewhere in this document and is committed by a person in an "intimate relationship" with the victim. See "Family or Household Member" for definition of "intimate relationship."

**DOMESTIC VIOLENCE:** An act which would constitute a violation of the penal law, including, but not limited to acts constituting disorderly conduct, harassment, aggravated harassment, sexual misconduct, forcible touching, sexual abuse, stalking, criminal mischief, menacing, reckless endangerment, kidnapping, assault, attempted murder, criminal obstruction or breaching or blood circulation, or strangulation; and such acts have created a substantial risk of physical or emotional harm to a person or a person's child. Such acts are alleged to have been committed by a family member. The victim can be anyone over the age of sixteen, any married person or any parent accompanied by his or her minor child or children in situations in which such person or such person's child is a victim of the act.

- **FAMILY OR HOUSEHOLD MEMBER:** Person's related by consanguinity or affinity; Persons legally married to one another; Person formerly married to one another regardless of whether they still reside in the same household; Persons who have a child in common regardless of whether such persons are married or have lived together at any time; Unrelated

persons who are continually or at regular intervals living in the same household or who have in the past continually or at regular intervals lived in the same household; Persons who are not related by consanguinity or affinity and who are or have been in an intimate relationship regardless of whether such persons have lived together at any time. Factors that may be considered in determining whether a relationship is an "intimate relationship" include, but are not limited to: the nature or type of relationship regardless of whether the relationship is sexual in nature; the frequency of interaction between the persons; and the duration of the relationship. Neither a casual acquaintance nor ordinary fraternization between two individuals in business or social contexts shall be deemed to constitute an "intimate relationship"; Any other category of individuals deemed to be a victim of domestic violence as defined by the office of children and family services in regulation. Intimate relationship status shall be applied to teens, lesbian/gay/bisexual/transgender, and elderly individuals, current and formerly married and/or dating heterosexual individuals who were, or are in an intimate relationship.

- **PARENT:** means natural or adoptive parent or any individual lawfully charged with a minor child's care or custody.

**SEXUAL ASSAULT:** New York State does not specifically define sexual assault. However, according to the Federal Regulations, sexual assault includes offenses that meet the definitions of rape, fondling, incest, or statutory rape as used in the FBI's UCR program.

**SEXUAL MISCONDUCT:** When a person (1) engages in sexual intercourse with another person without such person's consent; or (2) engages in oral sexual conduct or anal sexual conduct without such person's consent; or (3) engages in sexual conduct with an animal or a dead human body.

## RAPE

- **RAPE IN THE THIRD DEGREE:** When a person (1) engages in sexual intercourse with another person who is incapable of consent by reason of some factor other than being less than 17 years old; (2) Being 21 years old or more, engages in sexual intercourse with another person less than 17 years old; or (3) engages in sexual intercourse with another person without such person's consent where such lack of consent is by reason of some factor other than incapacity to consent.

- **RAPE IN THE SECOND DEGREE:** When a person (1) being 18 years old or more, engages in sexual intercourse with another person less than 15 years old; or (2) engages in sexual intercourse with another person who is incapable of consent by reason of being mentally disabled or mentally incapacitated. It is an affirmative defense to the crime of rape in the second degree the defendant was less than four years older than the victim at the time of the act.

- **RAPE IN THE FIRST DEGREE:** When a person engages in sexual intercourse with another person (1) by forcible compulsion; or (2) Who is incapable of consent by reason of being physically helpless; or (3) who is less than 11 years old; or (4) who is less than 13 years old and the actor is 18 years old or more.

## STALKING

- **STALKING IN THE FOURTH DEGREE:** When a person intentionally, and for not legitimate purpose, engages in a course of conduct directed at a specific person, and knows or reasonably should know that such conduct (1) is likely to cause reasonable fear of material harm to the physical health, safety or property of such person, a member of such person's immediate family or a third party with whom such person is acquainted; or (2) causes material harm to the mental or emotional health of such person, where such conduct consists of following, telephoning or initiating communication or contact with such person, a member of such person's immediate family or a third party with whom such person is acquainted, and the actor was previously clearly informed to cease that conduct; or (3) is likely to cause such person to reasonably fear that his or her employment, business or career is threatened, where such conduct consists of appearing, telephoning or initiating communication or contact at such person's place of employment or business, and the actor was previously clearly informed to cease that conduct.

- **STALKING IN THE THIRD DEGREE:** When a person (1) Commits the crime of stalking in the fourth degree against any person in three or more separate transactions, for which the actor has not been previously convicted; or (2) commits the crime of stalking in the fourth degree against any person, and has previously been convicted, within the preceding ten years of a specified predicate crime and the victim of such specified predicate crime is the victim, or an immediate family member of the victim, of the present offense; or (3) with an intent to harass, annoy or alarm a specific person, intentionally engages in a course of conduct directed at such person which is likely to cause such person to reasonably fear physical injury or serious physical injury, the commission of a sex offense against, or the kidnapping, unlawful imprisonment or death of such person or a member of such person's immediate family; or (4) commits the crime or stalking in the fourth degree and has previously been convicted within the preceding ten years of stalking in the fourth degree.

- **STALKING IN THE SECOND DEGREE:** When a person: (1) Commits the crime of stalking in the third degree and in the course of and furtherance of the commission of such offense: (a) displays, or possesses and threatens the use of, a firearm, pistol, revolver, rifle, sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, slingshot, slungshot, shirken, "Kung Fu Star," dagger, dangerous knife, dirk, razor, stiletto, imitation pistol, dangerous instrument, deadly instrument or deadly weapons; or (b) displays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; or (2) commits the crime of stalking in the third against any person, and has previously been convicted, within the preceding five years, of a specified predicate crime, and the victim of such specified predicate crime is the victim, or an immediate family member of the victim, of the present offense; or (3) commits the crime of stalking in the fourth degree and has previously been convicted of stalking in the third degree; or (4) being 21 years of age or older, repeatedly follows a person under the age of fourteen or engages in a course of conduct or repeatedly commits acts over a period of time intentionally placing or attempting to place such person who is under the age of fourteen in reasonable fear of physical injury, serious physical injury or death; or (5) commits the crime of stalking in the third degree, against ten or more persons, in ten or more separate transactions, for which the actor has not been previously convicted.

- **STALKING IN THE FIRST DEGREE:** When a person commits the crime of stalking in the third degree or stalking in the second degree and, in the course and furtherance thereof, he or she intentionally or recklessly causes physical injury to the victim of such crime.

CRIMINAL SEXUAL ACT

- **CRIMINAL SEXUAL ACT IN THE THIRD DEGREE:** When a person engages in oral or anal sexual conduct (1) with a person who is incapable of consent by reason of some factor other than being less than 17 years old; (2) being 21 years old or more, with a person less than 17 years old; (3) with another person without such persons consent where such lack of consent is by reason of some factor other than incapacity to consent.

- **CRIMINAL SEXUAL ACT IN THE SECOND DEGREE:** When a person engages in oral or anal sexual conduct with another person (1) and is 18 years or more and the other person is less than 15 years old; or (2) who is incapable of consent by reason of being mentally disabled or mentally incapacitated. It is an affirmative defense that the defendant was less than four years older than the victim at the time of the act.

- **CRIMINAL SEXUAL ACT IN THE FIRST DEGREE:** When a person engages in oral or anal sexual conduct with another person (1) by forcible compulsion; (2) who is incapable of consent by reason of being physically helpless; (3) who is less than 11 years old; or (4) who is less than 13 years old and the actor is 18 years old or more.

- **FORCIBLE TOUCHING:** When a person intentionally, and for no legitimate purpose, forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person; or for the purpose of gratifying the actor's sexual desire. It includes squeezing, grabbing, or pinching.

SEXUAL ABUSE

- **PERSISTENT SEXUAL ABUSE:** When a person commits a crime of forcible touching, or second or third degree sexual abuse within the previous ten year period, has been convicted two or more times, in separate criminal transactions for which a sentence was imposed on separate occasions of one of one of the above mentioned crimes or any offense defined in this article, of which the commission or attempted commissions thereof is a felony.

- **SEXUAL ABUSE IN THE THIRD DEGREE:** When a person subjects another person to sexual contact without the latter's consent. For any prosecution under this section, it is an affirmative defense that (1) such other person's lack of consent was due solely to incapacity to consent by reason of being less than 17 years old; and (2) such other person was more than 14 years old and (3) the defendant was less than five years older than such other person.

- **SEXUAL ABUSE IN THE SECOND DEGREE:** When a person subjects another person to sexual contact and when such other person is (1) incapable of consent by reason of some factor other than being less than 17 years old; or (2) less than 14 years old.

- **SEXUAL ABUSE IN THE FIRST DEGREE:** When a person subjects another person to sexual contact (1) by forcible compulsion; (2) when the other person is incapable of consent by reason of being physically helpless; or (3) when the other person is less than 11 years old; or (4) when the other person is less than 13 years old.

AGGRAVATED SEXUAL ABUSE

- **AGGRAVATED SEXUAL ABUSE:** For the purposes of this section, conduct performed for a valid medical purpose does not violate the provisions of this section.

- **AGGRAVATED SEXUAL ABUSE IN THE FOURTH DEGREE:** When a person inserts a (1) foreign object in the vagina, urethra, penis or rectum of another person and the other person is incapable of consent by reason of some factor other than being less than 17 years old; or (2) finger in the vagina, urethra, penis, rectum or anus of another person causing physical injury to such person and such person is incapable of consent by reason of some factor other than being less than 17 years old.

- **AGGRAVATED SEXUAL ABUSE IN THE THIRD DEGREE:** When a person inserts a foreign object in the vagina, urethra, penis, rectum or anus of another person (1)(a) by forcible compulsion; (b) when the other person is incapable of consent by reason of being physically helpless; or (c) when the other person is less than 11 years old; or (2) causing physical injury to such person and such person is incapable of consent by reason of being mentally disabled or mentally incapacitated.

- **AGGRAVATED SEXUAL ABUSE IN THE SECOND DEGREE:** When a person inserts a finger in the vagina, urethra, penis, rectum or anus of another person causing physical injury to such person by (1) forcible compulsion; or (2) when the other person is incapable of consent by reason of being physically helpless; or (3) when the other person is less than 11 years old.

- **AGGRAVATED SEXUAL ABUSE IN THE FIRST DEGREE:** When a person subjects another person to sexual contact: (1) By forcible compulsion; or (2) when the other person is incapable of consent by reason of being physically helpless; or (3) when the other person is less than eleven years old; or (4) when the other person is less than thirteen years old and the actor is twenty-one years old or older.

## COURSE OF SEXUAL CONDUCT AGAINST A CHILD

- **COURSE OF SEXUAL CONDUCT AGAINST A CHILD IN THE SECOND DEGREE:** When over a period of time, not less than three months, a person: (1) Engages in two or more acts of sexual conduct with a child less than 11 years old; or (2) being 18 years old or more engages in two or more acts of sexual conduct with a child less than 13 years old. A person may not be subsequently prosecuted for any other sexual offense involving the same victim unless the other charges offense occurred outside of the time period charged under this section.

- **COURSE OF SEXUAL CONDUCT AGAINST A CHILD IN THE FIRST DEGREE:** When a person over a period of time, not less than three months in duration, a person: (1) Engages in two or more acts of sexual conduct, or aggravated sexual contact with a child less than 11 years old; or (2) being 18 years old or more engages in two or more acts of sexual conduct which includes at least one act of sexual intercourse, oral sexual conduct, anal sexual conduct, or aggravated sexual contact with a child less than 13 years old.

- **FACILITATING A SEX OFFENSE WITH A CONTROLLED SUBSTANCE:** A person is guilty of facilitating a sex offense with a controlled substance when he or she: (1) knowingly and unlawfully possesses a controlled substance or any preparation, compound, mixture or substance that requires a prescription to obtain and administers such    substance    or

preparation, compound, mixture or substance that requires a prescription to obtain to another person without such person's consent and with intent to commit against such person conduct constituting a felony defined in this article; and (2) commits or attempts to commit such conduct constituting a felony defined in this article.

INCEST

- **INCEST IN THE THIRD DEGREE:** A person is guilty of incest in the third degree when he or she marries or engages in sexual intercourse, oral sexual conduct or anal sexual conduct with a person whom he or she knows to be related to him or her, whether through marriage or not, as an ancestor, descendant, brother or sister of either the whole or the half blood, uncle, aunt, nephew or niece.

- **INCEST IN THE SECOND DEGREE:** A person is guilty of incest in the second degree when he or she commits the crime of rape in the second degree, or criminal sexual act in the second degree, against a person whom he or she knows to be related to him or her, whether through marriage or not, as an ancestor, descendant, brother or sister of either the whole or the half blood, uncle, aunt, nephew or niece.

- **INCEST IN THE FIRST DEGREE:** A person is guilty of incest in the first degree when he or she commits the crime of rape in the first degree, or criminal sexual act in the first degree, against a person whom he or she knows to be related to him or her, whether through marriage or not, as an ancestor, descendant, brother or sister of either the whole or half blood, uncle, aunt, nephew or niece.

Roberts Wesleyan College                          Administrative Policy # 120
Policy and Procedure


SUBJECT:      Title IX Sex Discrimination:  Dating Violence, Domestic Violence, Sexual Assault,
              Stalking and Title IX Sexual Harassment

Applies to:   All Students and Employees                    Effective August 14, 2020


NOTE: Employees should also refer to Policy 109 Sexual Harassment Prevention for additional guidance
      Students should also refer to Policy 108 for additional guidance


# I.      NOTICE OF NON-DISCRIMINATION

The College is committed to creating and maintaining an academic and work environment that
respects each person and nurtures the trust of its mission. The College has general expectations
of students and employees and expects all to behave in a manner that supports the College's
Mission and Ethos, including respecting and protecting the personal rights of others.


The College seeks to create and maintain an environment free from intimidation or injury
generated by sexual harassment, including sexual violence. The College will act to eliminate
such practices from our community and to remedy their effects. All members of the College
community are entitled to a professional working and learning environment and are accountable
and responsible for maintaining a respectful and trusting environment.

The protections of this policy apply regardless of race, color, national origin, religion, creed,
age, disability, sex, gender identity or expression, sexual orientation, familial status, pregnancy,
predisposing genetic characteristics, military status, domestic violence victim status, or criminal
conviction.

This Policy prohibits all forms of sexual misconduct in any program or activity offered or
sponsored by the College.  Sexual misconduct is extremes of discrimination and wrongdoing
based on one's gender, sexuality, sexual orientation, and/or gender identity or expression.
Sexual Harassment is any instance of quid pro quo harassment by a school's employee; any
unwelcome conduct that a reasonable person would find so severe, pervasive, and objectively
offensive that it denies a person equal educational access; any instance of sexual assault (as
defined in the Clery Act), and dating violence, domestic violence, or stalking as defined in the
Violence Against Women Act (VAWA). Such behavior destroys the trust and respect at the
core of our academic mission.  Such actions are condemned by the College and in many
instances may be violations of NYS and federal laws which are referenced in other College
policies.  Members of the College community who are determined to have committed these acts
will be subject to sanctions from the College and/or may be subject to sanctions as the result of

a criminal process. Repeat violations will result in more stringent sanctions; however, as more fully described below, permanent separation of a student or termination of employment or volunteer status may result after a first offense.

Any individual who has experienced quid pro quo, sexual harassment, sexual assault, domestic violence, dating violence, stalking, or any other type of sexual misconduct defined in this Policy has the option to make a report to law enforcement, to initiate the College's formal complaint process described in this Policy, to do both or to do neither. This Policy also describes support resources and accommodations available to members of the College community who experience sexual harassment, including sexual assault, whether or not that individual decides to pursue a formal report on campus.

When a member of the College community chooses to make a formal report of an incident of sexual misconduct, then the College will use the procedures outlined below to take prompt and appropriate action to respond. Employees who choose to make a formal report against another employee should also refer to Policy #109 as the report may also be a violation of NYS laws.

## II.     STATEMENT OF POLICY AGAINST TITLE IX SEX DISCRIMINATION[1] AND RETALIATION

In compliance with Title IX, a federal law, The College does not discriminate on the basis of sex in the education programs or activities that it operates. Title IX of the Education Amendments of 1972 (20 U.S.C. §1681, *et seq.*) and its implementing regulations (34 C.F.R. Part 106) prohibit discrimination on the basis of sex in education programs and activities.

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any Education Program or Activity receiving Federal financial assistance.

Title IX requires that colleges and universities maintain an environment free from Title IX Sex Discrimination for all faculty, staff, and students. Under Title IX, discrimination on the basis of sex is Title IX Sexual Harassment, Sexual Assault, Domestic Violence, Dating Violence, and Stalking. Title IX also prohibits Retaliation.

---

[1] The Title IX regulations found at 34 CFR Part 106 refer to the five forms of Title IX Sex Discrimination (1) Title IX Sexual Harassment; (2) Sexual Assault; (3) Dating Violence; (4) Domestic Violence; and (5) Stalking) as Title IX Sexual Harassment, even though one of the five forms of sexual harassment is also called sexual harassment. For clarity and to avoid confusion, this Policy refers to the five forms of prohibited conduct as Title IX Sex Discrimination. Each type of conduct is defined separately in this Policy (*See* Glossary at Section XVI).

2

Title IX Sexual Harassment is prohibited by Title VII of the Civil Rights Act of 1964 and by the New York State Human Rights Law. Title IX Sexual Harassment is also prohibited by the Violence Against Women's Act, and NYS Education Law 129B.

Inquiries about this Policy and/or the application of Title IX and its regulations may be referred to:

Monika Robertson
Director of Risk management
Title IX Coordinator
Rinker, Lower Level, Room 122
585-594-6222
Robertson_Monika@roberts.edu

Ruth Logan
VP for Student Life & Organizational
Development
Title IX Administrator
Rinker, Lower Level, Room 127
585-594-6532
loganr@roberts.edu


Title IX Webpage: https://www.roberts.edu/student-experience/title-ix/
_____

Inquiries about the application of Title IX and its regulations may be referred to:

Assistant Secretary for Civil Rights
U.S. Department of Education, Office for Civil Rights
oci@ed.gov
1-800-421-3481


## III.      SCOPE OF THIS POLICY

This Policy on Title IX Sex Discrimination (Policy) applies to all Employees (faculty, staff, all other employees) and students. This Policy only addresses Title IX Sex Discrimination (Discrimination), as defined in this Policy. All other protected status allegations (including non-Title IX sex discrimination and non-Title IX sexual harassment) are addressed in other College policies, including other applicable discrimination policies and procedures, such as the Non-Discrimination Policy, Student Code of Conduct, Faculty Handbook, and Employee Handbook.

3

*Approved August 14, 2020*

Title IX Sex Discrimination is defined as conduct:

    *(1)*    *On the basis of sex,*

    *(2)*    *That occurs within the College's Education Program or Activity,*

    *(3)*    *Within the United States,* and

    *(4)*    *Involves*

        (a)    a College Employee conditioning the provision of an aid, benefit, or service on an individual's participation in unwelcome sexual conduct (Quid Pro Quo);

        (b)    unwelcome conduct that is determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to The College's Education Program or Activity (Hostile Environment);

        (c)    Sexual Assault;

        (d)    Dating Violence;

        (e)    Domestic Violence; or

        (f)    Stalking.

All allegations of Title IX Sex Discrimination will be addressed according to this Policy.

The College may take action against third Parties who engage in conduct prohibited by this Policy in connection with a College Education Program or Activity. In such circumstances, the College will determine whether to apply this Policy or another policy or procedure.

This Policy applies when any employee and student of the College is alleged to have engaged in Title IX Sex Discrimination as defined by this Policy. To the extent this Policy is inconsistent with any provisions of any faculty or Employee handbook, policy or procedure, because this Policy on Title IX Sex Discrimination is mandated by federal law, this Policy shall prevail. Federal law requires the College to use the same Standard of Evidence in all matters alleging Title IX Sex Discrimination, which, therefore, fall within this Policy. The College has no discretion to do otherwise.

All Employees who have experienced Title IX Sex Discrimination, who have provided a Report alleging Title IX Sex Discrimination, or have been alleged to have engaged in Title IX Sex

4

Discrimination can seek confidential assistance through Agape Counseling Services or Restoration Counseling Services.

## IV.     DEFINED TERMS

This Policy uses many defined terms, indicated by the capitalization of the first letter(s) in the term. All defined terms are included in a Glossary at the end of the Policy. The definitions in the Glossary are important to a complete understanding of this Policy.

## V.      RESPONSIBILITIES OF THE TITLE IX COORDINATOR AND DEPUTY TITLE IX COORDINATOR

The Title IX Coordinator coordinates the College's efforts to comply with Title IX, including overseeing this Policy and the publication and dissemination of information required by Title IX. The Title IX Coordinator's responsibilities include: (1) receiving and responding to Reports of conduct that may constitute a violation of this Policy; (2) coordinating the effective implementation of Supportive Measures; (3) designating Investigators, Facilitators, and Decision-makers to act pursuant to the Grievance Process; (4) ensuring that the technology needed to conduct and record hearings is available; (5) implementing effectively any Remedies or discipline imposed by a Decision-maker upon a finding of a violation of this Policy; (6) complying with the record-keeping requirements of this Policy; and (7) Hearing Board Chair.

The Title IX Administrator supports the Title IX Coordinator in fulfilling their role and responsibilities and may serve as the Title IX Coordinator's designee to carry out any response, action, initiative, project or other responsibility outlined in this Policy. An individual requiring emergency support or response should contact Campus Safety at 585-594-7777 or another appropriate Emergency Support Resource detailed in Section VIII below.

## VI.     OPPORTUNITIES FOR REVIEW OR APPEAL

This Policy provides individuals with opportunities to seek review of or appeal from a decision of the College. Information regarding review of an Emergency Removal can be found in Section IX(E). Information regarding appealing the dismissal of a Formal Complaint can be found in Section IX(B)(b), IX(B)(c), and X(J)(2). Finally, information related to appealing a Written Determination can be found in Section XI.

## VII.   REQUEST TO REMOVE TITLE IX COORDINATOR, AN INVESTIGATOR OR HEARING BOARD MEMBER

Parties have the right to request that someone other than the Title IX Coordinator oversee the Grievance Process or that the Title IX Coordinator remove an Investigator or member of the Hearing Board. Such requests must be based on reasonable and articulated grounds of bias, conflict of interest or an inability to be fair and impartial.

### (A)   Request to Remove the Title IX Coordinator

A request to remove the Title IX Coordinator should be submitted in writing to the person to whom the Title IX Coordinator reports, which is Ruth Logan, Title IX Administrator, and as soon as a Party becomes aware of any such grounds for removal. The Title IX Administrator will determine whether to delegate the Title IX Coordinator duties to someone else.

### (B)   Challenge to an Investigator

A challenge to an Investigator must be raised in writing within two (2) Business Days of receipt of the Notice of Investigation. The Title IX Coordinator will determine whether to remove the Investigator. If the Investigator is not removed, the Title IX Coordinator will notify the requesting Party of the decision. If an Investigator is removed and replaced, the Title IX Coordinator will send written notification to the Parties of the name of the new Investigator.

### (C)   Request to Remove a Hearing Board Member

A challenge to a member of the Hearing Board must be raised in writing within two (2) Business Days of receipt of the Notice of Live Hearing. The Title IX Coordinator will determine whether to remove the Hearing Board member. If the Hearing Board member is not removed, the Title IX Coordinator will notify the requesting Party of the decision. If a Hearing Board member is removed and replaced, the Title IX Coordinator will send written notification to the Parties of the name of the new Hearing Board member.

## VIII.   REPORTING POTENTIAL VIOLATIONS OF THIS POLICY, INCLUDING FORMAL COMPLAINTS

The College strongly encourages anyone who has information about a potential violation of this Policy, including Retaliation, to report to the Title IX Coordinator or another Campus Official. Any person may make a Report of a potential violation to the Title IX Coordinator in person, by mail, by telephone or by electronic mail. Reports by mail, telephone or electronic mail may be made at any time, including outside of regular business hours.

6

A Report does not constitute a Formal Complaint.  Members of the College community can find a Formal Complaint form online at https://www.roberts.edu/student-experience/title-ix/how-to-report/.  A completed Formal Complaint with an individual's physical or electronic signature can be submitted to the Title IX Coordinator through the web or by electronic mail or mail.  An individual can also prepare a document with the required contents of a Formal Complaint and submit it to the Title IX Coordinator through electronic mail, mail or an in-person meeting.  Finally, an individual may speak with the Title IX Coordinator prior to submitting a Formal Complaint, and the Title IX Coordinator can assist in filling out a Formal Complaint with the understanding that the Formal Complaint cannot be accepted without the Complainant's signature.

The timeframe for the Title IX Grievance Process begins with the filing of a Formal Complaint. The Grievance Process will be concluded within a reasonably prompt manner, and no longer than **ninety (90) school/calendar/business days** after the filing of the Formal Complaint, provided that the Process may be extended for a good reason, including but not limited to the absence of a party, a party's advisor, or a witness; concurrent law enforcement activity; or the need for language assistance or accommodation of disabilities. The procedure for applying for extensions is described below.

Any Campus Official who receives information or who otherwise has information about a potential violation of this Policy is required to share the information received, in full, with the Title IX Coordinator.

The College encourages individuals to make contact with the resources below as soon as the individual is prepared to make a report of the incident.

- Monika Robertson, the Title IX Coordinator, at 585.594.6222 or emailing robertson_monika@roberts.edu;
- Campus Safety by calling 585.594.7777; or on-campus extension 7777
- Local law enforcement by dialing 911;
- New York State Police's 24/7 hotline staffed by specially-trained responders at 1.844.845.7269

The College take seriously when alleged sexual misconduct occurs and to provide safety and solace, which may include medical treatment, counseling, and supportive measures.  All victims of sexual misconduct have the right to determine whether or not they wish to formally file a report with the College or law enforcement.  The College strongly encourages individuals who are considering whether to make a formal report to seek out one of the confidential resources on or off campus in order to have a safe and confidential venue to discuss options.

7

The health and safety of every student at the College is of utmost importance. The College recognizes that students who have been drinking and/or using drugs (whether such use is voluntary or involuntary) at the time that violence, including but not limited to domestic violence, dating violence, stalking, or sexual assault occurs may be hesitant to report such incidents due to fear of potential consequences for their own conduct. The College strongly encourages students to report domestic violence, dating violence, stalking, or sexual assault to institution officials. A bystander acting in good faith or a reporting individual acting in good faith that discloses any incident of domestic violence, dating violence, stalking, or sexual assault to the College's officials or law enforcement will not be subject to the College's code of conduct action for violations of alcohol and/or drug use policies occurring at or near the time of the commission of the domestic violence, dating violence, stalking, or sexual assault.

This document is aimed at helping you understand how confidentiality applies to different resources that may be available to you.

In general, the Wellness Center Counselors, Chaplain, and Student Health Services Staff are confidential reporters who are not required to report incidents of sexual misconduct. Their responsibility is to provide assistance. **All other campus faculty and staff are considered responsible employees who are required to report sexual harassment and misconduct, including sexual violence, of which they become aware to the Title IX Coordinator, and can assist students in reporting incidents of sexual misconduct.**

    **(A)**    Privileged and Confidential Resources

**On campus**, these confidential resources will not report alleged violations of this Policy to College officials or law enforcement without your permission, except for as dictated by law, such as when an individual is a threat to him or herself or others and the mandatory reporting of child abuse. At the College, this includes:

- The Counseling Center, located in the upper level of the Voller Athletic Center (across from the mailroom). You can reach the Counseling Center by calling 585.594.6882 (or Campus Safety at x. 7777 or 585.594.7777). Counselors can provide confidential support for you, including informing you of common emotional reactions and discussing coping methods that may assist you immediately following the assault and later. Talking about your concerns with a counselor in a safe and supportive environment may help you sort through your feelings and decide what to do. You do not need to disclose your name if you call the Counseling Center for information. Counselors will not reveal your identity to anyone without your permission. When classes are in session, the Counseling Center is open Monday through Friday from 9:00 a.m. to 5:00 p.m. During the semester there is a counselor on-call for after-hours emergencies. You can access the counselor on-call through your Assistant Dean of Students or Campus Safety. The Counseling Center is

8

closed over breaks and during the summer.  Visit the website for more information: http://www.roberts.edu/student-experience/counseling-  center.aspx

- The Campus Pastor can serve as a confidential resource.  You can contact the Pastor by visiting the office, located in the upper level of the Voller Athletic Center or calling 585-594-6530.

- The Student Health Center, located in Suite 231 of upper Voller Athletic Center. You can also reach the Health Center by calling 585.594.6360. Health Center staff can assist you with initial assessment after an incident of sexual violence.  In Fall and Spring semesters, Physician Assistants are in the Health Center from 8:00 – 11:30 a.m. on Monday, Wednesday, and Friday and from 1:30 -5:00 p.m. on Tuesday and Thursday.  During the Summer, students may still call the Health Center Monday through Wednesday from 8:00 a.m. to 1:00 p.m. for referrals to other health care providers and resources. Visit the website at  https://www.roberts.edu/student-experience/health-center.aspx

    **(B)**    **Off-campus** options to <u>confidentially</u> disclose sexual violence include:

- <u>Counselors and Advocates</u> - Members of the College community may contact any of the following local resources for confidential support:

  - Restore Sexual Assault Service's 24 hour/day, confidential rape crisis hotline:
    - 585.546.2777 (Monroe County)
    - 800.527.1757 (Genesee, Livingston, Orleans & Wyoming Counties)
  - Willow Domestic Violence Center's 24 hour/day confidential hotline (585.232.7353) for victims of domestic violence. Willow offers a shelter, counseling, support groups, children's services, court advocacy, Latina services, dating violence education, and transition programs. All services are free.
  - Safe Journey (585.425.1580), which serves women and children in transition from domestic violence who need individual or group counseling, advocacy or community referrals as they heal from abuse.
  - The Victim Resource Center of the Finger Lakes, Inc., a private,  non-profit domestic, sexual, stalking, dating violence and child abuse services agency that provides a 24 hour a day/7 day a week bilingual (Spanish/English) toll-free hotline at 866.343.8808 or 800.456.1172.

- <u>Medical Care</u> - Individuals who have experienced sexual violence should visit the Student Health Center, a local Emergency Department or the local medical provider of their choice for confidential emergency care, whether or not they have any intention of pursuing an on- campus complaint or complaint with law enforcement.  (Visits to a

9

hospital, urgent care center, or other medical provider are subject to a fee after insurance coverage.) An individual considering campus and/or law enforcement options against a Respondent (accused individual) should visit a Sexual Assault Forensic Examiner (SAFE) Nurse (also referred to as a Sexual Assault Nurse Examiner). SAFE Nurses provide free medical care for victims of sexual assault, and are specially trained in conducting sexual assault exams and collecting and preserving forensic evidence of the assault for possible prosecution of the assailant. Obtaining medical care or a sexual assault examination in no way binds anyone to pursue a complaint process. Options for seeking medical care include:

- o proceed directly to the Emergency Department at Strong Memorial Hospital (601 Elmwood Avenue in Rochester / 585.275.4551), which has a Sexual Assault Forensic Examination (SAFE) Center; *or*
- o proceed directly to the Emergency Department at Highland Hospital (1000 South Avenue in Rochester / 585.341.0725) to access a SAFE Nurse; *or*
- o call 585.922.4000 to access a SAFE Nurse at Rochester General Hospital (1425 Portland Avenue in Rochester); *or*
- o call Restore Sexual Assault Service's 24 hour/day, confidential rape crisis hotline at 585.546.2777 (Monroe County) or 800.527.1757 (Genesee, Livingston, Orleans & Wyoming Counties) for assistance locating a SAFE Nurse at other area hospitals and/or to request an escort to the hospital; *or*
- o call Campus Safety at 585.594.7777 or dial 7777 from a campus phone for assistance; *or*
- o call 911 for an ambulance.

A medical exam conducted by a SAFE Nurse (commonly referred to as a "rape kit") has two goals: (1) to diagnose and treat the full extent of any injury or physical effect and (2) to properly collect and preserve evidence. The exam may include testing and prophylactic treatment for HIV/AIDS, sexually transmitted infections ("STIs"); a vaginal examination; examining for injuries; and drawing blood. There is a limited window of time (typically 72 to 96 hours) following an incident of sexual assault to preserve physical and other forms of evidence. Gathering such evidence does <u>not</u> commit an individual to pursue legal action against the assailant, but is important for preserving that option.

- o If you suspect that you may have been given a rape drug, inform the hospital or clinic where you receive medical care and/or ask to provide a urine sample. Rape drugs, such as Rohypnol and GHB, are more likely to be detected in urine than in blood.

Hospitals are not required to report non-identifying information to the College or anyone else. However, hospitals providing care to individuals reporting sexual assault are required to:

10

- o collect and maintain the chain of custody of sexual assault evidence for not less than 30 days *unless* the patient signs a statement directing the hospital not to collect it;
- o advise the individual seeking medical treatment related to sexual assault of the availability of local rape crisis services or victim assistance organizations to accompany the individual through the sexual offense exam;
- o contact a local rape crisis or victim assistance organization to establish the coordination of non-medical services to individuals reporting sexual assault who request such coordination and services; and
- o provide emergency contraception upon the patient's request.

Even if an individual who has experienced sexual violence does not have injuries requiring emergency attention, the College encourages that individual to seek medical care as soon as possible.

Most health care providers will encourage an individual seeking medical treatment related to a sexual assault to authorize collection of evidence. (Note: If the individual has not seen medical personnel at the time a report is received by the College, the individual will be immediately advised to do so. The College will provide transportation, if needed.)Be aware that medical office and insurance billing practices may reveal information to the insurance policyholder, including medication and/or examinations paid for or administered. The NYS Office of Victim Services may be able to assist in compensating victims/survivors for health care and counseling services, including emergency compensation. More information may be found at: http://www.ovs.ny.gov/files/ovs_rights_of_cv_booklet.pdf, or by calling 1- 800-247-8035. Options are explained here: http://www.ovs.ny.gov/helpforcrimevictims.html.

Please note that even individuals who can typically maintain confidentiality are subject to exceptions under the law, including when an individual is a threat to him or herself or others and the mandatory reporting of child abuse.

The College will provide assistance to students and employees about existing counseling, health, mental health, victim advocacy, legal assistance, visa and immigration assistance, student financial aid, and other services available for victims in the community.

## IX.    RESPONSE TO POTENTIAL VIOLATIONS OF THIS POLICY

When the Title IX Coordinator or a Campus Official receives a Report, the College will respond by: (A) equitably offering Supportive Measures to the Complainant and Respondent, whether or not a Formal Complaint is filed; and (B) refraining from imposing upon Respondent disciplinary

11

sanctions or other actions that are not Supportive Measures unless and until the Respondent is found responsible for a violation of this Policy through a completed Grievance Process. Notwithstanding the foregoing, the College may impose an Emergency Removal or Administrative Leave as provided in Sections IX(E) and IX(F) below.

### (A)     First Steps

#### (1)     Purpose

When the Title IX Coordinator receives a Report of alleged Title IX Sex Discrimination or a Formal Complaint alleging Title IX Sex Discrimination, the Title IX Coordinator will seek to gather additional information regarding the alleged Title IX Sex Discrimination, to evaluate any risk of harm to individuals or to the campus community, and to address the immediate physical safety and emotional well-being of the Complainant.

#### (2)     Evaluating Risk of Harm

The Title IX Coordinator will take necessary action to address any risk of harm identified by the Title IX Coordinator, including implementation of Supportive Measures for either or both Parties, as appropriate, and actions designed to protect the larger campus community.   Supportive Measures are described in Section IX(D).  Any decision to remove a Respondent from campus pending the Grievance Process will follow the process discussed in the Emergency Removal section of this Policy (Section IX(E)).  At the Title IX Coordinator's discretion, one or more other Campus Officials (including but not limited to Dean of Students or Director of Campus Safety may also be included in the initial assessment or in evaluating information gathered in the initial assessment).

#### (3)     Notifications[2]

During this discussion, the Title IX Coordinator will provide the following information:

- notify the Complainant of the right to contact law enforcement (or not) and seek medical treatment;

- notify the Complainant of the importance of preservation of evidence;

- provide the Complainant with information about on- and off-campus resources;

---

[2] Under the Clery Act, The College must assess reported conduct for the need for a timely warning and, as applicable, enter the Report into the College's daily crime log.

12

- notify the Complainant that the institution can provide assistance in initiating legal proceedings in family court or civil court;

- notify the Complainant of the range of Supportive Measures available with or without filing a Formal Complaint;

- provide the Complainant with an explanation of the procedural options; and

- explain the College's policy prohibiting retaliation.

**(B)     Determination of Next Step**

After assessing the information gathered, the Title IX Coordinator will take one of the following steps regarding the Grievance Process:

(a)     Initiate Grievance Process

If the Title IX Coordinator determines that the alleged misconduct falls within this Policy and a Formal Complaint has already been submitted, the Title IX Coordinator will proceed with one of the options described in Section X(F) below.

If a Formal Complaint has not yet been submitted, the Title IX Coordinator will advise the Complainant that a Formal Complaint is required to initiate an investigation. The Title IX Coordinator will provide the Complainant a Formal Complaint form (or link to a website where one can obtain and submit a Formal Complaint through the web, by email or by mail) for the Complainant's completion and signature. Once a signed Formal Complaint is submitted, the Title IX Coordinator will proceed with one of the options described in Section X(F) below.

The Title IX Coordinator may initiate the Grievance Process without a Formal Complaint signed by the Complainant under the circumstances described in Section IX(C) below and under any other circumstances that, in the Title IX Coordinator's discretion, require the institution to investigate the allegations underlying a Report.

(b)     Dismiss Formal Complaint

A Notice of Dismissal will be issued to the Complainant if a Formal Complaint has been submitted but the Title IX Coordinator determines the alleged misconduct does not fall within this Policy because: the Complainant is not participating in or attempting to participate in a College Education Program or Activity; the conduct did not occur within the College's Education Program or Activity; the conduct did not occur within the United States; or the Respondent is no longer enrolled or employed by the College. The Notice of Dismissal, which will be issued to the Complainant within two (2) Business Days of the Title IX Coordinator's determination, will

13

include the reasons for the dismissal.  The Complainant has the right to Appeal from dismissal of a Formal Complaint on any of the following grounds:

- Procedural Irregularity that affected the outcome of the matter;
- New evidence that was not reasonably available at the time the determination regarding dismissal was made, that could affect the outcome of the matter; and/or,
- Conflict of interest or bias for or against Complainants or Respondents generally or the individual Complainant or Respondent that affected the outcome of the matter

Appeals from a Notice of Dismissal must be submitted in writing to Ruth Logan, Title IX Administrator within three (3) business days from delivery of the Notice of Dismissal and in the method described in the Notice of Dismissal.

(c)    Refer for Action Pursuant to Different College Policy

With or without a Formal Complaint, when the Title IX Assessment concludes with a determination that the alleged conduct does not fall within the scope of this Policy but involves conduct that, if found to have occurred, violates another College policy, the matter will be referred for further action.  The determination regarding next steps will be communicated to the Parties in writing.  When a Formal Complaint has been submitted, this information will be included in the Notice of Dismissal.  The Parties have the right to submit an Appeal from dismissal of a Formal Complaint on the same grounds and in the same manner explained in (b) above.

(C)    **Weighing a Complainant's Request Not to Proceed with the Grievance Process**

*(1)    General Description of Process*

If a Complainant requests that the College refrain from proceeding with the Grievance Process, the Title IX Coordinator may still decide that proceeding with the Grievance Process is necessary. The Title IX Coordinator must weigh such a request against the College's obligation to provide a safe, non-discriminatory environment for all community members and will confer with the Complainant when reaching a determination whether to proceed.

*(2)    Decision to Proceed*

If the College determines that it must proceed with the Grievance Process, the Title IX Coordinator will notify both Parties prior to commencing any investigation (as described further below in Section X(F)(1)).  In the event the Title IX Coordinator decides to proceed, the Complainant will still be treated as a Party within the Grievance Process.  Even a non-participating Complainant will be offered Supportive Measures, which will be reviewed and evaluated on an ongoing basis, and

14

*Approved August 14, 2020*

will be provided information regarding their right to report a crime to campus or local law enforcement and with assistance if they wish to do so.

### (D)    Supportive Measures

Promptly after receipt of a Report, the Title IX Coordinator will contact the Complainant and Respondent (if identified or identifiable based upon the Report) to discuss the availability of Supportive Measures.  Supportive Measures are available with or without the filing of a Formal Complaint.  In evaluating the Supportive Measures to be provided, the Title IX Coordinator will make an individualized determination, considering Complainant's wishes and other relevant factors, of the non-disciplinary, non-punitive measures that will be provided to the Complainant and Respondent to restore or preserve equal access to the College's Education programs or Activities, to protect the safety of the Parties, and/or to deter Title IX Sex Discrimination.

All Supportive Measures will be provided without fee or charge and without unreasonably burdening the other Party.  Supportive Measures will be maintained as confidential by the College to the extent that confidentiality will not impair the ability to provide the Supportive Measures.

Examples of Supportive Measures that may be implemented by the College include but are not limited to:

- Academic extensions or adjustments
- Campus escort services
- Changes in housing
- Counseling
- Increased security or monitoring of certain areas of the campus
- Modifications of class or work schedules
- Mutual restrictions on contact between the Parties

Appropriate Supportive Measures will also be available to Employees.

### (E)    Emergency Removal of a Respondent

The College may implement emergency removal of a Respondent, whether or not a Formal Complaint has been submitted, if there is an immediate threat to the physical health or safety of any student or other individual that arises from allegations of conduct that could constitute a violation of this Policy.

15

*Approved August 14, 2020*

Prior to implementing an emergency removal, the College will first gather information to undertake an individualized safety and risk analysis. The analysis will be conducted by an individual who is free from bias or conflict of interest; who has relevant knowledge and experience; and who will not be involved in any later Grievance Process related to the student who is being evaluated for potential removal.

> (1)     *Factors to be Considered*

The emergency removal analysis will focus on the specific Respondent at issue and examine the specific circumstances arising from the allegations of Title IX Sex Discrimination that potentially pose an immediate threat to a person's physical health or safety.

To evaluate the presence of an "immediate threat," the College will consider a Complainant's stated subjective fear and will also apply an objective reasonable person standard. The College will consider the student's propensity, opportunity, and ability to carry out a stated or potential threat. The analysis will evaluate whether Supportive Measures are a more appropriate and less restrictive means to negate or sufficiently minimize the likelihood of a threat being carried out. As part of its analysis, the College may rely on objective evidence and current medical knowledge, and may consult with a licensed evaluator to analyze the information gathered. The College shall also consider Respondent's rights, if any, under applicable federal and/or state disability laws.

In addition, the relationship between a threat and the physical health or physical safety of any student or other individual will also be carefully evaluated. In some but not all cases, threatening speech or virtual interactions without an associated action may rise to the level of a threat to physical health or physical safety. If the threat a Respondent poses is in the nature of potential emotional impact only, the College will instead focus on identifying appropriate Supportive Measures.

The College will also closely examine whether the emergency created by the immediate threat arises from the allegations of conduct that could constitute Title IX Sex Discrimination under this Policy. As an example, an immediate threat to Complainant's physical safety is likely present when a Respondent threatens physical violence against the Complainant in response to the Complainant's allegations of verbal harassment by the Respondent. Threats of physical self-harm will be addressed under separate, applicable policies. If the individualized safety and risk analysis results in a determination that a Respondent's actions pose an immediate and identified threat, but do not arise from allegations of Title IX Sex Discrimination, the College will respond pursuant to other applicable policies and/or procedures.

The College's assessment of the appropriateness of emergency removal will account for its multiple potential impacts, including: whether providing the Complainant Support Measures will be sufficient to ensure equal educational access; the adverse impacts of separating a Respondent

16

from educational opportunities and benefits; and the protection of the health and safety of the College's community. When assessing an emergency removal, the College will also consider the anticipated timeline of an investigation and hearing. Given these evaluations are necessarily fact specific, in some cases the College may determine that restricting a Respondent's participation in specific programs or activities will adequately address the situation.

      *(2)     Emergency Removal is Not Discipline nor a Determination of Responsibility*

At all stages of the process, the College will ensure that the emergency removal will not impose a premature sanction on the Respondent or circumvent the Grievance Process. An emergency removal does not equate to a Determination of Responsibility for a Policy violation and will not result in a presumption of responsibility in any subsequent Grievance Process.

      *(3)     Ongoing Evaluation*

The College will continually evaluate whether the presence of an immediate threat to physical health or safety of a student or another individual has remained the same or changed such that the removed student can be safely returned to programs or activities in a partial or complete manner.

      *(4)     Notice of Emergency Removal and Opportunity to Request Review*

In the event the College determines that emergency removal of a Respondent is appropriate, the Respondent will be notified in writing within two (2) Business Days of the removal decision. This written notice will include details about the specifically identified emergency threat of physical safety or harm underlying the decision, as well as information about the Respondent's immediate opportunity to request review of the Emergency Removal decision.

      **(F)    Placement of Employee on Administrative Leave**

In the event a Formal Complaint alleges conduct that could constitute Title IX Sex Discrimination and identifies an Employee as Respondent, the College may decide to place the Respondent on administrative leave, in emergency and non-emergency situations. The purpose of such an administrative leave is to allow a temporary separation of the Employee while the Grievance Process is ongoing. The College will determine the terms and conditions of the leave on a case-by-case basis. The decision process for placing an Employee-Respondent on leave will respect their rights under Title VII, Americans with Disabilities Act, and all other applicable employment laws.

The College may place a student-employee on administrative leave from on-campus employment in a non-emergency situation in order to provide Supportive Measures to a Complainant. The College will make its best efforts not to unreasonably burden the Respondent with placement on leave and will fully evaluate whether there are alternative and less restrictive measures that would

17

*Approved August 14, 2020*

be more appropriate. In most situations, a student-employee placed on administrative leave from on-campus employment as a Supportive Measure will continue to receive pay until the conclusion of the Grievance Process.

## X.     GRIEVANCE PROCESS FOR FORMAL COMPLAINTS

### (A)     Overview

All entitlements established in this section apply equally to both Parties. This process applies when a Formal Complaint is signed and submitted, whether by a Complainant or the Title IX Coordinator on behalf of the College. This process is grounded in a presumption that a Respondent is not responsible unless and until a Determination of Responsibility at the conclusion of this process. The standard of review for determinations regarding responsibility at the conclusion of this process is the preponderance of evidence.

Formal Complaints are resolved either through Live Hearing or Informal Resolution, briefly described as follows:

> **Live Hearing:** The Live Hearing process, and the investigation process that precedes the Live Hearing, are described at Sections X(I) (Investigation) and X(K) (Live Hearing). The standard of review for determinations regarding responsibility at the conclusion of this process is the preponderance of evidence.

> **Informal Resolution**: a ***voluntary*** process for resolution of Formal Complaints. The Title IX Coordinator or any Party may propose or request consideration of Informal Resolution. During the Informal Resolution process, a Facilitator(s) will attempt to help the Parties come to an agreement about how to resolve a Formal Complaint. The Informal Resolution process is available to the Parties any time after a Formal Complaint is filed and before the Written Determination is issued by the Hearing Board, except in matters in which a student Complainant alleges Title IX Sex Discrimination by an Employee. Participation in the Informal Resolution process is entirely voluntary and all Parties must agree to participate. The Informal Resolution process is more fully described in Section X(F)(2).

### (B)     Length of Process

The College seeks to resolve all Reports of Title IX Sex Discrimination promptly, thoroughly, fairly, and equitably. The timeframes which the College strives to meet can be found at Section XIII. The College will inform the Parties at regular intervals of the status of the Grievance Process. Circumstances may arise that require the extension of anticipated time frames. Such circumstances

18

may include the complexity of the allegations, the number of Witnesses involved, the availability of the Parties, Witnesses, or others involved, the effect of a concurrent criminal investigation, breaks or other closures of campus, faculty sabbatical, approved employee leave or unforeseen circumstances.  In the event timelines are modified, the College will provide written notification to the Parties.

### (C)     Privacy of Process

The College will keep confidential the identity of any individual who has made a Report or Formal Complaint, and the identity of any Complainant, Respondent, and Witness except as permitted by FERPA, required by law, or as necessary for the Institution to take action under this Policy.

### (D)     Participation in Grievance Process is Voluntary

Neither Parties nor Witnesses are required to participate in the Grievance Process, but without their live testimony at the hearing, the Hearing Board cannot rely upon their Statements.  The College may not threaten, coerce or intimidate a Party or Witness into participating, nor may the College retaliate against a Party or Witness for declining to participate in any part of the Grievance Process.

### (E)     Right to an Advisor and Advisor Role

Each Party has the right to choose an Advisor of their choice to assist and advise them (at the Party's own expense, if the Advisor is paid).  Each Party has the right to be accompanied by their Advisor throughout the Grievance Process, including during all related meetings and hearings. Parties are encouraged to identify an Advisor as soon as practical, as Advisors play an important role.  Advisors:

1.     provide support to the Party but do not serve as a proxy voice for the Party;

2.     can confer quietly with their advisee as needed, but if there is a need for an extended discussion, the Party should ask for a break in the meeting, interview or Live Hearing;

3.     may not make statements or arguments or answer questions on behalf of Parties during meetings, interviews or during the Live Hearing;

4.     may not speak during the hearing process, except in connection with Cross-examination Questions, described in Section X(K)(9);

5.     cannot direct the Party how to answer a question; and

6.     must conduct themselves quietly and professionally, must not disrupt any meeting, interview or proceeding, and must comply with any rules of decorum imposed by the College.

*Approved August 14, 2020*

An Advisor who does not follow the guidelines above may be removed from the meeting, interview or Live Hearing.

Each Party must notify the Title IX Coordinator promptly of the name, title, and contact information for their Advisors and any change in their Advisor. If a Party does not select an Advisor and the matter proceeds to a Live Hearing, an Advisor will be appointed by the College, at no fee to the Party, to ask Cross-examination Questions on that Party's behalf.

### (F)     After a Formal Complaint is Accepted

Once a Formal Complaint is signed, submitted, and approved to proceed by the Title IX Coordinator, the College will take one of the following actions:

*(1)     Initiate an Investigation* (see Section X(I) below)

In these circumstances, the Title IX Coordinator will issue a Notice of Investigation to known Parties sufficiently in advance of any request to meet with the Investigator. This Notice of Investigation will include:

(a)     Notice of these grievance procedures, including the Informal Resolution process, and a copy of this Policy.

(b)     The conduct alleged to violate this Policy, and the date and location of the alleged incident, if known.

(c)     Known Parties involved in the alleged incident

(d)     A statement that the Respondent is presumed not responsible for the alleged misconduct and that a Determination of Responsibility will be made at the conclusion of the process.

(e)     Notice of the Parties' right to an Advisor of choice, who will be permitted to accompany them to investigation meetings, interviews, and any hearing and to review materials provided to their advisee throughout the process. The role of Advisors during the Grievance Process is explained in Sections X(E), X(K)(4), and X(K)(9) of this Policy.

(f)     Notice of and citation to the College's prohibition on knowingly making false Statements or submitting false information during a College process.

(g)     The name(s) and title(s) of the Investigator(s).

20

If during the course of an investigation, new or additional allegations arise that require investigation, the College will send the Parties an updated Notice of Investigation revising the scope of the Investigation. Any objection to a named Investigator must be submitted as provided in Section VII(B) above.

(2)   *Informal Resolution*

The Informal Resolution process will be followed when a signed Formal Complaint has been accepted and: (a) the Title IX Coordinator suggests that an Informal Resolution may be an appropriate course of action and the Parties agree to that approach, or (b) a Party requests that the Title IX Coordinator consider allowing an attempted resolution of the Formal Complaint through the Information Resolution process, the Title IX Coordinator finds the matter appropriate for Informal Resolution, and the Parties agree to proceed in that manner. The Informal Resolution process is available to the Parties any time after a Formal Complaint is filed and before the Written Determination is issued by the Hearing Board. Participation in the Informal Resolution process is entirely voluntary and all Parties must agree to participate. Information Resolution is not available when a Formal Complaint alleges that a College employee engaged in Title IX Sex Discrimination toward a student.

(a)   Notice

Prior to beginning the Informal Resolution process, the College will provide the Parties notice of the allegations of the Formal Complaint and will direct the Parties' attention to this provision of the Policy for an understanding of the requirements of this process and the consequences of participating in this process. The notice will also advise of the requirement that each Party must sign the "Consent to Informal Resolution Process" form and submit it to the Title IX Coordinator before the Informal Resolution process can begin.

(b)   Commencement of Informal Resolution Process and its Effect on the Grievance Process

When all Parties to a Formal Complaint have submitted the consent forms, the College will pause the Grievance Process, including any ongoing investigation or hearing, for a period of fourteen (14) days (unless a shorter or longer time is set by the Title IX Coordinator), to allow the Parties to proceed with the Informal Resolution Process. The time period during which the Grievance Process is paused for the Informal Resolution process shall not count toward the time periods set forth in Section XIII below.

The Facilitator(s) may not be called to serve as a Witness in the Grievance Process.

21

(c)    The Process

The Facilitator(s) will decide the process and procedures to be used in the Informal Resolution process but shall not take actions inconsistent with this Policy.  The Facilitator(s) will treat the Parties fairly and equitably.  Each Party may be accompanied by their Advisor during the Informal Resolution process.  The Facilitator(s) may meet with the Parties separately, may share information obtained during the course of any investigation with the Parties, may make suggestions about the terms of an Informal Resolution, and may take other reasonable steps to assist the Parties in determining if they can reach an Informal Resolution.

The Facilitator(s) shall not require the Parties to meet together, in person; the Parties will meet together only if they choose to do so.

(d)    Informal Resolution Agreements

If the Parties reach an agreement, the Facilitator(s) shall create a written agreement that lists the terms of the Informal Resolution for the Parties to sign.

A Party may withdraw from the Informal Resolution process at any time before they sign a written document agreeing to an Informal Resolution of a Formal Complaint.

(e)    Title IX Coordinator Approval of Agreement

The Title IX Coordinator will defer to the Parties' agreement unless the Title IX Coordinator determines that it is impractical, unduly burdensome or inconsistent with the College's obligations under this Policy, Title IX or another applicable law or policy.  If the Title IX Coordinator declines to approve the Parties' written agreement on one of these bases, with the assistance of the Facilitator(s), the Parties may agree to modify and resubmit the agreement.  If they do not agree to do so and/or do not submit a modified written agreement, the College shall resume the Grievance Process.

(f)    Recordkeeping

When a Formal Complaint is resolved through an approved written agreement after Informal Resolution, the College shall retain the Formal Complaint, any documents prepared in the course of the Grievance Process, any documents prepared in the course of the Informal Resolution process, the final approved written agreement documenting the Informal Resolution, and any documentation of the implementation of the Informal Resolution.  Those documents shall be retained in accordance with the Recordkeeping requirements set forth in this Policy at Section XIV.

22

### (G)    Concurrent Law Enforcement Activity

When the College receives a Report or Formal Complaint alleging Title IX Sex Discrimination to which it has determined it must respond through its Grievance Process, the College's process continues regardless of whether a Complainant has made or decides to make a report to law enforcement.  The filing of a report with law enforcement, or an ongoing law enforcement investigation or proceeding, does not relieve the College of its obligation to address the Complaint through its Grievance Process.  At the College's discretion, the College may temporarily pause its investigation at the request of law enforcement.  In that circumstance, the Title IX Coordinator will send written notice to both Parties explaining the reason for pausing the investigation. Extension of timelines at the request of law enforcement typically will not exceed ten (10) days unless law enforcement specifically requests and justifies a longer extension.  The College and law enforcement may coordinate their investigations, including sharing information to the extent it is prudent and feasible.

### (H)    Consolidation of Certain Formal Complaints

The College may consolidate its processing of Formal Complaints in appropriate circumstances, such as when allegations arise out of the same facts or circumstances and multiple Complainants allege misconduct by one Respondent, multiple Complainants allege misconduct by more than one Respondent, one Complainant makes multiple allegations against one Respondent or a Respondent makes a cross-complaint against the Complainant.  All parties will be notified in writing of a decision to consolidate Formal Complaints.

### (I)    Investigation

The College's investigation process is designed to (1) allow for the thorough, impartial, and reliable gathering of information and (2) result in a comprehensive investigation report summarizing relevant, admissible evidence.  The College strives to assemble and share with the Parties all inculpatory and exculpatory information gathered during the investigation that is directly related to the allegations of the Formal Complaint (*see* Section X(I)(3) below) within 60 Business Days of receipt of Notice of Investigation, understanding that numerous issues arise during investigations that may justify a good cause extension of the timeline as described in Section X(B) above.

### (1)    Assignment of Investigator

The Title IX Coordinator will supervise the investigation, starting with determining who will serve as Investigator.  The Investigator may be: a College Employee or Employees; an external Investigator or Investigators; or a team of Investigators that pairs an external Investigator with a College Employee.

23

(2)     *Process Overview*

All Investigators will conduct the investigation with a presumption that the Respondent is not responsible and will investigate free of bias or any conflict of interest.  The Investigator(s) will conduct the investigation in a manner appropriate in light of the circumstances of the case, which will typically include interviews with the Complainant, the Respondent, and any Witnesses.  The Investigator(s) will provide advance written notice to Parties of the date, time, location, participants, and purpose of any requested meeting(s).

Interviews will be supplemented by the gathering of any physical, documentary, and other evidence, as appropriate and available.  The burden of gathering relevant, admissible information rests on the College.  The Parties will have an equal opportunity to submit evidence and suggest Witnesses (including fact and expert Witnesses).  Investigation interviews will be conducted in a thorough, impartial, and fair manner; all involved individuals will be treated with appropriate sensitivity and respect.

The Investigator(s) will decide which individuals to interview based on the information the Investigator(s) gathers as part of the investigation and, with respect to Witnesses offered by a Party, the Investigator may ask the Witnesses to describe the information the Party expects the Witness to provide.  The Title IX Coordinator may also direct that additional interviews be conducted.

The Investigator(s) will not ask questions or gather information or documents protected by a legally recognized privilege, including treatment records of a physician, psychiatrist, psychologist or other recognized professional or paraprofessional acting in a professional capacity, without written consent to use such documents in the Grievance Process from the person protected by the privilege.  Further, the Investigator(s) will not seek information about a Complainant's sexual predisposition and will only allow submission of or pursue information about a Complainant's prior sexual behavior if such questions and evidence: (1) are offered to prove that someone other than the Respondent committed the alleged misconduct or (2) concern specific incidents of the Complainant's prior sexual behavior with respect to the Respondent and are offered to establish Consent.

(a)     Confidentiality Cannot be Promised

The investigation will be conducted in a manner that is respectful of individual privacy concerns.  To be clear, however, confidentiality cannot be promised during an investigation because, for example, the Investigator may need to speak with Witnesses and others to gather evidence.

24

       (b)     Parties' Rights to Discuss the Allegations and Consequences for Providing False or Manipulated Information

The Parties are not restricted from discussing the allegations under investigation or from gathering and presenting relevant evidence. However, where the investigation reveals intentional efforts by a Party to fabricate or alter information they submit or to influence the information a Witness provides to the Investigator, conduct charges may result.

       *(3)     Parties' Review of and Response to Information Gathered as Part of Investigation*

At the conclusion of the investigation, the Investigator will assemble all inculpatory and exculpatory information gathered during the investigation that is directly related to the allegations of the Formal Complaint, including information upon which the College does not intend to rely in reaching a determination regarding responsibility. The Investigator will redact information that is unrelated to the allegations of the Formal Complaint or otherwise not admissible in the Grievance Process (i.e., (a) because it is subject to an unwaived legally recognized privilege, (b) it relates to Complainant's sexual predisposition or (c) constitutes prior sexual history not offered to establish: (i) Consent or (ii) that Respondent did not engage in the alleged misconduct). The College will create a list describing information it has redacted or removed as irrelevant, inadmissible or not directly related to the allegations of the Formal Complaint, which it may allow the Parties to inspect.

The assembled information will then be shared with the Parties and their Advisors in hard copy or an electronic format with at least ten (10) Business Days to review and submit a written response. Depending on the nature of the information shared, the College may require Parties and their Advisors to agree to restrictions or sign a non-disclosure agreement prohibiting dissemination of any of the information provided for inspection and review or use of such evidence for any purpose unrelated to this Grievance Process.

The Investigator will review the Parties' responses to evaluate whether further investigation may be required to ensure the investigation is thorough and complete. In consultation with the Title IX Coordinator, the Investigator will determine any further action indicated by the Parties' responses and develop a plan to complete the investigation.

       *(4)     Investigation Report*

After considering the Parties' responses and conducting any additional investigation indicated by those responses, the Investigator will prepare a report summarizing all of the relevant, admissible information obtained during the investigation, including Inculpatory Evidence and Exculpatory Evidence. The Investigator will incorporate the Parties' responses to the report, as well as an explanation of any additional steps taken after receipt of Party responses, and include any related

materials.  All of these written submissions and all relevant, admissible information gathered during the investigation will collectively be considered the investigation report.

To the extent that the investigation report includes an assessment of Party and Witness Credibility, Credibility determinations may not be based upon a person's status as a Complainant, Respondent or Witness.

### (5)    Parties' Review of and Response to Investigation Report

The College will share the investigation report with the Parties and their Advisors either in hard copy or an electronic format, and each Party will have at least ten (10) days to review and respond to the investigation report in writing.  Upon receipt of the Parties' responses after review of the investigation report and a determination by the Title IX Coordinator (in consultation with the Investigator) that the investigation is complete, the College will notify all Parties that the investigation is complete and provide information about next steps in the process.

### (J)    Determination After Investigation

### (1)    Proceed to Live Hearing

At the conclusion of the investigation, the Title IX Coordinator will review the investigation report to determine whether the conduct, if proved, falls within this Policy.  When the alleged conduct, if proved, falls within this Policy, the Title IX Coordinator will prepare a Notice of Live Hearing based on information contained in the investigation report.  (*See* Section X(K)(1) below.)

### (2)    Dismissal of Formal Complaint

If the conduct, even if proved, does not fall within this Policy because it would not constitute Title IX Sex Discrimination, the conduct did not occur within the College's Education Program or Activity or did not occur within the United States, the College must dismiss the Formal Complaint. The College may also dismiss a Formal Complaint if the Title IX Coordinator determines: that there is not sufficient cause to believe the alleged conduct may have occurred; the Respondent is no longer enrolled or employed by the College; or specific circumstances prevent the College from gathering sufficient evidence to reach a Determination of Responsibility or No Responsibility.

In either instance, the Title IX Coordinator will issue a Notice of Dismissal, including the reasons for the dismissal, to the Parties simultaneously within (2) two Business Days of the Title IX Coordinator's determination.  If the alleged conduct would potentially violate a different College Policy, the Notice of Dismissal will include information about the referral and immediate next steps.

*Approved August 14, 2020*

The Parties have a right to submit an Appeal from a dismissal of a Formal Complaint on the same grounds and using the same process described in Section IX(B)(b) above.

### (K)   Live Hearings

#### (1)   Notice of Live Hearing

The Live Hearing process begins with the issuance of a Notice of Live Hearing.  The Notice of Live Hearing will be sent to the Parties simultaneously within ten (10) Business Days of the delivery of conclusion of the Investigation and at least five (5) Business Days before the scheduled hearing date.  The Notice of Live Hearing will include the following information:

- the date, time, and location of the Live Hearing;

- a brief factual summary of the conduct alleged to have violated the Policy, including date, time, and location;

- the specific Policy provision(s) at issue;

- possible sanctions associated with a finding of responsibility for the alleged Policy violation(s);

- the composition of the Hearing Board empaneled by the Title IX Coordinator;

- the Parties' right to be accompanied by an Advisor at the Live Hearing and the obligation to notify the Title IX Coordinator within (2) two days of receipt of the Notice of Live Hearing of: (1) the name, title, and contact information for their Advisors, (2) whether they will continue to be advised by the same Advisor as during the investigation (if applicable) or (3) that they do not intend to select an advisor;

- a statement that there is a presumption of No Responsibility on the part of the Respondent until a determination regarding responsibility is made at the conclusion of the Grievance Process; and

- information regarding the Informal Resolution process (as applicable).

In addition, the Notice of Live Hearing will attach a copy of this Policy or include a web link to this Policy.

#### (2)   Title IX Coordinator as Hearing Board Chair

Hearings are convened by the Title IX Coordinator.  The Title IX Coordinator oversees all hearings.  In rare circumstances when the Title IX Coordinator is unavailable or ineligible to do so, the Title IX Coordinator will appoint a delegate to convene and oversee the Hearing Board process.  The Title IX Coordinator will be the ***non-voting*** chair of all Hearing Boards during Live

27

Hearings, serving as a process and policy advisor to the Hearing Board.  In this role, the Title IX Coordinator may be referred to as the Hearing Officer.

The Title IX Coordinator is never a Decision-maker, whether in connection with a Live Hearing or an Appeal, but may be an Investigator.

>    *(3)     Hearing Board*

Prior to the Live Hearing, the Hearing Board will have read all of the information in the file.  The Parties will have the same information as the Hearing Board.

>    (a)     Gathering Information

The Hearing Board will focus its questions on those areas where it needs clarification or more information.  The Hearing Board will not necessarily need or want Parties or Witnesses to repeat everything they shared during the investigation, but as the Decision-maker(s), the Hearing Board is obligated to come to its own Findings of Fact.

The Hearing Board has the right and responsibility to ask questions and elicit information from Parties and Witnesses on the Hearing Board's own initiative to aid the Hearing Board in obtaining relevant information, both inculpatory and exculpatory.

Only members of the Hearing Board may ask questions of any person testifying, except in connection with Cross-examination Questions asked by Advisors (*See* Section X(K)(9).  The Hearing Board is responsible for ensuring that it has sought and probed all information necessary to make an informed decision.  At times, the Hearing Board will need to ask difficult or sensitive questions in order to understand the allegations, related information, and to gain a full understanding of the context.

If at any time a Party does not understand a question or why the Hearing Board is asking a question, the Party should let the Hearing Board know.  The Hearing Board will explain and modify its question at its discretion.

The Parties have equal rights to present information in front of the Hearing Board, which ensures that the Hearing Board has the benefit of each Party's perspectives about the evidence.

Parties have no right to self-representation and may not ask questions directly of the other Party or Witnesses.

>    (b)     Evaluating Information

The Hearing Board must objectively evaluate all admissible, relevant evidence for weight or Credibility, including both Inculpatory Evidence and Exculpatory Evidence.  The Hearing Board

*Approved August 14, 2020*

must focus on evidence pertinent to proving whether facts material to the allegations under investigation are more or less likely to be true. Determinations of Credibility must be based on objective evaluation of relevant evidence, not on a person's status as a Complainant, Respondent or Witness or inferences from Party or Witness status. Factors related to Credibility are set forth in the definition of Credibility. Credibility determinations are based on a number of factors, including demeanor (but ***never*** only demeanor); opportunity and capacity to observe the event; contradiction or consistency with other evidence; availability of corroboration (where it should logically exist, noting that corroborating evidence is not required); level of detail in Statement or testimony; motive to be untruthful; and inherent plausibility or implausibility.[3] The evaluation of Credibility also takes into account the normal fallibility of human memory.

A Party's answers to Cross-examination Questions will be evaluated by the Hearing Board in context, taking into account that a Party may experience stress while answering Cross-examination Questions. Parties will not be unfairly judged if they are unable to recount every specific detail in sequence, whether such inability is due to trauma, the effects of drugs or alcohol or simple fallibility of human memory. These factors will also be considered as part of the Credibility assessment.

(4)    *Role and Obligations of Advisors During Hearings*

The Advisor's role and consequences for exceeding that role are set forth at Section X(E) above with the following important additions relevant to the Live Hearing:

(a)    Advisors may not speak during the hearing process, except in connection with Cross-examination Questions, described in Section X(K)(9). Therefore, in all instances other than Cross-examination Questions, Advisors may not speak to the Hearing Board, make statements or arguments, or answer questions on behalf of a Party.

(b)    Advisors conducting Cross-examination must be capable of understanding the purpose or scope of Cross-examination. Equal competency between the Parties' Advisors is not required.

(c)    When conducting Cross-examination, Advisors need not be advocates for Parties, but simply may be individuals who ask questions.

---

[3] U.S. Equal Employment Opportunity Commission: Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors (June 18, 1999). https://www.eeoc.gov/laws/guidance/enforcement-guidance-vicarious-liability-unlawful-harassment-supervisors

(d)     Advisors cannot direct the Party how to answer a question.  Parties should provide their own responses to questions, not the responses their Advisor believes would be best.

### (5)     Location of the Live Hearing

Live Hearings may be conducted with all Parties physically present in the same geographic location or, at the College's discretion, any or all Parties, Witnesses, and other participants may appear virtually at the Live Hearing, with the Parties being able to see and hear each other and Witnesses live.

At the request of either Party, the College will provide for the entire Live Hearing (including Cross-examination) to occur with the Parties located in separate rooms with technology enabling the Parties to see and hear each other.  Unlike Parties, Witnesses do not have the right to demand to testify in a separate room, but the College, in its discretion, may permit any participant to appear remotely.

### (6)     Scope of the Live Hearing

The Live Hearing will relate solely to charges set forth in the Notice of Live Hearing received by the Parties.  If the Parties or any Witnesses share information that goes beyond these charges, the Hearing Board will redirect the speaker to the charges at hand.

Parties may be accountable for additional violations discovered through the Grievance Process even if they do not appear in the Notice of Live Hearing.  In this instance, a separate Grievance Process under this Policy or under other applicable policies will commence.

### (7)     Attendance at the Hearing

The Live Hearing is closed, meaning it is not open to the public.  Witnesses may be present only for their individual meeting with the Hearing Board.  Advisors and Parties may be present throughout the proceeding.  If a Party, after having been given notice, does not appear at the Live Hearing, the Live Hearing will be conducted in their absence, and the Party's Advisor may appear and conduct Cross-examination.  In the event neither a Party nor their Advisor appear at the hearing, the College will provide an Advisor to appear on behalf of the non-appearing Party.

### (8)     Expectation of Honesty

Parties and other individuals who offer information at a Live Hearing are expected to respond honestly and to the best of their knowledge.  The Hearing Board reserves the right to recall any Party or Witness for further questions and to seek additional information as it deems necessary.  A

30

Party or Witness who intentionally provides false or misleading information may be subject to discipline under this Policy or other applicable policies.

     *(9)*    *Cross-examination Questions and Effect of Failure to Submit to Cross-examination*

        (a)    Advisors Conduct Cross-examination

Advisors are allowed, on behalf of the Party they are advising, to cross-examine the other Party and Witnesses by asking relevant questions and follow-up questions, including questions challenging Credibility.

        (b)    Relevance Determination Before Answering

Before a Party or Witness answers a Cross-examination question, the Hearing Board must determine if the question is relevant. If a question is deemed irrelevant, the Hearing Board must explain why. The requirement of relevancy (see definition of Relevance at Section XVI) applies throughout the hearing, including during Cross-examination, and will be determined by the Hearing Board. Parties should understand that the process of Cross-examination may be difficult and may feel uncomfortable because its purpose is to promote the perspective of the other Party. Cross-examination Questions may not be submitted in writing in advance of the Live Hearing or during the Live Hearing for purposes of seeking an evaluation of Relevance.

        (c)    Effect of Not Submitting to Cross-examination

If a Party or Witness does not submit to Cross-examination by Advisors at the Live Hearing, the Hearing Board must not rely on any Statement of that Party or Witness in reaching a determination regarding responsibility. This rule does not apply if a Party or Witness refuses to answer questions posed by the Hearing Board.

        i.    "Submit to Cross-examination" means answering those Cross-examination Questions that are relevant, as determined by the Hearing Board in real time during the Live Hearing. If a Party or Witness disagrees with the Hearing Board's Relevance determination, they may either (a) abide by the Hearing Board's determination and answer the question or (b) refuse to answer the question. In the event the Party or Witness refuses to answer the question, unless the Hearing Board reconsiders the Relevance determination, the Hearing Board cannot rely on any Statement of that Party or Witness.

        ii.    "Statement" has its ordinary meaning, but would not include evidence (such as videos) that do not constitute a person's intent to

*Approved August 14, 2020*

make factual assertions, or to the extent that such evidence does not contain a person's Statements. Thus, police reports, SANE reports, medical reports, and other documents and records may not be relied on in making a final Determination after the completion of the hearing to the extent that they contain the Statements of a Party or Witness who has not submitted to Cross-examination. Documentary evidence such as police reports or hospital records may have been gathered during investigation and, if directly related to the allegations inspected and reviewed by the Parties, and to the extent they are relevant, summarized in the investigation report, the hearing is the Parties' first opportunity to argue to the Decision-maker about the Credibility and implications of such evidence. Probing the Credibility and reliability of Statements asserted by Witnesses contained in such evidence requires the Parties to have the opportunity to cross-examine the Witnesses making the Statements.

iii.    Examples

- This rule applies to law enforcement reports, SANE reports, medical reports, and any other documents and records that contain the Statements of a Party or Witness who has not submitted to Cross-examination.

- If one Party to a text message or email exchange submits to Cross-examination and the other does not, only the messages of the individual who submits to Cross-examination may be considered.

- Where a Party refuses to answer Cross-examination Questions, but video evidence exists showing the underlying incident, the Hearing Board may still consider the available evidence and make a determination.

- If the matter does not depend upon a Party's or Witness's Statements, but on other evidence (e.g., video evidence that does not consist of "Statements" or to the extent the video contains non-Statement evidence), the Hearing Board can still consider this other evidence and reach a determination, but without drawing any inference based upon lack of Party or Witness testimony.

*(10)    Breaks*

The Hearing Board may need to take breaks during testimony to ensure that it can confer regarding the information that has been offered and can determine whether further questions are necessary. The Hearing Board will take as few breaks as possible, but breaks are needed and help to avoid having to call individuals back to meet with the Hearing Board at a later date.  At any time, a Party may request a break to talk with their Advisor or for another reason.  In almost all instances, a break will be allowed.

*(11)    Rape Shield Protections*

All questions and evidence about Complainant's sexual predisposition or prior sexual behavior are irrelevant unless offered to prove that someone other than the Respondent committed the alleged misconduct or offered to prove Consent.

*(12)    Order of the Live Hearing*

(a)    The Chair will call the Live Hearing to order and will explain the hearing process, which will include a reading of the charge(s) at issue and will provide an opportunity for all Parties to ask procedural questions prior to opening statements.

(b)    The Parties shall be informed that the hearing is being recorded.  The recording is the sole official verbatim record of the Live Hearing and is the property of the College.

(c)    The Complainant may present an opening statement related to the charges.

(d)    The Respondent may present an opening statement related to the charges.

(e)    The Hearing Board will ask the Complainant questions relevant to the charges.

(f)    The Respondent's Advisor may ask Complainant relevant questions and follow-up questions, including those challenging Credibility (Cross-examination Questions).

(g)    The Hearing Board will ask the Respondent questions relevant to the charges.

(h)    The Complainant's Advisor may ask Respondent relevant questions and follow up questions, including those challenging Credibility (Cross-examination Questions).

33

*Approved August 14, 2020*

(i)     The Hearing Board may call Witnesses to provide relevant information to the Hearing Board.

(j)     At the conclusion of each Witness, Complainant and Respondent's Advisors may ask each Witness relevant questions and follow up questions, including those challenging Credibility (Cross-examination Questions). The Parties may never ask questions directly of the Witnesses.

(k)     First, Complainant's Advisor will ask questions of each Witness and then Respondent's Advisor will ask questions of each Witness. Complainant's Advisor will then have one more opportunity to ask questions of each Witness and Respondent's Advisor will have one more opportunity to ask questions of each Witness.

(l)     Before a Witness answers a Cross-examination Question from an Advisor, the Hearing Board must first determine whether the question is relevant.

(m)    At the conclusion of the testimony of the Parties and the Witnesses, the Parties will be able to make a closing statement, with the Complainant going first and the Respondent going next.

(n)     The Chair announces that the Live Hearing is concluded.

(13)  *Hearing Board Deliberations and Written Determination*

(a)     Deliberations

When the Live hearing concludes, the Hearing Board will privately deliberate and make its decision in accordance with the preponderance of the evidence Standard of Evidence.

(b)     Delivery and Contents of Written Determination

The Hearing Board will issue a Written Determination, which will be sent to the Parties simultaneously within fourteen (14) Business Days of the conclusion of the Live Hearing, which will include:

i.      Procedural History

ii.     Summary of allegations in Notice of Live Hearing

iii.    Policy provisions at issue

34

      iv.     Findings of Fact related to each allegation potentially constituting Title IX Sex Discrimination, made by the applicable standard of evidence

      v.     Rationale (or evidentiary basis) for the Findings of Fact related to each allegation, which should include an evaluation of the weight or Credibility of admissible, relevant evidence

      vi.     A determination of whether the conduct found to have occurred violates this Policy (Determination of Responsibility) or not (Determination of No Responsibility)

      vii.     Rationale (or evidentiary basis) for the Determination of Responsibility or No Responsibility

      viii.     A statement of any disciplinary sanctions imposed on the Respondent and the rationale for the sanctions

      ix.     Whether Remedies will be provided to the Complainant, using the phrase: "Remedies designed to restore or preserve equal access to the College's Education Program or Activity will be provided by the College to the Complainant, and include no contact orders, the opportunity to retake a course or provide additional off-campus counseling with a professional.

          i.     The nature of such Remedies will not appear in the Written Determination

          ii.     Remedies that do not directly affect the Respondent must not be disclosed to the Respondent

   (c)     Information about how to file an Appeal and how to access the electronic recording before the time to file an Appeal lapses.

*(14)   Implementation of Remedies in Written Determination*

The Title IX Coordinator is responsible for the effective implementation of Remedies.

35

**(L)     Sanctions**

*(1)     Possible Sanctions*

The following sanctions and/or conditions may be imposed following a Determination of Responsibility for a violation of this Policy.  Title IX requires that the College provide notice of a range of sanctions; the list below is intended as notice of possible Remedies and disciplinary sanctions and does not reflect the probability that any particular outcome will occur.

     (a)     Students

- Expulsion (permanent separation)
- Suspension
- Deferred Suspension
- Disciplinary Probation
- Disciplinary Probation with deferred removal from the residence halls
- Loss of housing contract
- Residence hall probation
- Conduct warning
- Title IX Sex Discrimination education or other relevant education
- Parent or guardian notification (subject to privacy restrictions)
- Financial restitution
- Organizational sanctions including probation and rescinding recognition or other organizational restrictions
- Fine
- Community restoration and/or community service
- Loss of campus privileges
- Loss of campus employment and/or opportunities for campus employment
- Withholding records or degree
- Revocation of admission and/or degree

*Approved August 14, 2020*

- Bar against registration
- Discretionary action
- Substance abuse education and/or evaluation

(b)   Employees

- Termination of employment
- Suspension
- Demotion
- Progressive discipline
- Warning
- Loss of pay or other pay adjustments
- Job transfer
- Change or restrictions in work location and/or job responsibilities
- Title IX Sex Discrimination education
- Restrictions on the Employee's communications
- Limitations on the Employee's movement in or on the College's campus, programs, and activities

*(2)   Factors in Determining Sanctions*

In considering the appropriate sanction within the recommended outcomes, the Hearing Board may consider the following factors:

- Respondent's prior discipline history;
- how the College has sanctioned similar incidents in the past;
- the nature of the conduct at issue, including whether there was violence or other use of force;
- the impact of the conduct on the Complainant;
- the impact of the conduct on the College's community, its members or College property;
- whether the Respondent accepted responsibility;

37

*Approved August 14, 2020*

- whether the Respondent is reasonably likely to engage in the conduct in the future;

- any other mitigating or aggravating circumstances, including the College's values; and

- the College's obligation to eliminate Prohibited Conduct, prevent its recurrence, remedy its effects, and to maintain an environment free from Title IX Sex Discrimination.

Respondent's lack of comprehension that conduct constituting Title IX Sex Discrimination violates the bodily or emotional autonomy and dignity of a victim does not excuse the misconduct, though genuine lack of understanding may, in the College's discretion, factor into the sanction decision.

### (3)    *Remedial Action*

The Hearing Board may consider other remedial actions that may be taken to address and resolve any incident of Title IX Sex Discrimination and to prevent its recurrence, including: strategies to protect the Complainant and any Witnesses from retaliation; provide counseling for the Complainant; other steps to address any impact on the Complainant, any Witnesses, and the broader campus community, and any other necessary steps reasonably calculated to prevent future occurrences of harassment.

### (4)    *Failure to Comply with Sanctions*

Failure to comply with the sanctions or conditions imposed by the Hearing Board will result in action under the College's student code of conduct, Faculty or Employee Handbooks, as applicable.

### (M)    Effective Date of the Written Determination and Possible Notice to Parents

The Written Determination becomes final only after the time period to file an Appeal has expired (See Section XI(E) below) or after the Appeal decision has been sent to the Parties. The Written Determination will identify to whom any Appeal must be addressed.

The College reserves the right to notify parents of dependent students when student conduct has resulted in serious disciplinary sanctions.

## XI.    APPEALS

### (A)    Filing an Appeal from a Written Determination

The Parties have equal rights to file an Appeal. Appeals must be submitted to the individual identified in the Written Determination on or before the date specified in the Written

*Approved August 14, 2020*

Determination, which shall be seven (7) Business Days after the delivery of the Written Determination.

**(B)     Appeal Grounds**

An Appeal is not intended to be a rehearing of the information presented at the Live Hearing.  An Appeal may only be based upon one or more of the following grounds:

1.     Procedural Irregularity that affected the outcome of the matter;

2.     New evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter; and/or,

3.     Conflict of interest or bias for or against Complainants or Respondents generally or the individual Complainant or Respondent that affected the outcome of the matter.

**(C)     Actions upon Receipt of Appeal**

1.     When the Title IX Coordinator receives an Appeal, Title IX Coordinator will provide the request to the Appeal Decision-maker.

2.     Within five (5) Business Days of the receipt of the Appeal by the Title IX Coordinator, the Appellant will be given notice of the receipt of the Appeal, which will also serve as notice to the non-appealing Party of the Appeal, and notice to the Parties of the Appeal Decision-maker.

3.     The Parties will have two (2) days after notice of receipt of the Appeal to request that the Title IX Coordinator remove the Appeal Decision-maker based on reasonable and articulated grounds of bias, conflict of interest or an inability to be fair and impartial.  The Title IX Coordinator will determine whether to remove the Appeal Decision-maker member.  If the Appeal Decision-maker is not removed, the Title IX Coordinator will notify the requesting Party of the decision.  If the Appeal Decision-maker is removed and replaced, the Parties will be sent simultaneous written notification of the name of the new Appeal Decision-maker.

4.     When the time to request removal of the Appeal Decision-maker has run, the Appeal Decision-maker will be provided with the entire file provided to the Hearing Board, together with the Written Determination.

5.     The Appeal Decision-maker will first determine whether the Appeal will be accepted, based upon whether one or more of the Appeal Grounds set forth above has been properly alleged by the Appellant.  Within seven (7) Business Days of the receipt of the Appeal, the Appeal Decision-maker will send written notice to the Parties simultaneously:

39

        (a)     That the Appeal has been rejected due to insufficient grounds, with the Appeal Decision-maker's rationale, or

        (b)     That the Appeal has been accepted.

6.     The non-appealing Party/ies will be entitled to submit a response to the Appeal, which must be sent to the Title IX Coordinator within five (5) Business Days of receipt of notice that the Appeal was accepted.

7.     The Appeal Decision-maker will then analyze all of the materials related to the Appeal and will take one of the following actions:

        (a)     Uphold the original decision

        (b)     Send the matter back to the Hearing Board for further consideration

        (c)     Refer the matter to the Title IX Coordinator for further investigation or a new hearing with a new Hearing Board

8.     The written Appeal decision, which will include the Appeal Decision-maker's rationale, will be sent to the Parties simultaneously.

9.     The Appeal Decision-maker will issue its written decision on Appeal within fourteen (14) Business Days of the notice to the Parties that the Appeal was accepted (step 5 (b) above).

**(D)    Appeal Decisions are Final**

A decision denying the entitlement to an Appeal and all decisions made by the Appeal Decision-maker are final.

**(E)    When an Appeal is not Filed**

The Parties will be notified if the time to file an Appeal has expired without any Appeal having been submitted.

## XII.   TRANSCRIPT NOTATIONS

New York law requires the College to make specific notations on the transcripts of Respondents found responsible for the following conduct prohibited by this Policy: Sexual Assault, Dating Violence, Domestic Violence, and Stalking.

*Approved August 14, 2020*

- Students suspended after a finding of responsibility will receive the following notation on their transcript: "suspended after a finding of responsibility for a code of conduct violation." Such notations will remain for at least one year after the conclusion of the suspension, at which point a suspended student can seek removal of the notation by appealing to the Title IX Administrator. Students seeking removal of the notation should contact the Title IX Coordinator for Appeal procedures.

- Students expelled after a finding of responsibility will receive the following notation on their transcript: "expelled after a finding of responsibility for a code of conduct violation." Such notation shall not be eligible for removal.

- Students who withdraw pending resolution of alleged violations of this Policy will receive the following notation on their transcript: "withdrew with conduct charges pending." Such notation shall not be eligible for removal unless the charges are later resolved.

- If the College vacates a finding of responsibility for any reason, any such transcript notation shall be removed.

## XIII.   GRIEVANCE PROCESS TIMEFRAMES

The College strives to meet the following timeframes for the Grievance Process. All days are measured in Business Days with the Grievance Process commencing as of date of acceptance of a signed Formal Complaint.

   **(A)**   **Notice of Investigation**: Within five (5) Business Days of acceptance of signed Formal Complaint.

   **(B)**   **Investigation**: The investigation process will typically be completed within sixty (60) Business Days of issuance of the Notice of Investigation.

   **(C)**   **Opportunity to Review/Respond to Information Gathered During Investigation and Directly Related to Allegations of the Formal Complaint**: The information gathered during investigation and directly related to the allegations of the Formal Complaint will be provided to the parties in hard copy or electronic format within sixty-five (65) Business Days of issuance of the Notice of Investigation. Parties and their Advisors have ten (10) days to review and respond.

   **(D)**   **Opportunity to Review/Respond to Investigation Report**:   Parties and their Advisors have ten (10) Business Days from the delivery of the Investigation Report to review and respond to the Investigation Report.

41

*Approved August 14, 2020*

(E)     **Notice of Live Hearing**:  As applicable, a Notice of Live Hearing will be sent the Parties simultaneously within ten (10) Business Days of the conclusion of the investigation, which occurs after receipt of the Parties' response to the Investigation Report and when the College determines no further investigation is warranted.

(F)     **Challenge to Hearing Board Member**:  Within two (2) Business Days of receipt of the Notice of Live Hearing, Parties have the right to make a written request that the Title IX Coordinator remove a member of the Hearing Board based on reasonable and articulated grounds of bias, conflict of interest or an inability to be fair and impartial.

(G)     **Live Hearing**:  The Live Hearing will begin no sooner than fourteen (14) Business Days and no more than twenty-one (21) Business Days of issuance of the Notice of Live Hearing.

(H)     **Written Determination following a Live Hearing**:  Following a Live Hearing, the Written Determination will be sent to the Parties simultaneously within fourteen (14) Business Days of the conclusion of the Live Hearing.  A Live Hearing is not concluded until Hearing Board deliberations have ended.

(I)     **Appeals**:

1.     Parties must file an Appeal within seven (7) Business Days of receipt of the Written Determination.

2.     Within five (5) Business Days of the receipt of the Appeal by the Title IX Coordinator, the Appellant and non-appealing Party/ies will receive written notice that an Appeal has been submitted and the identity of the Appeal Decision-maker.

3.     The Parties will have two (2) days after notice of receipt of the Appeal to request that the Title IX Coordinator remove a member of the Appeal Decision-maker based on reasonable and articulated grounds of bias, conflict of interest or an inability to be fair and impartial.

4.     Within seven (7) Business Days of the receipt of the Appeal, the Appeal Decision-maker will send written notice to the Parties either accepting or rejecting the Appeal.

5.     The Appeal Decision-maker will issue its written decision on the Appeal within fourteen (14) Business Days of the notice to the Parties that the Appeal was accepted.

## XIV.  RECORDKEEPING

The College will maintain the records identified in this section of this Policy for a period of seven (7) years.  The records maintained shall be kept confidential and not disclosed, except as permitted or required by law.  The records may be maintained in paper or digital files.

42

In connection with each Report and each Formal Complaint, the College will maintain the following records, to the extent they exist:

    1.    documentation of any Report of alleged Title IX Sex Discrimination;

    2.    documentation of any Supportive Measures or if no Supportive Measures are provided, the reasons why and an explanation of how the College's response was not clearly unreasonable;

    3.    the Formal Complaint;

    4.    Notice of Dismissal of Formal Complaint and any associated documents;

    5.    documentary evidence gathered in the course of an investigation and photographs or descriptions of non-documentary evidence gathered in the course of an investigation;

    6.    written responses of the parties provided prior the finalization of the Investigation Report;

    7.    the Investigation Report;

    8.    the audio recording, audiovisual recording, or transcript of any Live Hearing;

    9.    the Written Determination;

    10.    any Appeal and Written Appeal Decision;

    11.    records of the sanctions and/or remedies;

    12.    records of any other steps taken to restore or preserve equal access to the College's Education Program or Activity,

    13.    any written agreement of an Informal Resolution; and

    14.    a statement documenting the basis for the College's conclusion that its response to a report or formal complaint was not deliberately indifferent.

The College shall also maintain all materials used to train its Title IX Coordinators, Investigators, Decision-makers, and Facilitators and a copy of each version of its Title IX Policy on Sex Discrimination.

*Approved August 14, 2020*

## XV.   MODIFICATIONS TO THIS POLICY

This Policy may be modified from time-to-time, during an academic year or otherwise, in the College's discretion and as may be required by law.  The College Employees and Students will be notified whenever this Policy is modified.

## XVI.   GLOSSARY OF DEFINED TERMS

- **Advisor**: A person selected by a Complainant or Respondent to assist them during the Grievance Process; or appointed by the College to support Complainant or Respondent pursuant to this Policy.

- **Administrative Leave**:  Temporary separation from a person's job, with or without pay and benefits intact, as determined by the College and any relevant obligations binding The College.

- **Appeal**:  An objective review of the prior process (including Dismissal of a Formal Complaint) and outcome, unless new evidence must be considered.

- **Appeal Decision-maker**: An individual or a group of people that makes decisions when Parties submit an Appeal.  An Appeal Decision-maker cannot be the Investigator, the Title IX Coordinator or members of the Hearing Board.

- **Appellant**:  A person who files an Appeal.

- **Business Days**:  Any day, excluding Saturday, Sunday, and federal and state holidays.

- **Campus Official**:  An Employee of the College who has authority to institute corrective measures on behalf of the College.

- **Complainant**:  An individual who is alleged to have been the target of conduct that could constitute Title IX Sex Discrimination under this Policy, whether or not the individual has filed a Formal Complaint.

- **Consent**:  Affirmative Consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity.  Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity.  Silence or lack of resistance, in and of itself, does not demonstrate Consent.  The definition of Consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression.

44

- Consent to any sexual act or prior consensual sexual activity between or with any Party does not necessarily constitute Consent to any other sexual act.

- Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

- Consent may be initially given but withdrawn at any time.

- Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity.   Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot Consent.   Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to Consent.

- Consent cannot be given when it is the result of any coercion, intimidation, force, or threat of harm.

- When Consent is withdrawn or can no longer be given, sexual activity must stop.

This definition is required by New York State Education Law Article 129B.

- **Credibility:**  The worthiness of belief of information shared by a Party or a Witness.

- **Cross-examination Questions**: Relevant questions and follow-up questions, including questions challenging Credibility.  Cross-examination Questions are intended to give both Parties equal opportunity to meaningfully challenge the plausibility, reliability, Credibility, and consistency of the information provided by the other Party and Witnesses so that the outcome of each individual case is more likely to be factually accurate.

- **Dating Violence**:  Violence committed by a person: (a) who is or has been in a social relationship of a romantic or intimate nature with the victim; and, (b) where the existence of such a relationship shall be determined by (i) the length of the relationship; (ii) the type of relationship; and (iii) the frequency of interaction between the persons involved in the relationship.   Title IX requires that the College use this definition, from 34 U.S.C. 12291(a)(10).

- **Decision-maker**:  A person or persons designated to conduct Live Hearings, to decide whether or not a violation of this Policy has or has not occurred, to determine disciplinary sanctions and Remedies when a violation has occurred, and/or to decide Appeals.

45

Decision-makers may or may not be Employees of the College. Decision-makers are trained on the definition of Title IX Sex Discrimination, the scope of the College's program or activity, the Grievance Process, Relevance, the technology to be used at a hearing, how to conduct hearings and Appeals, and how to serve impartially.

- **Determination of Responsibility or No Responsibility**: A determination by the Hearing Board regarding whether or not the Respondent violated this Policy.

- **Domestic Violence**: Violence committed by a current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as spouse or intimate partner, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the state, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the state. Title IX requires that the College use this definition, from 34 U.S.C. 12291(a)(8). This definition does not apply to roommates who have not expressed interest in entering into, or who have not entered into, a dating or sexual relationship. Under the Clery Act and the Campus SaVE Act, the College will record and report all relevant incidents of domestic violence.

- **Education Program or Activity**: Locations, events or circumstances over which the College exercised substantial control over the Respondent and the context in which the conduct allegedly constituting Title IX Sex Discrimination occurred. Education program or Activity includes any building owned or controlled by the College and/or by a student organization that is officially recognized by the College.

- **Emergency Removal**: A decision to remove a Respondent after an individualized analysis concluding that there is an immediate threat to the physical health or safety of any student or other individual arising from allegations of Title IX Sex Discrimination. Respondents can request review of an Emergency Removal.

- **Employee**: Faculty, staff, administrator, and any other individual employed by the College in any capacity or role, except an Employee does not include a College Employee who is also enrolled as a full-time student of the College.

- **Exculpatory Evidence**: Evidence that shows or suggests that a Respondent did not engage in the alleged Title IX Sex Discrimination.

- **Expulsion:** Permanent dismissal from the College and restriction from College property. This status constitutes a disciplinary record and this sanction will be noted on the student's transcript.

46

*Approved August 14, 2020*

- **Facilitator**:  A person or persons designated to facilitate an Informal Resolution of a Formal Complaint.  Facilitators may or may not be Employees of the College.  Facilitators are trained on the definition of Title IX Sex Discrimination, the scope of the College's program or activity, how to conduct an Informal Resolution process, and how to serve impartially.

- **Formal Complaint**:  A document signed by a Complainant or a Title IX Coordinator alleging Title IX Sex Discrimination against a Respondent(s) and requesting that the allegation(s) be investigated.

- **Findings of Fact**:  A Hearing Board's decision regarding what occurred.

- **Grievance Process**:  The process for investigating and resolving a Formal Complaint.

- **Hearing Board**:  A single Decision-maker or group of Decision-makers who conduct the Live Hearing.  Regardless of a Hearing Board's composition, the Decision-makers will be referred to as the Hearing Board.  The Hearing Board cannot be the same person(s) as the Title IX Coordinator or the Investigator.

- **Inculpatory Evidence**: Evidence that shows or suggests that a Respondent engaged in the alleged Title IX Sex Discrimination.

- **Informal Resolution**: A voluntary process that allows the Parties and the College to engage in discussions in an attempt to come to an agreement to resolve a Formal Complaint that does not involve a full investigation and/or hearing and adjudication.  This process is not available when a Formal Complaint alleges that an Employee has engaged in Title IX Sex Discrimination toward a student.

- **Investigator**:  A person or persons, internal or external to the College, designated by The College to investigate the allegations of a Formal Complaint.  An Investigator may also be the Title IX Coordinator, but may not be a member of the Hearing Board or the Appeal Decision-maker.    Investigators are trained on the definition of Title IX Sex Discrimination, the scope of the College's program or activity, the Grievance Process, Relevance, how to conduct an investigation, how to create an investigation report, and how to serve impartially.

- **Live Hearing**:  A hearing where all Parties can see and hear each other in real time, whether in the same location or connected via technology.

- **Notice of Dismissal**: written notice of the Title IX Coordinator's decision to dismiss a Formal Complaint, including the basis of the decision.  A Party may submit an Appeal of a dismissal of a Formal Complaint.

47

- **Notice of Informal Resolution**: As applicable, a Notice of Informal Resolution will be sent to the Parties simultaneously following receipt of each Party's completed Consent to Informal Resolution form.

- **Notice of Investigation**:  A written notice to the Parties commencing the Grievance Process.

- **Notice of Live Hearing**:  The letter sent to the Parties detailing and providing notice of the allegations falling within the scope of this Policy that will proceed to a Live Hearing.

- **Party or Parties**:  Individuals who are Complainants and Respondents in a Grievance Process.  When referencing the Complainant, the Respondent may be referred to as the "other Party" and when referencing the Respondent, the Complainant may be referred to as the "other Party."

- **Procedural History**:  A section of the Written Determination describing the procedural steps taken from the receipt of the Formal Complaint through the determination, including notifications to the Parties; the date Respondent received the Notice of Investigation; the investigation process; and hearings held.

  - Regarding the description of the investigation process, the Procedural History section should include:  which Parties and Witnesses were interviewed and when; site visits; methods used to gather evidence; what type of evidence was reviewed; and the process undertaken to inspect and review the evidence and to disseminate the investigation report, including timelines.  The Written Determination should include any actual or perceived procedural issues.  For example, if a process was delayed for good cause, that delay should be explained in the Written Determination.  Likewise, if the Parties requested that the Investigator follow certain "leads" that the Investigator was not reasonably able to pursue based on a lack of time, resources, or the unavailability of Witnesses, that should be addressed in the timeline.

- **Procedural Irregularity**:  A failure to follow the College's own procedures.

- **Prohibited Conduct**:  Five types of Title IX Sex Discrimination that violate Title IX and this Policy: (1) Title IX Sexual Harassment; (2) Sexual Assault; (3) Dating Violence; (4) Domestic Violence; and (5) Stalking.

- **Quid Pro Quo**:  a conditioning the provision of an aid, benefit, or service on an individual's participation in an unwelcome sexual contact.

48

- **Rape Shield Protections**:  Protects Complainants from questions about or submission of evidence regarding the Complainant's sexual predisposition or, except in very limited circumstances, Complainant's prior sexual behavior.

- **Relevance**: Information that is relevant directly relates to the allegations in dispute, and, therefore, is probative of a material fact concerning the allegations.  Information that is not relevant includes: information protected by a legally recognized privilege; evidence about a Complainant's prior sexual predisposition; evidence about a Complainant's prior sexual behavior unless offered to prove that someone other than the Respondent committed the conduct alleged by the Complainant or offered to prove Consent, where Consent is at issue (and it concerns specific instances of sexual behavior with Respondent); any Party's medical, psychological, and similar records unless the Party has given voluntary, written consent; Party or Witness Statements that have not been subjected to Cross-examination at a Live Hearing; and evidence duplicative of other evidence.

- **Remedies**:  Measures taken by the College following a Determination of Responsibility on the part of Respondent designed to restore or preserve equal access to the College's Education Program or Activity.  Remedies may be disciplinary or punitive and may burden the Respondent; such Remedies are referred to as Sanctions.

- **Report**:  The submission of information to the Title IX Coordinator or a Campus Official regarding a potential violation of this Policy.  A Report is not a Formal Complaint and, therefore, does not trigger the Grievance Process.

- **Respondent**:  Any individual who has been alleged to have engaged in conduct that could violate this Policy.

- **Retaliation**: Intimidation, threats, coercion or discrimination, including charges against an individual for code of conduct violations that do not involve Title IX Sex Discrimination, but arise out of the same facts or circumstances as a Report or Formal Complaint of Title IX Sex Discrimination, for the purpose of interfering with any right or privilege secured by Title IX or this Policy.

- **Sanctions**:  Disciplinary or punitive measures imposed on a Respondent by the College following a Determination of Responsibility on the part of Respondent.

- **Sexual harassment**:  a form of sexual discrimination and is unlawful under federal, state and where applicable local law. Sexual harassment includes harassment on the basis of sex, sexual orientation, gender identity and the status of being transgender.

49

- **Sexual Assault**:  Any conduct that would constitute a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation.  Sexual Assault includes the following Prohibited Conduct:

    1. **Rape** (Except Statutory Rape) - the carnal knowledge of a person, without the Consent of the person, including instances where the person is incapable of giving Consent because of their age or because of their temporary or permanent mental or physical incapacity.  "Carnal knowledge" means contact between the penis and the vulva or the penis and the anus, including penetration of any sort, however slight.

    2. **Sodomy** - oral or anal sexual intercourse with another person, without the Consent of the person, including instances where the person is incapable of giving Consent because of their age or because of their temporary or permanent mental or physical incapacity.

    3. **Sexual Assault with An Object** - to use an object or instrument to unlawfully penetrate, however slightly, the genital or anal opening of the body of another person, without the Consent of the person, including instances where the person is incapable of giving Consent because of their age or because of their temporary or permanent mental or physical incapacity.

    4. **Fondling** - touching of the private body parts of another person for the purpose of sexual gratification without the Consent of the person, including instances where the person is incapable of giving Consent because of their age or because of their temporary or permanent mental or physical incapacity.

    5. **Incest** - nonforcible sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law.

    6. **Statutory Rape** - nonforcible sexual intercourse with a person who is under the statutory age of consent.

Title IX requires that the College use this definition, from 20 U.S.C.  1092 (f)(6)(A)(v).

- **Stalking**:  engaging in a course of conduct directed at a specific person that would cause a reasonable person to: (a) fear for their safety or the safety of others; or (b) suffer emotional distress.  Title IX requires that the College use this definition, from 34 U.S.C. 12291(a)(30).

50

- **Standard of Evidence**: The Standard of Evidence reflects the degree of confidence that a Decision-maker has in the correctness of the factual conclusions reach.  The College will apply the preponderance of evidence Standard of Evidence to matters falling under the Policy.

- **Statement**:  Evidence that constitutes a person's intent to make factual assertions.

- **Supportive Measures**:  Non-disciplinary and non-punitive services that are offered, without fee or charge, by the College on an individualized basis to a Complainant or Respondent that are designed to restore or preserve equal access to the College's Education Program or Activity without unreasonably burdening the other Party.

- **Suspension**: Termination of course registration from the College after a specific date and for a specified time.  The suspension may be for the semester during which the violation occurred and/or for a subsequent semester.  A student who is suspended for the current semester will be withdrawn from all courses and receive a W grade depending on the date of suspension.

- **Title IX Coordinator**:  The person or persons designated by the College as a Title IX Coordinator, including any persons designated as an "acting," "deputy" or "interim" Title IX Coordinator.  In the event that special circumstances require the Title IX Coordinator to delegate responsibilities, the term also includes the Title IX Coordinator's delegate.

- **Title IX Sex Discrimination or Discrimination**:  Discrimination on the basis of sex prohibited by Title IX (20 USC 1681, *et seq*.), Title 34 CFR Part 106, and this Policy in the form of (1) Title IX Sexual Harassment; (2) Sexual Assault; (3) Dating Violence; (4) Domestic Violence; and (5) Stalking.  *See* also Prohibited Conduct.

- **Title IX Sexual Harassment**:  Conduct on the basis of sex that satisfies one or more of the following:

    1. An Employee or Student of the College conditioning the provision of an aid, benefit, or service of The College on an individual's participation in unwelcome sexual conduct; or

    2. Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the College's Education Program or Activity.

- **Witness**: A person who has seen, heard or otherwise has knowledge or information relevant to an alleged violation of this Policy, but not including the Investigator.  The Investigator and Hearing Board meet with Witnesses at their request and at the suggestion of the Parties.

51

- **Written Determination**: A letter delivered simultaneously to the Parties that describes the Hearing Board's decision regarding responsibility, which must be supported by evidence.

*Approved August 14, 2020*

# EXHIBIT 2

# ROBERTS WESLEYAN COLLEGE
# STUDENT HANDBOOK
# TABLE OF CONTENTS

THE COLLEGE STATEMENT ............................................................................................................2

ACADEMIC LIFE ...........................................................................................................................5

STANDARDS OF SCHOLARSHIP .....................................................................................................16

ACADEMIC RESOURCES ...............................................................................................................18

SPIRITUAL LIFE ..........................................................................................................................19

STUDENT CONDUCT ....................................................................................................................22

PRIVACY OF EDUCATIONAL RECORDS...........................................................................................30

SEXUAL MISCONDUCT AND TITLE IX COMPLIANCE POLICY ..............................................33

RESIDENCE LIFE .........................................................................................................................37

CAMPUS SAFETY .........................................................................................................................46

COMMUNITY LIFE .......................................................................................................................47

# STUDENT HANDBOOK

# THE COLLEGE STATEMENT

**OUR MISSION**

As a community of learners committed to historic Christianity, Roberts Wesleyan College seeks to prepare thoughtful, spiritually mature, service-oriented people who will help transform society.

**OUR FOUNDATIONAL ASSUMPTIONS**

The mission of Roberts Wesleyan College is anchored in shared assumptions about:

**Scholarship**
• The world reflects the mind and purpose of the Creator.
• God desires people to reflect upon the world thoughtfully.
• Faith precedes and conditions all understanding.
• Knowing the truth requires people to act upon that truth.

**Spiritual Formation**
• The study of Scripture – the authoritative guide for faith and life – is the foundation for an informed Christian worldview.
• We affirm the richness of diverse traditions within historic Christianity.
• We honor the Creator through nurturing the life of the mind.
• Each member of the community is shaped and strengthened in faith through shared experiences.

**Service**
• Christian service derives from the Biblical mandate to love God and to love one's neighbor as oneself.
• Christian commitment to servant-leadership should contribute to constructive and restorative acts.
• Christian service responds to the diverse needs of individuals and communities.
• Christians learn and grow from serving others.

**OUR COMMITMENTS**

In keeping with our mission, Roberts Wesleyan College provides an education that focuses on scholarship, spiritual formation, and service.

**Scholarship**
As a community of Christian scholars, the College believes that learning is multifaceted and achieved in a variety of ways.

• Discovery – We provide opportunities for inquiry and investigation that contribute to intellectual growth and understanding.
• Integration – We provide opportunities to achieve an interdisciplinary understanding of issues and concerns.
• Application – We provide opportunities to learn by engaging problems in society.
• Education – We seek effective methods of teaching and learning.

**Spiritual Formation**
As a faith-affirming community, Roberts Wesleyan College provides an environment where people's relationship with God through Christ can be nurtured.

• Scripture – We explore our world through faith perspectives that affirm the authority of Scripture.
• Tradition – We affirm the richness of historical Christian thought and practice through the ages.
• Reason – We employ critical thinking to integrate our faith beliefs with our views of the world.
• Experience – We provide opportunities for transforming encounters with God.

**Service**
As a College attuned to the needs of the world, we seek to develop people of faith who will help transform the world through service.

• Vocation – We strive to discover how our God-given talents can lead to productive lives of service.
• Service Learning – We provide learning through service opportunities.
• Global Perspective – We encourage the development of cross-cultural competence and a global perspective.
• Social Responsibility – We foster socially responsible engagement in society.

## OUR GRADUATES

As a result of the opportunities provided them, the ideal graduates of Roberts Wesleyan College will be characterized by:

**Thoughtful Engagement**
• Lifelong habits of inquiry, reflection, and critical thinking from a Christian perspective.
• Competence in their chosen disciplines.
• Sound choices leading to intellectual, physical, emotional, and spiritual well-being.

**Spiritual Maturity**
• An ability to articulate a Christian worldview.
• Excellence and integrity in work, family, service, and culture, with Christ as an example.
• A desire to extend compassion, mercy, and justice to all people.

**Commitment to Service**
• A clear sense of vocation through meaningful avenues of service.
• The knowledge and skills needed to contribute meaningfully to society.
• The desire to participate as world citizens with a cross-cultural awareness and a global perspective.

## OUR HERITAGE

Roberts Wesleyan College, originally Chili Seminary, was founded by Benjamin Titus Roberts in 1866. Roberts was an evangelical Methodist minister and the first General Superintendent of the Free Methodist Church.  He and the other founders of the Church affirmed the view of Christian teaching, personal piety, and social action taught by John Wesley, the founder of Methodism.  The Church's official teaching in its Articles of Religion clearly shows its roots in historic orthodox Christianity.  Its heritage can be traced through the thirty-nine Articles of the Church of England,

3

the Augsburg Confession of the Protestant Reformation, and the great historic creeds of the early church, such as the Apostles' Creed, back to the Scriptures, and the teachings of Jesus Christ. The heritage of the College within the Free Methodist tradition has been of major importance in the development of its educational programs. Stating his purpose for founding the school, Roberts wrote, "While we cannot prize too highly the benefits of mental culture, we should not lose sight of that moral and religious culture which lies at the foundation of correct principles and good character."

Continuing in its Christian heritage and its dedication to "education for character," Roberts Wesleyan College remains committed to the mission of integrating a Christian worldview and learning.

## OUR EDUCATIONAL PHILOSOPHY

Roberts Wesleyan College serves traditional and non-traditional students at the undergraduate and graduate levels. The College's educational philosophy is built on the assumption that education must address the whole person as a physical, psychological, social, rational, and spiritual being. An education at Roberts Wesleyan College presupposes both the complexity of the world and the diversity of human nature. No one method of inquiry or verification is regarded as the sole route to knowledge, nor does one set of skills provide sufficiently for a life of service. A Roberts Wesleyan education is one in which students investigate the aesthetic, historic, philosophic, scientific, and professional disciplines.

Academic pursuit is strengthened by the College's historic Christian concern for the communication of human values and the development of the whole person. Through membership in a community of learners, students are encouraged to cultivate the knowledge, skills, and attitudes that will prepare them to be thoughtful, spiritually mature, service-oriented persons who will have a transforming impact on society.

## STUDENT RESPONSIBILITY

Students at Roberts Wesleyan College are responsible for the behavioral expectations and policies set forth in this handbook. All students should be familiar with and abide by the expectations in this publication.

## RIGHT TO AMEND

Please note that Roberts Wesleyan College reserves the right to revise policies and statements included in this publication at any time. The Student Handbook is subject to updates and efforts will be made to inform the campus community of revisions.

# ACADEMIC LIFE

## ACADEMIC RESPONSIBILITY

It is the student's responsibility to be familiar with the academic guidelines of the College.  The student is responsible for completing all program and degree requirements in order to secure eligibility for graduation.

To assist students in this endeavor, each student is assigned a faculty advisor.  The advisor is available to guide the student in the area of course selection.  Class standards are set and maintained by each faculty member.  Students are advised to consult the instructing professor concerning individual problems with course work.  Unresolved issues should be conveyed to the academic advisor for assistance in resolution.

## ACADEMIC GUIDANCE AND SUPPORT COMMITTEE

Roberts Wesleyan College maintains an Academic Guidance and Support Committee that reviews students' academic progress.  Each semester, progress is reviewed and warnings are forwarded to those students whose academic achievement is less than adequate.  The Academic Guidance and Support Committee may place students on probation or suspension, and in some cases may dismiss a student from Roberts Wesleyan College.

## ACADEMIC INTEGRITY STATEMENT

Roberts Wesleyan College seeks to promote personal and intellectual integrity within the academic community.  Honesty and trustworthiness are not only fundamental principles of the Judeo-Christian tradition, but essential practices within academe.   The following behaviors are, therefore, unacceptable:

- **a. Cheating** in its various forms: e.g.,
    1) Copying another student's work.
    2) Allowing work to be copied.
    3) Using unauthorized aids on an examination.
    4) Obtaining any part of an examination prior to its administration.
    5) Fabricating research data.
    6) Submitting another person's work as one's own.
    7) Receiving credit falsely for attendance at a required class or activity.
    8) Signing another student into a required class or activity.

- **b. Plagiarizing** (i.e., presenting someone else's words or specific ideas as one's own, including inadequate documentation of sources and excessive dependence on the language of sources, even when documented).  All material and ideas taken from published sources, electronic media, and formal interviews must be cited; direct quotations must be enclosed in quotation marks.   Therefore, whether quoting or paraphrasing, include an appropriate reference to the source (e.g., in-text citation, footnote, or endnote) and a Works Cited/Reference page.   Refer to Diana Hacker's *A Writer's Reference* for proper citation formats; consult the instructor regarding preferred citation style (e.g., American Psychological Association—APA; Modern Language Association—MLA, Chicago Manual of Style—CMS, etc.).

    **c. Violating copyright laws** and license agreements, including but not limited to:
1) Making *illegal* single copies of music or other print materials.
2) Making and/or distributing illegal multiple copies of printed, copyrighted materials.
3) Making and/or distributing unauthorized copies of computer software and/or digital information.

    **d. Denying others appropriate access** to information in the classroom, library, or laboratory, including but not limited to:
1) Removing materials from the library without checking them out.
2) Removing pages from books or journals.
3) Hiding or intentionally damaging materials or electronic information.

    **e. Destroying, altering, or tampering with someone else's work.**
    **f. Submitting the same or similar work** for more than one course or assignment without prior approval from the professor(s).
    **g. Destroying, altering, or tampering with academic or institutional records.**

## ACADEMIC INTEGRITY POLICIES AND PROCEDURES

In cases involving questions of academic integrity, the faculty member shall follow procedures outlined below, typically beginning with direct interaction with the student. If a student wishes to appeal, discussion must move through approved procedures. In no case shall the faculty member's perspective, authority or autonomy be violated. Similarly, in no case shall the student's right to a fair hearing through the Institution's Academic Grievance Policy be denied.

### Institutional Officer of Record

The Registrar, or designee approved by the Chief Academic Officer, shall function as the Institutional Officer of Record. That Officer shall establish and maintain an Academic Integrity File containing the names of students who have violated institutional academic- integrity standards; the file shall include all written documentation concerning the nature of the offense(s) and subsequent action(s) taken. The records of all students with more than one documented violation shall be transferred to individual academic files and noted, as appropriate, on permanent transcripts.
\* Personnel directly involved shall be apprised of resultant disciplinary action, and students shall be apprised of the right to appeal and procedures to be followed. (Records of students with only one documented violation shall be expunged upon graduation.)

### Institutional Academic Integrity Committee

The Institutional Academic Integrity Committee shall consist of the Officer of Record (*ex officio* Chair) and three faculty members at large. Each Academic Department and Northeastern Seminary shall name a representative who shall be available to serve as needed. That Officer of Record shall convene a committee appropriate to the case under review. (For example, faculty selected should be outside of the academic discipline of the faculty member involved.)

    The Academic Integrity Committee shall:
o   Advise faculty in first-offense cases, upon request.
o   Hear a first-offense case if the student requests such a hearing.
o   Review all cases beyond the first offense.

6

o Recommend disciplinary action in relation to the nature and number of the offense.

**Academic Departments**

Each academic department shall create a written policy outlining the role of department personnel in advising faculty and students in matters of academic integrity. (For example, a Department might determine that all issues of integrity be reported to the Department Chair, that one faculty member serve as "first advisor" in matters of integrity, that the Department function "as a whole" where violation jeopardizes the professional future of the student, or the like.) Whatever the Department's policy, departmental advisory roles shall not replace institutional procedures: that is, when it is determined that a violation of academic integrity has occurred, the faculty member shall report the incident to the Officer of Record.

**Procedures for Faculty**

A faculty member who suspects, but is not certain, that a student has violated academic integrity may:
- Seek clarification through discussion with the student;
- Seek counsel within the Departmental policies and procedures;
- Seek advice from the Officer of Record and/or the Academic Integrity Committee.

A faculty member who determines that a student has not acted in accordance with standards of academic integrity shall:
- Notify the Officer of Record, as well as the Department Chair or Academic Integrity Representative;
- Provide the Officer of Record with a brief written statement documenting the offense (including a copy of materials in question, if relevant);
- Notify the student of the procedures and possible consequences;
- Issue the appropriate course-related penalty, pending an investigation by the Institutional Academic Integrity Committee if the student has had previous offenses.

This process should be completed within ten business days ** of discovery of the incident.

**Procedures for Students**

A student who feels falsely accused of violating academic integrity may:
- Resolve the situation with the faculty member;
- Discuss the situation with the faculty member's Department Chair or representative;
- Request a meeting (within ten business days** of being informed of the incident by a faculty member) with the Academic Integrity Committee, accompanied by a person of choice if desired;
- Appeal decisions through the Institution's Academic Grievance Policy (within ten business days**).

**Policies related to Offenses**

**First Offense:**
The faculty member, with consultation if desired, shall make a judgment concerning the nature of the offense and appropriate action to be taken. (Depending on the nature of the assignment and offense, the professor might assign a grade of "F" or "zero"; require a different assignment for reduced credit; enter into an appropriate

7

soit of "contract agreement" with the student; or the like.)  In most instances, the
Officer of Record shall simply make note of a "first offense."  The student shall
receive a letter-of-first-offense, including:
o   Disciplinary action taken,
o   The right of appeal, and
o   Possible consequences, should there be a second offense.

**Repeated Offenses:**
A student's second offense shall typically result not only in "failure" related to the
specific assignment or activity, but also in course failure and possible suspension or
dismissal.  The Officer of Record and Institutional Integrity Committee shall initiate
the appropriate investigation (including discussion with the student, faculty member,
Department Chair or representative, and all other relevant parties) and shall
determine disciplinary action consistent with the circumstances and nature of the
offense.

A student's third offense, and beyond, shall typically result in temporary "suspension
with academic-integrity cause" or dismissal from the Institution.

In cases involving repeated offenses:
o   The permanent record and academic transcript shall indicate institutional
disciplinary action.*
o   The student shall receive written notification of disciplinary action and be
apprised of the right to appeal through the Institution's Academic Grievance
Policy.
o   The faculty member and all relevant parties shall be apprised of resultant action.

\* Courses for which a student receives a failing grade due to violation of academic-integrity
standards shall be identified on the student's permanent transcript.

\*\* **Ten business days refers to ten days when the College offices are open.**

## STUDENT ACADEMIC GRIEVANCE POLICY
**(Approved by Faculty Senate, October 7, 2016)**

The Faculty of Roberts Wesleyan College determine and enforce the academic standards of the
College. Sometimes, however, students believe that they have been treated unfairly or inequitably by
a faculty member or program/department.  Students should first attempt to resolve such
disagreements informally.  [The College abides by a six-month statute of limitations for initiating
grievance resolution.]
● If informal discussion with a faculty member about what is perceived to be unfair or
inequitable treatment does not result in an acceptable solution, the student should contact
the faculty member's Program Director or Department Chair to discuss next steps.  If the
faculty member in question is a Program Director, the student should contact the
Department Chair, if there is one, or the School Dean if not.  If the faculty member in
question is a Department Chair, the student should contact the School Dean.  If the faculty
member in question is a School Dean, the student should contact the Chief Academic
Officer.
● If informal discussion with the relevant program/department representatives about what is
perceived to be unfair or inequitable treatment does not result in an acceptable solution, the

student should contact the Program Director, if applicable, or Department Chair to discuss next steps.  If the Program Director is directly involved in the situation, or there is no program director, the student should contact the Department Chair or School Dean if there is no Department Chair.  If the Department Chair is directly involved, the student should contact the School Dean.  If the School Dean is directly involved, the student should contact the Chief Academic Officer.

If there is still no acceptable resolution after exhausting all departmental/program resolution options, the student may file a formal College Student Academic Grievance within ten business days when classes are in session*.

Student academic grievances may originate with complaints such as the following: a perceived violation, misinterpretation, or inequitable application of course or program requirements; unfair or inequitable treatment by a faculty member; unfair or inequitable application of grading policies; and the like.

**Steps to initiate and resolve a formal College Student Academic Grievance**

1. The student shall, within ten business days when classes are in session,* submit a formal, written grievance to the Dean of the School in which the Department/Program is housed using the College Student Academic Grievance Form. [The Chair/Program Director or designee will ensure the student understands exactly what needs to be done at each step throughout the process.]

2. The Chair/Program Director of the relevant Department/Program shall document in writing the steps previously taken at the Department/Program level to resolve the grievance and submit this record to the School Dean.

3. The  Dean shall, within ten business days when classes are in session* of receiving the written grievance, appoint and convene an Ad Hoc Committee composed of:
   - Three faculty members from 3 different Schools chosen in consultation with the Deans of those schools.  One faculty member may, but need not, come from the Dean's School, even the relevant Department/Program in this School. To assure impartiality, faculty members included in the informal process to resolve the complaint, or who have experiences with the student that may hinder impartiality (e.g. close personal friendship or prior grievances) should not be appointed to the committee.
   - A student representative appointed by the Student Association (typically either President or Vice-President), or, in Nontraditional or Graduate programs, by the relevant Department Chair/Program Director. To assure impartiality, the student appointee shall not currently be enrolled in courses with the student and shall not be in the same academic program (for traditional programs) or program cohort (for degree completion and graduate programs).  Further the student appointee should not have had experiences with the student that may hinder impartiality.

4. As soon as the Ad Hoc Committee is appointed, the members shall receive from the Dean a copy of the student's written grievance and a summary of the previous meeting(s) seeking informal resolution.

5. At the first meeting convened by the Dean, one of the faculty members shall be designated as Convener and Chair for subsequent meetings. The Committee will then:

9

- Review the materials.
- Decide what additional information is needed.
- Decide who, in addition to the student and relevant faculty member, should be interviewed – e.g., additional faculty, a representative from Student Life, representative from Registration, etc.
- Schedule a second meeting to consider the additional information and interview those asked to attend.  [The second meeting may, in some cases, be scheduled for the same day as the first meeting.] Depending on the nature of the incident and grievance, the student and faculty member may appear separately or together.

6. The Ad Hoc Committee shall then deliberate and make a ruling, using a simple majority vote.
   (1) The Dean will attend this meeting and participate in the discussion but will only vote in the case of a tie.  Once a decision has been made, the Dean will send a written copy of the ruling to the student, advisor, relevant department chair/program director, and the CAO. (Steps 3-5 should be completed within ten business days when classes are in session*.)
   (2) If the decision is not appealed to the CAO, the School Dean will work with the Department Chair/Program Director and faculty member (if relevant) to ensure that the practical consequences of the decision are implemented in a fair, timely fashion.

7. Any further appeal shall be filed with the Chief Academic Officer (or appropriate designee). The role of the CAO is not to "retry" the case.  The CAO's role is to ensure that policy was followed, the process was free from bias, and that the committee considered all relevant options.  To this end, the CAO retains the right to consult with the student, the committee, and/or additional personnel relevant to the situation.
   - Once the Chief Academic Officer has made a final decision, the student, school dean, department chair/program director, advisor, and faculty member (if relevant) shall be notified in writing within ten business days when classes are in session.*  Note:  either the student or CAO may request a meeting to receive and review the CAO's final decision.
   - The school dean will work with the Department Chair/Program Director and faculty member (if relevant) to ensure practical consequences of the final decision are implemented in a fair timely fashion.

8. Once the grievance is resolved, proceedings of the meetings involved shall be filed in the Dean's office. If the process involves the Chief Academic Officer, the proceedings of the meetings shall also be filed in that Office.

9. Retaliation (any targeted, punitive action) by anyone against a student for initiating a grievance under this policy, for supporting a student filing a grievance, or for participating in the grievance process is strictly prohibited.  Regardless of the merits of the original grievance, retaliation is a serious offense that can lead to disciplinary action.

*Ten business days refers to ten days when the College offices are open.

10

## ACADEMIC ADVISING

To promote the best results from student-faculty contacts, each freshman is assigned to a faculty mentor who is also the student's mentor for First Year Seminar. This mentor works with the faculty of the department of the student's chosen major during the first semester. During the first semester, the student is also assigned to a faculty advisor in the major field of specialization. If either the student or the advisor wishes, a change of advisor can be arranged.

Students must consult with their advisors before registering. This procedure assists students in keeping the program well planned and in proper order. Between registrations, students are urged to consult with advisors regarding any matters of concern. Advisors should be considered the student's first source for help. If the student has not contacted the advisor otherwise, there should be a consultation at least every three months. Although faculty is assigned to assist students, all students must accept full responsibility for identifying and completing requirements as they are listed in the catalog.

## COMPUTER INTEGRITY

Roberts Wesleyan College maintains computing facilities for the benefit of students and faculty. The efficient operation of these facilities requires cooperation between users and the staff of Information Technology Services (ITS). The hardware and software in these facilities are the property of the College; the files of users are individual property. All require respect. Use of the computing facilities is thus a privilege that can be withdrawn if users abuse the hardware or software, or violate the rights and needs of others.

### Acceptable Computer User Policy

1. You may use and distribute copyrighted or proprietary material only with written consent of the copyright holder. Unless otherwise indicated by the author, you should assume that any software you did not create is copyrighted.

2. You may not use false identification or misleading information to gain access to computing resources nor use computing resources for which you are not authorized. You may use an account only for Roberts Wesleyan College-related activities, and not for others such as advertising for a commercial organization or endeavor, or running a business.

3. Your password should be kept private, even faculty or staff members. If a need arises for another person to use your account, you need to receive approval by the systems administrator.

4. Access to the RWC system should be available for all campus members. Please refrain from disabling or crashing the system, playing games at inappropriate times, sending mass mailings or chain letters, and creating unnecessary multiple jobs or process names.

5. The RWC system has several security mechanisms in place to protect your files. Any attempt to circumvent data-protection schemes or uncover security loopholes is prohibited. Only college software intended to be user-customized can be modified.

6. You may not harass others, or send obscene, defamatory or threatening messages at RWC. This includes messages spoken, phoned, or sent via the computer.

7. Individuals are not allowed to set up a network server on the College network without prior permission from the CIO and the network administrator.

8. Network drives are provided by the College for your use.  You are responsible for adhering to the acceptable computer use policy in regards to how you use the network drives.

9. If you violate any of the above policy you may face one of the following penalties. Network/email account locked or disabled, dorm phone or network jack disconnected restricted access to the computer labs/classrooms, loss of network drives, printing privileges revoked.

Specific Internet guidelines and an abstract from the New York State Computer Crime Statute are available on the RWC Intranet homepage or by calling the **IT Services Help Desk at 585-594-6898**.

### E-MAIL CORRESPONDENCE

In addition, the Roberts Wesleyan College assigned e-mail account shall be the **official means of electronic communication** within the College community. Students are responsible for all information sent to them via their College assigned e-mail account from faculty, administrative offices, and academic departments.

### COURSE LOAD

To be classified as full-time, a student must take 12 credit hours per semester.  Students must average 15 hours per semester to advance to the next higher level at the end of each two semesters of study. Students wanting to take more than 18 hours in one semester must have a minimum G.P.A. of 3.0 and must be approved by the Academic Guidance and Support Committee.

### ADMISSION TO CLASSES

To be admitted to classes, a student must complete all parts of the registration process and receive the approval of the Finance Office.  Failure to comply will result in exclusion from classes and cancellation of the student's registration.

After initial registration is completed, any changes must be done on the Change of Registration form, which is obtained in the Registration office.  No change is official until the completed form is returned to the Registration Office.  Courses may not be added after the 10th day of the semester. In summer session, courses may not be added after the 2nd day.

### CLASS ATTENDANCE

The College is, first of all, an educational institution.  Its purpose is to promote student learning in fulfillment of its mission to promote scholarship, spiritual formation and service.  Regular class attendance and active engagement with course content through participation in class are essential for meeting curricular goals and objectives.

Members of the faculty and administration are encouraged to keep this principle in mind when planning all courses, course activities and co-curricular experiences.

Course instructors are expected to (1) take attendance; (2) include an attendance policy in course syllabi that is consistent with the College attendance policy; (3) state clearly how attendance, participation and/or unexcused absences will affect students' grades in specific courses; and (4) schedule any course-related activities that take place outside of class time in ways that will minimize as much as possible the time students will be required to miss other classes.

Similarly, administrators, staff and faculty who plan co-curricular activities during the academic year, both on and off campus, are expected to schedule such activities in ways that will minimize as much as possible the time students will be required to miss classes.

Students should be encouraged to value regular attendance and participation as essential components of learning and responsible citizenship. Students are expected to attend all sessions of the courses for which they are registered.

## CLASS ABSENCE

Unavoidable absence due to documented illness, death of a close relative, or other emergency beyond the control of the student is excusable and the work missed may be made up. Absences for college-sponsored activities, including athletic participation and field trips, both on and off-campus, are also regarded as excused, and all work may be made up without penalty.
It is the responsibility of the student to contact her or his instructor(s) regarding the reason for an absence. All excuses for class absence should be presented to the instructor in advance when possible. Make-up of work missed can then be arranged.

When an instructor finds that a student is failing because of excessive absence, whether excused or unexcused, the instructor may recommend that the student be dropped from the course. Absences due to late registration are considered as any other absences. A student on Academic Probation is allowed no unexcused absence.

## TARDINESS TO CLASS

Excuses for tardiness to class should be presented to the instructor at the close of that class session. Three unexcused tardiness constitute an absence, as does any part of a class session missed that exceeds 20 minutes.

## EXPECTED CLASSROOM BEHAVIOR AND PROCEDURES FOR ADDRESSING DISRUPTIVE BEHAVIOR

## EXPECTED CLASSROOM BEHAVIOR

Educating students in professional values and behaviors occurs inside and outside the classroom at Roberts Wesleyan College. Examples of expected classroom behaviors that exhibit professional behaviors and values include:

- Respect for others, including other students, faculty, and staff,
- Personal integrity and ethical behaviors such as honesty, trustworthiness and academic integrity *,
- Personal responsibility exhibited by:
    - attendance, punctuality, and dependability
    - acting and speaking appropriately

- o   coming prepared for class and course related activities
- o   participating in classroom activities
- Commitment and ability to work collaboratively with others
- Professional demeanor
- Commitment to personal and professional growth
- Listening with an open mind and learning from constructive feedback.

*See Academic Integrity Policy for additional guidance on academic integrity

## FACULTY EXPECTATIONS

Faculty members have a responsibility to establish and maintain a safe and effective learning environment for all students. This includes:

- Ensuring that  classroom behavioral expectations  are clear through the course syllabus, program handbook, or verbally at start of course
- Modeling expected professional behavior
- Providing an environment where opposing views can be expressed in a respectful manner
- Affirming the dignity of all students

## GUIDELINES FOR DISRUPTIVE STUDENT BEHAVIOR

If a student is disruptive or disrespectful of others in class, the following guidelines will be used:

1. First occurrence – The student may be asked to leave the class session.  The professor will meet privately with the student to:
    a.   discuss the behavior,
    b.   review the course policy and the appropriate standard of behavior,
    c.   explain that disruptive behavior will not be tolerated because it interferes with student learning, and
    d.   let the student know that if the behavior continues, the student will receive a written warning.
2. Second occurrence - If the disruptive behavior continues, the professor will meet privately with the student and
    a.   a written warning will be given and review i – iv above.
    b.   The student will help establish goals and expectations and understand the consequences of continued disruptive behavior which could result in dismissal from the course.
    c.   A copy of the written warning is sent to the student's advisor, Program Director or Chairperson and school dean.
3. Third occurrence - If the disruptive behavior continues, a consultation will be made with the Dean, Program Director/Chair, and CAO with consideration for student withdrawal from the course.

**NOTE:**  Behavior that places students or faculty in danger or substantially impedes the lawful activities of other members of the campus community can result in immediate dismissal from the class and follow-up with the Program Director/Chair, Dean and CAO per the College Policy. Call campus security for assistance if the student refuses to leave or is posing a danger of violence

## PRINCIPALS FOR STUDENTS AUDITING A COURSE

1. Students who are required to audit a course as part of their plan of study will be handled as a regular student using the principles above.
2. Students who choose to audit a course are guests of the class.  Disruptive behavior will be dealt with at the discretion of the faculty member in consultation with the Program Director/Chair, Dean and/or  CAO.

## EXAMPLES OF DISRUPTIVE BEHAVIOR THAT IS NOT CONDUCIVE TO A CULTURE OF COMMUNITY

- Verbal abuse, threatening or abusive language or behavior – including vulgar language, gestures or expressions.
- Inordinate demands for time and attention
- Erratic and/or irrational behavior.
- Continually speaking without being recognized by the faculty or staff.
- Persistent disruptions resulting from ringing cell phones, pagers and other electronic devices.
- Other verbal or behavioral expressions that interfere with the classroom/college environment

## FINAL EXAM SCHEDULING

All classes will meet throughout the semester with the last class typically serving as the time for a final exam.  Students who are scheduled for more than two 3 credit hour course exams on the same day can request a change in their final exam schedule at the Office of Registration.

## WITHDRAWAL FROM INDIVIDUAL CLASSES

Students may withdraw from a course for which they registered or exchange it for another course or section by formal permission from the Registrar, during the Drop/Add period of that semester. Such permission is obtained only on the basis of filing a Change of Registration form obtainable at the Registration Office.  The instructor whose course the student is entering must sign this form. No withdrawal is official until the form is returned to the Registration Office.

If proper application is made to the Registration Office within two weeks following the beginning of a regular semester and within two days following the beginning of the summer session, a student may withdraw from a course without receiving a grade.  As in all other changes of registration, the date the form is left in the Registration Office is the official date of change.  If students withdraw from a course during the 3rd through 12th week of a semester, or between the 2nd day and last 3 days of a class in a summer session, they will receive a "W", which will be noted on their transcript but have no effect on their GPA.  Starting with the 13th week, or during the last 3 days of class in a summer session, students cannot withdraw and will be assigned the grade that they earn.

All unofficial withdrawals from a course are recorded as F.

Withdrawal from a class may alter a student's financial aid and financial standing with the College. A student withdrawing from a class should check with the Offices of Student Financial Services and Student Accounts.

**TUTORING**

Occasionally a student will find the necessity to receive assistance in a particular area of study. Students are encouraged to visit the Learning Center and request a peer tutor.

**GRADING SYSTEM**

Levels of the grading schedule are assigned as A, A-, B+, B, B-, C+, C, C-, D+, D, D- and F.  At all grade levels, the quality of English is taken into consideration.

In a few courses, grades are assigned as H, Honors; P, Pass; F, Fail.  No quality points are assigned to these courses.

**REPEATING COURSES**

A student may repeat any course for which the grade is lower than B-.  When a course has been repeated, the most recent grade is the one used to calculate the grade point average.  The repeated course on the permanent record will be marked with brackets.

**GRADE POINT AVERAGE**

The grade point average (GPA.) is the numerical average of the letter grades the student has received.  It is determined by multiplying the quality points of each letter grade by the number of semester hours in that particular course, adding all such products, and dividing by the total number of semester hours.  For example, the procedure for a student with 3 semester hours of A, 2 semester hours of B, and 3 semester hours of C is as follows: 3 x 4 + 2 x 3 + 3 x 2 = 24 quality points. Twenty-four quality points divided by 8 semester hours gives a 3.0 grade point average.  In order to graduate, a student must have a grade point average of 2.0 or higher.  Transfer credit is not used in computing a student's grade point average at Roberts Wesleyan.

# STANDARDS OF SCHOLARSHIP

**GRADE REPORTS**

Faculty members report grades to the Registrar at the end of each semester.  Students may view their grades by accessing the Office of Registration's online resource, R-Serve.  Students can also request a written report card from the Office of Registration.

**WARNING**

Each student whose grade point average is less than 2.0 at the end of a grading period is warned by the Academic Guidance and Support Committee that improvement must take place.

**ACADEMIC PROBATION**

A student may be placed on academic probation when the student has failed to meet minimal academic requirements and as a result has endangered his or her chances of remaining in the College.

A student's academic record may be reviewed and the student placed on academic probation if he or she fails to achieve a semester or cumulative grade point average of at least a 2.0.

16

Students on academic probation may be limited to 12 semester hours and are allowed no unexcused absences.  Students on academic probation may not participate in off-campus co-curricular activities representing the College.

## ACADEMIC SUSPENSION

Suspension for academic reasons occurs when students have failed to respond to previous academic warnings.  Students can apply to re-enter the College through the Office of Admissions.

Re-admitted students are automatically placed on academic probation. Re-admitted students may be dismissed from the College indefinitely if they fail to attain good academic standing.

## WITHDRAWAL FROM COLLEGE

Withdrawal from the College within a semester is initiated in the Office of Student Life.  A withdrawal is not official until the withdrawal form is completed by the student and the appropriate College officials.  Students who do not plan to return to the College for the next semester must contact the Student Life Office.

## NON-ACADEMIC INVOLUNTARY WITHDRAWAL

This policy discusses the involuntary withdrawal of a student for physical and/or mental health reasons.  A student may be involuntarily withdrawn from the college if it is determined that a student suffers from either a physical or mental health disorder as defined by the current American Medical Association standards or the American Psychiatric Association Diagnostic and Statistical Manual or its equivalent, and, further as a result of the disorder the student engages or threatens to engage in behavior that:
- Poses a significant danger of causing harm to the student or to others, or
- Substantially impedes the lawful activities of other members of the campus community.

If a student's behavior meets the above requirements the following actions will be taken:
1. The Counseling Center or Health Center Director will write a letter to the student and VP for Student and Organizational Development or Dean of Students detailing the specifics of their assessment and recommended action.
2. The case will be reviewed by the VP for Student and Organizational Development or Dean of Students or a designee with consultation from other appropriate individuals (e.g., administrators, other students, legal consult etc.) as necessary.
3. After review, the VP for Student and Organizational Development or Dean of Students will communicate in writing, to the student and others as appropriate, within five working days. If this timeframe is not possible the VP for Student and Organizational Development or Dean of Students will notify the student of the updated timeframe.
4. If the student disagrees with this decision he/she will have an opportunity to write a formal appeal to the VP for Student and Organizational Development; this written appeal must be completed within three days.
5. The VP for Student and Organizational Development will review all relevant information and make a final decision regarding the appeal.

When a student is withdrawn for these reasons, the student may not return until he/she adequately demonstrates that the issue(s) that caused the withdrawal are no longer in existence.

## RE-ADMISSION TO THE COLLEGE

Students who have left the College for any reason must file an application for re-enrollment if they want to return to the College. These forms are available online via the Undergraduate Admissions web page. Readmission is not automatic, but is based on the student's entire academic record, previous College involvements and achievements, and other life circumstances since leaving the College.

Upon receipt of the re-enrollment application, the Admissions staff will contact several campus offices to confirm that the student is eligible to return in good standing. Registration confirms the student's academic eligibility, Financial Services confirms financial eligibility, and Student Development confirms issues regarding citizenship, behavior or medical progress.

In cases where the student left involuntarily by action of the college, a review will determine whether appropriate activities, treatments, and/or personal growth has occurred to warrant another opportunity for the student to attend the College. There are some cases where the Office of Student Life may choose to meet with the student or consult with appropriate professionals (doctor, counselor) before making a final decision. The student can appeal a decision of denial for readmission to the Chief Academic Officer.

Returning students who have completed a minimum of 30 semester hours at the College and have been away for two semesters may exercise the option to have all course work with grades of D and F purged from their transcript. Students who have been away for more than six years and have fewer than 92 accumulated credit hours must exercise this grade purge option. Purging of Traditional Undergraduate Transcript Forms are available in the Office of Registration. Courses in which a grade of A, B, or C was earned will be shown as transfer credits on the revised transcript.

## FIRST YEAR SEMINAR

The purpose of the First-Year Seminar course is to assist you in making the transition from high school to college and to enable you to acquire knowledge, skills and attitudes characteristic of successful college students. *Education for Character*, the theme for this course, is part of the logo of Roberts Wesleyan College. *Education for Character* describes the goal of your college experience as you actively participate in a Christian academic community and prepare to apply your learning throughout your life.

# ACADEMIC RESOURCES

## THE LEARNING CENTER

The Learning Center, located in the Golisano Library, helps individuals and groups of students achieve academic success. Assistance takes the form of peer tutoring, study groups, help in writing and editing papers, study skills, coordination of individual accommodations for disabilities, and workshops. The personal attention given at the Learning Center is part of the trademark of Roberts' interest in student development. Students are encouraged to make use of all the Learning Center has to offer.

# SPIRITUAL LIFE

**SPIRITUAL LIFE CREDITS**

The Roberts Wesleyan College Chapel is an **integral and distinctive** part of our Christian liberal arts education experience at Roberts. Students have the opportunity to worship with classmates, faculty, and staff and hear from a variety of guest speakers from across the world (and across campus). We hope to foster spiritual growth and discussion throughout the Roberts community.

Each semester, there are **multiple** options available for students to fulfill their spiritual life requirement:

1. **Monday Kickstart Chapels (1 Spiritual Life Credit)**
   Monday chapels will be shared virtually and accessible through the iAttended app. Chapels can be viewed at any time so that students can continue to grow spiritually even if not able to attend chapel in person.

2. **Wednesday Community Chapel Services (1 Spiritual Life Credit)**
   We create space and time for our Roberts community to worship and learn together. During the Community Worship from 11-11:50 a.m., sermons focus us together on various topics of faith development throughout the semester. We worship in a variety of Christian traditions and styles that reflect the various faith groups represented on campus and the variety of worship practices today. Chapel programs seek to have a holistic and inclusive approach to worship, respecting these various forms yet focusing on the faith we have in common.
   *The Purpose of Community Gatherings:*
   To create opportunities for more interaction and spiritual conversation among all people in the college community by:
   - providing a place and time for the entire college community to celebrate our joys, share our prayers and worship God acknowledging our dependence upon Him.
   - identifying with semester-long themes that prompt spiritual conversations and interactions throughout campus life.
   - incorporating the breadth and diversity of Christian traditions into worship experiences so that as a college community we gain appreciation for all in the Christian faith.

3. **Friday Discussions/Café Chapel (1 Spiritual Life Credit)**
   A member of the Chapel team, a Residence Life Professional Staff person, or a Wednesday speaker will lead discussions on different topics each week. On Fridays from 11-11:50, students have the opportunity to more deeply explore faith issues in conversation with their peers.

4. **Saturday Service Opportunities (3 Spiritual Life Credits) offered occasionally**
   The Office of Spiritual Life occasionally sponsors Saturday service projects on a Saturday morning or afternoon for 3 spiritual life credits. These are typically service/ministry opportunities off campus, often in the city of Rochester. Our goal is to introduce students to new opportunities to serve God and stretch them to see God's heart for those in need.

5. **Special Night Chapels (1 Spiritual Life Credit)**
   Student-led evening worship services are held a few times/semester, usually on Sunday.

## COMMUNITY BEHAVIORAL AND EXPECTATION STANDARDS

Chapel has a long and honored place in the life of Roberts Wesleyan College. It is a **community worship event** intended to uplift, strengthen, challenge, and positively transform people's lives. Chapel speakers and programs represent a wide variety of religious and educational opportunities. It is necessary that each member of the College community consider the purpose and intentions of the Chapel program in order to fulfill one of the College's core values – spiritual formation. When we gather for chapel, we set apart our surroundings as sacred space.

Worshipers are expected to conduct themselves with reverence in chapel (respecting the sanctity of the service and the freedom of fellow worshippers), and to demonstrate appropriate behaviors that respect the rights of other participants: listen attentively; participate in readings, singing and prayer. Unacceptable behaviors include talking, use of cell phones, headphones, and screens, and showing disrespect for any person. (As a reminder, food and drink are not permitted in Hale Auditorium.)

## SPIRITUAL LIFE CREDIT COMPLETION POLICY

### Minimal Chapel Requirements and Expectations
- ➢ Meet Chapel Attendance Requirement – ("seniors" by college definition have a minimum of 90 academic credits)
  **Full-time Freshmen, Sophomores, Juniors:** earn **20 spiritual life credits**/semester;
  **Full-time Seniors:** earn **10 spiritual life credits**/semester `
- ➢ Uphold community behavioral and expectation standards for in-person Chapel events.
- ➢ Mid-semester check-in: Students falling short of meeting the minimal chapel requirements and expectations will follow up with one of the Student Development staff to discuss next steps to progress toward meeting the requirement.
- ➢ The consequence for not meeting the requirement in a semester is up to a **$250.00** fine added to the student's account at the end of the semester.

Spiritual formation credits are tracked through the iAttended app. Students should monitor their own spiritual formation credits throughout the semester.

Students who are at least **23 years old** as well as students who are considered **part-time** (registered for fewer than 12 credits) are automatically exempt from chapel attendance requirements. All students are welcome and are encouraged to attend Spiritual Life events. Students who have completed 8 semesters of Chapel requirements, will be exempt from a ninth (and any subsequent) semesters.

## CAMPUS PASTOR

The Campus Pastor's Office is located in the Office of Spiritual Life in the Golisano Library. Students who desire to make appointments for pastoral counseling should contact the Office of Spiritual Life.

## CAMPUS MINISTRIES

Campus Ministries seeks to provide opportunities for worship, discipleship, and volunteer services for the Roberts community.

Examples of programs available through Campus Ministries are B.A.S.I.C.(Brothers and Sisters In Christ), Cru-, Dance Ministry, F.C.A. (Fellowship of Christian Athletes), In Jesus' Name, Young Life, Prayer Ministry, Rochester Youth Outreach, Small Groups, and Worship teams.

In addition, students have opportunities to participate in cross-cultural travel.  Mission trips are designed to provide opportunities for students to be involved in Christian service.  The Office of Spiritual Life can provide additional information about these opportunities.

# STUDENT CONDUCT

## STUDENT CONDUCT PHILOSOPHY

Roberts Wesleyan College recognizes that ample opportunity to make decisions is a significant part of a student's development and growth. The Student Life Office desires to promote the well-being and growth of students by upholding the mission and values of Roberts Wesleyan College.

Roberts does not expect perfection of its students, just as God does not expect perfection of us. As such, the Student Life office will handle each case at the lowest level of accountability necessary. It is our hope that during their time at Roberts, students will learn to hold themselves and their peers accountable for their actions. At times, these avenues may not be effective or appropriate and the student conduct process is necessary.

The primary goal of the student conduct process is the growth of the student, not the consequence. Thus, the Student Life Office strives to provide an educational environment where students are asked to engage in difficult conversations about their goals, values, and how their actions impact themselves and others. Because students may find themselves in different stages of growth, and have individual challenges and needs, it is possible that different outcomes may be assigned for similar violations.

Roberts Wesleyan College recognizes the significant role that parents often play in the lives of students. Therefore, students will be encouraged to communicate openly with their parents throughout the student conduct process. Should a parent find they have questions about their student's involvement in a conduct process they should contact the Dean of Students office to discuss the completion of a FERPA release form.

## DEFINITION OF A STUDENT

For the purposes of Student Conduct at Roberts Wesleyan College, a student is defined as any person who is registered for, or enrolled in, a traditional undergraduate program, either full-time or part-time, on the residential campus.

- Any student who is under the age of 25 OR chooses to live on campus is expected to abide by the code of conduct.

- Any student who is 25 years of age or older AND does not live on campus is expected to abide by the College's code of conduct when on campus, when in the presence of students (as listed in the above definition), or while attending college events.

## TERM

Students are expected to abide by the Code of Conduct at all times while they are enrolled in an academic term (Fall, Spring, Summer, etc.). This includes:
- On and off campus, traveling abroad, at home, etc.
- Fall Break, Thanksgiving Break, Spring Break
- Anytime outside periods of enrollment when a student is representing or engaged in a formal relationship with the college (Athletics, campus employment, etc.).

22

While students are not enrolled in an academic term, or engaged in a formal relationship with the College they are encouraged to abide by any expectations set for them by the community in which they are engaged. Violations of local, state, or federal laws may still be addressed by the college when a student is considered "out of term".

## CAMPUS POLICIES

The following behaviors will constitute a violation of the Roberts Wesleyan College Code of Conduct:

- The possession or consumption of alcohol.
- The possession, sale, use, or distribution of any narcotic, drug, marijuana, or other addictive or hallucinogenic substances, except as prescribed by a physician.  Possessing equipment and paraphernalia for the use or possession of these substances.
- The use or possession of e-cigarettes or of tobacco products, including cigarettes, cigars, chewing tobacco or snuff.
- Participation in gambling.
- Demeaning, derogatory, criminal or bias-related actions directed against a person or persons because of race, ethnic origin or sex.
- Theft or damage to public or private property.
- Conduct which is lewd, indecent, or obscene, including the use of profanity or abusive language.
- The possession of pornographic literature or sexually dehumanizing or exploitative photographs, cartoons or materials.
- Participation in hazing and initiation tactics which involve any activity expected of someone joining a group that humiliates, degrades, abuses or endangers mental or physical health or involves the consumption of liquor or drugs for the purpose of initiation into or affiliation with any organization, regardless of the person's willingness to participate.
- Furnishing false or misleading information on college records.
- Possession or use of firearms, explosives, dangerous chemicals, or other weapons on campus.
- Failure to comply with the directions of college officials acting in the performance of duties.
- Failure to comply with the laws of the local community, the state, and the nation.
- Assaulting, threatening, harassing, or endangering in any manner, the health and safety of any person.
- Unauthorized occupancy or use of college facilities or buildings.
- Picketing, protesting, demonstrations, rallies, or distribution of leaflets which directly interfere with or seek to discourage the orderly operation of the College community.
- Interference with the orderly operation of the College by breach of the peace, physical obstruction, coercion, noise or other forms of disturbance.

## ADDITIONAL CAMPUS POLICIES

### DRESS CODE
Modesty and appropriateness exemplifying good taste is requested of all students in their choice of dress for all campus and personal activities.

### ON-LINE POSTINGS
Students are reminded that photographs and information posted on the internet via applications such as Facebook, Instagram, and Twitter are public information. Pictures or information from

23

these sources that describe or document behaviors that are brought to the attention of the College and which reasonably suggest that behavior violating College policy has taken place, on campus or at a College-sponsored function off-campus, is subject to further investigation and verification by the College. Any College policy violations that are documented as a result of such an investigation will result in appropriate disciplinary action by the College.

## SEXUAL ACTIVITY

The engagement in or appearance of sexual relationships outside of marriage is not permitted. This includes but is not limited to: sexual intercourse, groping, and touching of sexually related body parts such as breast, buttocks, or genital areas. It may also include instances where students are found in compromising situations/positions with someone they are in a romantic/physical relationship with. This might include situations where doors are closed, lights are off, and/or students are not fully clothed.

Students who become pregnant on account of a sexual relationship outside of marriage will be provided support and may request accommodations in order to continue with their education. Students should seek appropriate medical and personal support in these circumstances.

## PUBLIC DISPLAYS OF AFFECTION

The excessive or offensive public displays of affection (PDA) are to be avoided as they are not generally appropriate and could be disruptive to the living and learning environment. Such displays may include, extended or suggestive kissing, lying/sitting on one another, touching under clothing, or touching of sexually related body parts such as breast, buttocks, or genitals.

## STUDENT CONDUCT PROCESS

As an institution of higher learning, Roberts Wesleyan College strives to handle student conduct violations at the lowest level necessary. As such, some cases will be investigated by Resident Directors (RDs) and others by the Dean of Students. A case is assigned based on the severity of the violation(s) and the student's personal conduct history with the institution.

Once a determination is made regarding which college official will be responsible for the student's case, the student can expect the following process:

1. The student will receive an email in their Roberts student email account, which will provide a scheduled meeting time.
2. During the conduct meeting the student will:
    a. Be provided with the information that has been shared in the submitted report.
    b. Be allowed time to ask questions
    c. Be allowed to provide their own information regarding the report, including "evidence", names of additional witnesses, etc.
    d. Be asked to answer additional questions by the college official as part of the investigative process.
3. If the college official has determined that there is enough information to make a decision at the conduct meeting, the decision and any sanctions will be communicated at that time. If it is determined that more information or further investigation is necessary, the decision will be made after the investigation is complete. It is possible this may include additional meetings with the student.
4. The decision will be communicated with the student in writing, through a letter sent to their Roberts student email account.

5. Should the student wish to request a review of their student conduct case, Decisions made by an RD will be reviewed by the Dean of Students. Decisions made by the Dean of Students will be reviewed by the Vice President for Student Development and Organizational Leadership. Instructions for this process can be found under "Case Review Process"

*Occasionally, cases assigned to Resident Directors may be reassigned to the Dean of Students before a decision is reached, due to new information or level of cooperation by the student. In the event that this occurs, the Dean of Students will determine which of the above steps may be repeated in order to ensure a fair and timely process.

## GOOD SAMARITAN CLAUSE

The health and safety of every student at Roberts Wesleyan College is of utmost importance. Roberts Wesleyan College recognizes that students who have been drinking and/or using drugs may be hesitant to report medical emergencies. Roberts strongly encourages students to report any incidents of injury or violence to college officials. A bystander acting in good faith or reporting individual acting in good faith that discloses a potentially life-threatening incident, or incident of violence will not be subject to the student conduct process concerning their own violations of the alcohol and drug policies.

It should be noted that this does not absolve students from action by local authorities, nor does it preclude other violations of the code of conduct (theft, hazing, damage to property, etc.).

## RIGHT TO A SUPPORT PERSON

Any student involved (reporting or responding) in the student conduct process has the right to a support person of their choosing, excluding an attorney or legal representation. The support person may consult with the student but may not participate directly in the hearing. Any student planning to bring a support person should contact the Dean of Students office at least 24 hours prior to the meeting with the individual's name.

The College will allow a student to be accompanied by an attorney in the event that criminal charges are pending concurrent to the College's process. Proof of such charges must be provided to the Dean of Students more than 24 hours prior to the scheduled meeting. During the meeting the attorney may only advise their client, but may not speak during the meeting or serve as an active participant in the process.

The Dean of Students office reserves the right to excuse any accompanying individual or attorney should their behavior be deemed inappropriate.

## ACCOMMODATIONS

Just as a students with documented disabilities may be entitled to accommodations in the classroom, accommodations may be available for the student conduct process as well. Students requesting accommodations should speak to the Disability Services office, which will coordinate with the Dean of Students office to be sure necessary accommodations are made and proper documentation is on file.

25

NOTIFICATION TO PARENTS/GUARDIANS

Students will be encouraged at every opportunity to share information about the student conduct process with their parents.The College may notify parents of a student who has violated any laws or college policy governing possession or use of alcohol or a controlled substance who is under the age of 21 at the time of the report. The College may also notify a parent/guardian if a student has been suspended, dismissed, or expelled from the college. In cases deemed by the College as an emergency situation, including but not limited to serious injury, the college may contact parents/guardians.

DEFINITIONS OF SANCTIONS AND ASSIGNMENTS

Students should receive consistent and fair responses to incidents of misconduct, and yet also be addressed with regard for their individual circumstances. Students may receive more than a minimum outcome for a pattern of repeated violations, severe violations, multiple violations at the same time, dishonesty in the student conduct process, failure to comply or blatant disrespect toward college personnel.

Below is a list of Sanctions and Assignments that may be applied in the event of a violation of the code of conduct. This list is not exhaustive and other sanctions or assignments may be assigned at the discretion of College officials.

## Warning Statuses
### Verbal Warning
A student receives a verbal warning from a college official and it is documented to reference in the event of future violations.

### Disciplinary Warning
Disciplinary Warning is a warning status into which a student is placed when the student is in jeopardy of suspension or dismissal from the College. It is assigned for a specific period of time. Disciplinary Warning is typically assigned for a first-time violation, and is intended as a caution for future behavior. Students who have a violation of the code of conduct while on Disciplinary Warning status may have that violation treated as a second offense, even if the policy violated is not the same. Disciplinary Warning does not typically result in exclusion or removal from campus activities, however, a campus supervisor (depending on the nature of the position) may determine that there should be consequences for employment. A permanent record is kept in the student's file.

### Disciplinary Probation
Disciplinary Probation is a warning status into which a student is placed when the student is in jeopardy of suspension or dismissal from the College. It is assigned for a specific period of time. Disciplinary Probation is typically assigned for a more significant violation or multiple violations, and is intended as a caution for future behavior. Disciplinary Probation status affects the eligibility of students to participate in co-curricular activities. The supervisor or campus official responsible for the co-curricular activity will be notified of a student's placement on this status. A permanent record is kept in the student's file.

## Separation Statuses
### Interim Suspension
If the Dean of Students or Vice President for Student and Organizational Development determines at any time that the well-being of a student or any member of the College community is at risk, an interim suspension may be imposed on a student during the investigation phase of the Student

26

Conduct Process. This action assumes no determination of responsibility and a thorough investigation will be completed in a timely manner.

**Suspension**
A student is suspended from the College for a specified period of time (typically a semester or a year). In this case a student is to leave campus immediately and not return until the specified period has ended and a re-enrollment interview has been conducted by the Dean of Students. Students are subject to academic penalties as a result of disciplinary action and will be immediately withdrawn from classes. The student may be asked to apply to the Admission Committee for readmission to subsequent semesters. A permanent record is kept in the student's file.

**Dismissal**
A student is dismissed from the College immediately, and is not eligible for readmission for at least one year. Students are subject to academic penalties as a result of disciplinary action and will be immediately withdrawn from classes. In this case substantial change would need to be documented to consideration of re-enrollment.The student must apply to the Admissions Committee for readmission to subsequent semesters. A permanent record is kept in the student's file.

**Expulsion**
The permanent separation of a student from Roberts Wesleyan College. The student is dismissed immediately with no process to return to the College. Students are subject to academic penalties as a result of disciplinary action and will be immediately withdrawn from classes. A permanent record is kept in the student's file.

**Other Sanctions/Assignments**

**Paper/Letter(s) of Apology**
Research papers, reflection papers, or letters of apology may be assigned to encourage reflection and reconciliation.

**Interim Restrictions**
Interim restrictions may be placed on a student during the student conduct process as a temporary remedy when a student poses a threat to the emotional health, physical health, safety or welfare of the student or other students, staff, or college property.

**Interim Campus Housing Suspension**
In the event that there is reasonable cause to believe a student's continued presence in a campus residential facility constitutes an immediate threat to the emotional health, physical health, safety or welfare of the student or other students, staff, or college property, a student may be asked to temporarily vacate their housing assignment. In such cases the student will be required to leave their campus residence immediately and not return until such a time that a hearing can be held to determine the continued status of the student as a member of the residential community.

**Open House/Visitation Restriction**
A student may receive a suspension of their open house/visitation privileges for a specified period of time. This means that a student may not enter the residence hall/apartment occupied by members of the opposite sex or be anywhere in a residence area that is not a public lobby/lounge with a member of the opposite sex.

**Campus Housing Suspension**
In the event it is determined that a student's behavior in campus housing is too disruptive to maintain a positive living/learning environment, the student may be suspended from living on campus for a specified period of time.

In the event it is determined a student's continued presence in a campus residential facility constitutes an immediate threat to the emotional health, physical health, safety or welfare of the student or other students, staff, or college property, a student may be issued a Campus Housing Suspension. Students will be issued a set time to move out of their campus housing. Students wishing to return to campus housing after a Campus Housing Suspension may be asked to provide evidence that they are ready to return to the residential environment.

**Restitution**
Restitution is a requirement for a student to compensate for loss, damage, or injury incurred due to behavior for which they have been found responsible.

**Substance Use Assessment**
A student may be required to take a professionally designed assessment, at their own expense, related to their choices regarding substance use/abuse. The student must also sign a release of information form to the provider of the assessment allowing communication with a designated college official.

**Online Education Course**
A student may be assigned an online education course facilitated by a third party, at their own expense,  designed to educate and encourage reflection on specific behaviors for which they have been found responsible.

**Community Service**
A student may be required to restore, clean, or repair something damaged as a result of the behavior for which they have been found responsible.

**CASE REVIEW PROCESS**
**Requesting a Case Review**

Students have the right to request a review of a decision and/or sanction(s) imposed through the Student Conduct Process. Requests must be submitted by the student within **72 hours** of notification of a student conduct outcome.

A Case Review is not a re-do of the Student Conduct Process, but rather an opportunity to review a case in light of the grounds presented for the review.

Requests must state whether the student is requesting a review of the decision (responsible or not responsible), the sanction(s), or both. The request must also state on which grounds the case should be reviewed, which are limited to the following:

- New evidence not previously available could significantly affect the outcome.
- A procedural irregularity is discovered which could materially affect the outcome.
- The sanctions or assignments are severely disproportionate to the severity of the violation.

It should be noted that requests made due to disagreement with a decision and/or pleas for mercy are not grounds for case review. Requests for case review must be made on one of the above grounds or they will not move forward.

Additionally, students are responsible for submitting their own requests for case review. In the event of a case with multiple parties, each student must submit their own request. Requests from parents or third parties, including legal representation, will not be considered.

Case Review requests for cases heard by Resident Directors will be reviewed by the Dean of Students. Case Review requests for cases heard by the Dean of Students will be reviewed by the Vice President of Student and Organizational Development.

**Case Review Process**

If the Case Review request has been approved:

- Cases heard by Resident Directors (RDs) will be reviewed by the Dean of Students.
- Cases heard by the Dean of Students will be reviewed by the Vice President for Student and Organizational Development.

The student will be notified at least 48 hours in advance, via their RWC email account of the date their case will be considered.

Because a Case Review is not a re-hearing of a case, students, parents, witnesses, and other involved parties do not attend these meetings. The student's request for review is considered along with all documentation and case-related notes. Any other written statements from students given prior to 24 hours before the meeting will also be considered.

Should the College official feel more information is needed to make a decision, a student may be asked to attend a future meeting to answer questions.

In a Case Review, the College official can make one of the following determinations:

- The outcome and sanctions from the original conduct process are upheld based on proper findings and appropriate sanctions.
- The outcome from the original process is not upheld; there are no sanctions.
- The outcome of the original process is upheld; but sanctions are disproportionate to the violation. Sanctions are altered to be more appropriate (sanctions cannot be made more severe, with the exception of Title IX cases).

Once a decision has been made, the student will be notified of the outcome in writing, via a letter sent to their RWC email account that details the decision and rationale given by the Dean of Students or Vice President for Student and Organizational Development.

The decision made in the Case Review Process is the final decision in a conduct case; there are no further opportunities for review.

PRIVACY OF EDUCATIONAL RECORDS

FERPA

> The Family Educational Rights and Privacy Act (FERPA) of 1974, as amended extends the right of access to certain records maintained by Roberts Wesleyan College (RWC) and Northeastern Seminary (NES) to all former and presently enrolled students. Students are notified of their FERPA rights in the RWC Student Handbook.

Student Rights

> Inspection and Review:  Students have the right to inspect and review their <u>education records</u>.  Requests for access to education records should be submitted in writing directly to the school representative responsible for the record's custody.  A standard form, "<u>Request to Review Academic Record</u>," is available in the Registration Office.  In general, access will be granted within 72 hours upon request to the record custodian, but if a delay is necessary, access will be granted no later than 45 days after the request.

> Roberts Wesleyan College reserves the right to refuse to permit students from viewing the following records.)
> - Financial information submitted by parents
> - Confidential letters or statements of recommendation submitted prior to January 1, 1975
> - Letters that the student has waived the right to view
> - Education records containing information on more than one student
> - <u>Sole Possession Records</u> of staff and faculty maintaining personal notes in student's folders.  However, any material in the folder when it is transferred to another record keeper (e.g. Advisor, finance officer, Student Life, or professor) is no longer personal, and is, therefore, subject to the policies governing access.

> Explanation and Interpretation:  Students will be granted an explanation of their records upon request to the appropriate department personnel.

> Formal Hearing and the Challenge of Contents:  A student wishing to challenge any item on file must submit a "<u>Request for a Hearing to Challenge Educational Records</u>" form with the Registrar who will pass the request on to the appropriate department head.  The department head will research the information under dispute and/or arrange a formal hearing. Upon reviewing the information, the Department Head will forward a copy of the findings to the registrar and the student. After the review of the dispute or formal hearing, if the student's dispute is denied, a written statement from the student regarding his/her views about the dispute may be written and enclosed in the permanent file.

> File Complaint: Students have the right to file a complaint with the U.S. Department of Education concerning any alleged violations of FERPA by Roberts Wesleyan College.

Send complaints to the following address:

Family Policy Compliance Office
US Department of Education
400 Maryland Avenue, SW
Washington, DC 20202-5920

Release of Information

Under the Anti-Terrorism Act of 2001 certain U.S. governmental agencies have a right to access educational records and personally identifiable information contained in records without prior student consent. Also, as of January 2012, certain third party agencies deemed by the U.S. governmental agencies may have access to educational records and personal identifiable information without student consent.

Disclose/Directory Information: RWC maintains, and may release, <u>directory information</u> to the public without the consent of the student under federal law.  Directory information is information that is not considered harmful or an invasion of privacy if released.  Directory information includes:

Student's Name
Address (Campus residents, 2301 Westside Dr; off-campus and Alumni, permanent)
E-mail
Picture
Telephone listing
Date & place of birth
Major field of study
Dates of attendance
Awards, degrees, and honors received
Participation in officially recognized activities and sports
Weight and height of members of athletic teams
Class Level
Enrollment Status (Full-time, Part-time, etc.)
Most recent previous educational agency or institution attended

Students have the right to refuse the release of <u>directory information</u>, in which case a "<u>Request to Prevent Disclosure of Directory Information</u>" form should be submitted to the Registration Office.  By signing this form, the directory information is not released to a third party, nor printed in the RWC Commencement Program. It will be released to available <u>school officials</u> for legitimate educational interests.  The action of prevention of <u>disclosure</u> of directory information will be in effect until revoked in writing by the student.

Release to Parents:  All parental rights to access <u>education records</u>, without consent, transfer to the student at age 18.  Therefore, parents will only be given rights to access educational records if a)the student has given the written consent, b) in compliance with a subpoena, c) by submission of evidence that the parents declare the student as a dependent (as defined by the Internal Revenue Service) d) in connection with some health or safety issue.  Students may obtain the form "<u>Authorization to Release Education Record Information to Parents/Guardians/Spouses</u>" in the Registration Office to allow parents the right to access educational records as a dependent

31

*Referenced from U.S Department of Education & AACRAO*

For more information regarding FERPA see:

U.S. Department of Education FERPA information (linked to website below)
(http://www.ed.gov/policy/gen/guid/fpco/ferpa/index.html)
AACRAO's Online guide to FERPA (linked to website below)
(http://web.aacrao.org/asp_lib/federal_relations/ferpa_index.asp)

# SEXUAL MISCONDUCT AND TITLE IX
# COMPLIANCE POLICY

The College is committed to creating and maintaining an academic and work environment that respects each person and nurtures the trust of its mission. The College has general expectations of students and employees and expects all to behave in a manner that supports the College's Mission and Ethos, including respecting and protecting the personal rights of others.

The College seeks to create and maintain an environment free from intimidation or injury generated by sexual harassment, including domestic violence, dating violence, stalking and sexual assault. The College will act to eliminate such practices from our community and to remedy their effects. All members of the College community are entitled to a professional working and learning environment and are accountable and responsible for maintaining a respectful and trusting environment.

Any complaints involving sexual harassment, domestic violence, dating violence, sexual assault, and stalking will be handled under the College's Sexual Misconduct and Title IX Policy.

> The complete policy may be accessed via this link:
> Sexual Misconduct Title IX Policy.docx
> The Clery Report may be accessed via the Campus Safety Resources webpage

Definitions:

**Domestic violence** - a felony or misdemeanor crime of violence committed by:
- a current or former spouse or intimate partner of the person against whom the violence is committed;
- a person with whom the person against whom the violence is committed shares a child in common;
- a person who is cohabiting with, or has cohabited with, the person against whom the violence is committed as a spouse or intimate partner;
- a person similarly situated to a spouse of the person against whom the violence is committed under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred; or
- any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred.

**Dating violence** - violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the person against whom the violent act is/acts are committed. The existence of such a relationship shall be determined based on the reporting party's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

For the purposes of the definition-
- Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse.

- Dating violence does not include acts covered under the definition of domestic violence.

**Stalking** – engaging in a course of conduct directed at a specific person that would cause a reasonable person to-
- Fear for his or her safety or the safety of others
- Suffer substantial emotional distress.

**Sexual Assault** – is defined as Rape, Fondling, Incest, or Statutory Rape.

The College is in compliance with *Title IX of the Education Amendments of 1972*, the *Violence Against Women Reauthorization of 2013*, the *Jeanne Clery Disclosure of Campus Security Policy* and Campus Crime *Statistics Act* also known as the *Clery Act* and *Article 129-A and Article 129-B of the New York State Education Law.*

Article 129-B of the New York State Education Law requires that the Student Handbook include the following definition of *Affirmative Consent:* Affirmative Consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, sexual identity or gender expression.

Consent to any sexual act or prior consensual activity between or with any party does not necessarily constitute consent to any other sexual act.

Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

Consent may be initially given but withdrawn at any time.

Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent.

Consent cannot be given when it is the result of any coercion, intimidation, force, or threat of harm.

When consent is withdrawn or can no longer be given, sexual activity must stop.

**STUDENT'S BILL OF RIGHTS REGARDING DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT AND STALKING**

**Regarding incidents of domestic violence, dating violence, sexual assault and stalking, all students have a right to:**
- Make a report to local law enforcement and/or state police.
- Have disclosures of domestic violence, dating violence, stalking, and sexual assault treated seriously.
- Make a decision about whether or not to disclose a crime or violation and participate in the judicial conduct process and/or criminal justice process free from pressure by the college.

34

- Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard.
- Be treated with dignity and to receive from the institution courteous, fair, and respectful health care and counseling services, where available.
- Be free from any suggestion that the reporting individual is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes and violations.
- Describe the incident to as few college representatives as practical and not be required to unnecessarily repeat a description of the incident.
- Be protected from retaliation by the college, any student, the accused and/or the respondent, and/or their friends, family and acquaintances within the jurisdiction of the college.
- Access to at least one level of appeal of a determination.
- Be accompanied by an advisor of choice who may assist and advise a reporting individual, accused, or respondent throughout the judicial or conduct process including all meetings and hearing related to such process.
- Exercise civil rights and practice of religion without interference by the investigative, criminal justice, or judicial process of the college.

| Contact Information: | | |
|---|---|---|
| | Title IX Officer | 585-594-6260 |
| | Campus Safety | 585-594-7777 |
| | Local Law Enforcement | 911 |
| | State Police 24-hour hotline | 1-844-845-7269 |

**Requesting Confidentiality — How the College Will Weigh the Request and Respond**
If the Title IX Coordinator receives a report of an act covered by this Policy, but the individual impacted requests confidentiality or otherwise asks that an investigation not be pursued, the Title IX Coordinator will make every effort to balance this request with the College's commitment and obligation to provide a safe and non-discriminatory environment for all members of the community. Honoring such a request may limit the College's ability to conduct a thorough investigation and take appropriate disciplinary action. Accordingly, the Title IX Coordinator will consider many factors when determining whether or not the College can honor the request for confidentiality, including but not limited to whether:

- the alleged perpetrator has a history of violent behavior or is a repeat offender;
- the information provided suggests an increased risk that the alleged perpetrator will commit additional acts;
- the alleged perpetrator used a weapon or force;
- the sexual violence was committed by multiple perpetrators;
- the incident represents escalation, such as a situation that previously involved sustained stalking;
- the information provided suggests that the act is part of a larger pattern at a specific location or by a particular group,
- the individual impacted is a minor; and
- Information can be obtained by means other than from the impacted individual (e.g., by personnel or security cameras, witnesses, or through physical evidence).

## AMNESTY

The health and safety of every student at Roberts Wesleyan College is of utmost importance. Roberts Wesleyan College recognizes that students who have been drinking and/or using drugs (whether such use is voluntary or involuntary) at the time that violence, including but not limited to domestic violence, dating violence, stalking, or sexual assault occurs may be hesitant to report such incidents for fear of potential consequences for their own conduct. Roberts Wesleyan strongly encourages students to report domestic violence, dating violence, stalking, or sexual assault to school officials. A bystander acting in good faith or a reporting individual acting in good faith that discloses

35

any incident of domestic violence, dating violence, stalking, of sexual assault to school officials or law enforcement will not be subject to the school's code of conduct action for violations of alcohol and/or drug use policies occurring at or near the time of the commission of the domestic violence, dating violence, stalking, or sexual assault.

# RESIDENCE LIFE

## RESIDENCE HALL PHILOSOPHY

Living in a residence hall on a college campus is an experience of personal enrichment and development, both for the present and for the future.  The goal of campus life at Roberts Wesleyan College is the development of a community that will enhance the emotional, intellectual, physical, social and spiritual welfare of each student.  The needs of students are met when the members of the College community cooperate with each other for mutual growth and understanding.  The standards of community living and social relationships as valued by the College must be accepted and supported by all students for harmony to be maintained within the group setting.

All students, whether living off campus or in residence, are required to observe all guidelines of the Roberts Wesleyan College Student Handbook.  The College retains the right to change any housing assignment or policy as appropriate.

Housing requirements are specified by the Board of Trustees and are administered by the Office of Student Life.  Mandatory residency requirements are part of the educational philosophy of Roberts Wesleyan College.  All students must reside in college housing unless living with immediate family members.

## OFF CAMPUS APPLICATION PROCESS

### Criteria
The following categories of students may live off campus subject to the completion of the *Application to Live Off Campus/Commute* form and the discretion of the Office of Student Life.  In considering an exemption to the residency requirement, consideration will be given to the following factors:
- student applicant resides with immediate family members (e.g. parent, guardian, grandparent)
- student applicant is living with an approved RWC faculty or staff member
- student applicant is a part-time student (taking less than 12 credit hours per semester)
- student is at least 22 years of age before the semester for which s/he is applying to live off-campus

## TOWNHOUSE AND BEESON AGREEMENTS

Living in the campus townhouses or in Beeson Hall is considered a privilege that brings with it certain expectations.  Students granted this privilege are responsible for the behavior that takes place within their residence.  No Townhouse or Beeson apartment should be used for activities that violate Roberts Wesleyan College policies.  If evidence exists that such violations occurred, the tenant will forfeit the privilege of living in the apartment and may be required to return to the residence halls.  A full description of the Townhouse or Beeson agreement is available in the Office of Student Life.

## CAMPUS ROOM ASSIGNMENT PROCESS

Room assignments are made in the Spring semester for returning RWC students.  Some buildings or areas in a building may be designated for students with specific interests or needs.  New students will receive their housing assignment prior to the beginning of their first semester.

All requests for room and roommate changes must be made through discussion with the Residence Life Professional Staff person for that building/area.

Fall semester students approved for a room or roommate change for Spring semester will be required to complete their move before leaving for the Winter break.

**Room keys** are obtained from the Residence Life Professional Staff person of each building or residence area at the beginning of the year.  For the safety of all students, keys should never be copied or given to unauthorized individuals.  Keys are to be returned to the Residence Life Professional Staff person of that building/area when students check out of their rooms.  Loss of a key will result in a charge of $30 for a replacement key.

## RESPONSIBILITIES OF RESIDENCE HALL LIVING

### Care of College Property
Room care is the responsibility of the occupants.  A clean and orderly room is expected.  Extreme non-conformity may result in disciplinary action.

College furniture is not to be removed from any designated locations.  Lounge furniture is to remain in the lounge in which it is located.  Room furniture is not to be removed except under unusual circumstances and with prior approval of the Residence Life Professional Staff person of that building/area.

Residence hall lounges are to be kept clean of personal belongings and clutter.  These public spaces are cleaned by custodial staff, but excessive mess will lead to fines being charged to the floor members.

Because of potential damage to people and property, throwing balls or other objects in the residence halls is prohibited.  For similar reasons, water fights are prohibited inside College buildings. Removing screens or throwing things out of windows is an infraction of residential hall policy.

Care must be used in mounting items on walls or doors.  Tape, pins, nails, or glue may not be used to mount items on doors or painted walls.  All items must be mounted using PlastiTak or a similar substance.

### Damages
Damages to the room and furniture is the responsibility of the student causing the damage.  The cost of any damage to school property will be deducted from the room deposit.  Unclaimed damage on a floor or in the hall will be billed to all students living on the floor/hall.  Students are therefore expected to take responsibility for any damage that occurs in their living area and cooperate with the College's investigation of responsibility.

### Repairs
Needed repairs should be reported to the Residence Life Professional Staff person of that building/area.  The Residence Life Professional Staff person and Resident Advisor have a list of emergency numbers to call if maintenance personnel are needed after hours for emergency repairs. Routine repairs may be requested through the Facilities online work order system. Repairs for laundry machines should be reported directly to the service provider-Statewide Laundry-phone number is posted near the machines.

## Sanitation

All residents are responsible for the general sanitation in the buildings. Students are expected to dispose of trash in the proper places, keep bathroom areas clean and free of personal belongings, leave the public kitchens in good order after use, and keep personal food items in sealed containers to avoid attracting insects. Containers are provided for certain recyclable materials. Hazardous materials and chemicals must be properly discarded. Contact Campus Safety for instructions. Townhouse and Beeson residents must take their trash to the nearest dumpster.

## Room Decorations

Individualizing a room is an opportunity available to each student. Consideration should be given to the wishes of the roommate and to the guidelines of the College community.

## Pets

NO pets are permitted, except for small fish.

## Waterbeds

Waterbeds are not allowed in rooms.

## Loft/Bunk Bed Construction.

While it is the intent of Roberts Wesleyan College to permit flexibility with the room décor in order to enhance living conditions, the College does not permit the construction of lofts in the residence halls. Most of the College's room furnishings are able to be stacked or bunked. The Buildings and Grounds department has a limited number of bunk beds that can be provided on first come, first serve basis.

## Electrical Appliances and Audio Equipment

Appliances and audio equipment should be used with moderation and consideration. Use of headsets is requested during quiet and late night hours. Students must have respect for the right of others for rest and for conditions conducive to study. Kitchens are provided in each residence hall, and cooking is limited to the kitchen areas. Small, personal refrigerators are permitted in the rooms. Microwave ovens are provided in residence hall kitchens and are not permitted in rooms due to electrical demands.

## Weapons

No weapons may be present or stored on campus.

## Use of room

Residents may not use their room to serve as a business address or as the home for a private business. This policy refers to formal (i.e. Mary Kay, Consulting) and informal (babysitting, daycare) business activities.

## Insurance Coverage

Insurance Coverage for a student's personal belongings is not provided by the College. If the student desires such protection, policies are often available through the parents' Homeowners Policy.

## Overnight Guests on Campus

For safety and security reasons, students should register any guest of the same gender with the Resident Advisor. Guests are generally restricted to peer friends of students. Young children,

parents and spouses are asked to stay in off-campus lodging.  Approval for overnight guests will only be permitted after all roommates have agreed to the visitation.

### Check Out Procedures
Check out procedures are established any time a student moves from a room.  Check out is facilitated by the Resident Advisor or Residence Life Professional Staff person of that building/area. If a room is vacated without being properly inspected, or left without being cleaned, a fee will be assessed.  Students are responsible for the cost of any damage beyond reasonable wear and tear, which will be deducted from the room deposit.

### Break Housing
 During break/vacation periods, the College residence halls and Garlock Dining Commons are officially closed.  Room and board charges do not include break periods.

Students needing to stay on campus through non-academic periods must apply for permission in the Office of Student Life.  Deadlines are posted in the residence halls prior to each break.  Applications received after posted deadlines may not be accepted.  Break housing will have a per-day cost.  The **"Application for Break Housing Form"** gives more detailed information on vacation housing and policy and is available from the student's Residence Life Professional Staff person or in the Office of Student Life.

### Summer Housing
Housing for summer is available for students who meet specific criteria. See Student Life for details.

### Storage Space
Storage on campus is extremely limited and students are discouraged from leaving personal possessions in storage.  Only students living at least 250 miles away from campus may store items in the summer storage room.  Any stored items must be boxed and labeled with the student's name and placed in designated areas.  The College will dispose of any possessions left in unauthorized places. Because of fire hazard, no empty boxes may be stored.

There is no space on campus for storing furniture, rugs, or carpets of any kind.  The student must assume full responsibility for any item left in storage.  Any item left for more than 15 days after the student's withdrawal from school will be disposed of by the College.

### Computer capabilities
Computer jacks are available in each residential room for student use.  Students may provide their own computers. Wireless access is also available in each residence hall.

### Quiet Hours
Since the residence hall is a place for studying, sleeping, and socializing, a careful balance must be maintained when it comes to the needs of individuals pursuing those activities.  Students should be able to sleep or study in their rooms without distractions from **11:00 p.m. to 10:00 a.m.**  Students who are being disturbed should take the initiative in confronting the source of the disturbance.  If this is unsuccessful, members of the residence hall staff should be contacted.

### Visitation Hours
Residence Life Professional Staff will establish open house hours with the residents for public lounges and private rooms in the traditional residence halls.  Typically there will be evening hours

available for most nights of the week.  Consideration must always be given to roommates' needs.  Violations of visitation hours will result in disciplinary action.

## EMERGENCY CONTACT

From time to time emergency situations do occur and it becomes necessary for family members to contact a student.  The College will make every effort to locate a student in such emergencies.  This process can be made less stressful if you provide your family with the following information at the beginning of each semester:

- Your personal phone number and the office phone number of your Resident Director.
- Your hall or apartment address and room number.
- A copy of your class and work schedules.

Resident students who are leaving the campus overnight or on a weekend are encouraged to notify their Resident Advisor and to leave them an emergency number where family members may contact them.

## RESIDENCE HALL SAFETY

Safety is a primary concern at Roberts Wesleyan College.  Individuals found propping doors or windows open, thus compromising the security of the hall, will be subject to disciplinary action.

All members of the RWC campus community are expected to report incidents of crime to their appropriate supervisors or the Director of Campus Safety.  Students should contact their Residence Life Professional Staffs or Resident Advisors, the Office of Student Life, Health or Counseling Services to report such incidents.  In any life-threatening situation, students may call 911 from any campus phone and then report it to the above personnel.  When calling 911, clearly define the specific area of campus from which you are calling.

## FIRE SAFETY

At all times, students need to consider the safety of themselves and others.  Community living demands that each member take special precautions.  Procedures for fire alarms and for reporting fires are shared at residence hall meetings.  The following guidelines have been established:

- Know the location of the fire extinguishers.
- Cook in kitchen areas only.
- Use irons in kitchens or on a table.
- Use power-strips and not extension cords.
- Leave all firearms, explosives, incense and oil-burning lamps at home.
- Use only fire resistant artificial evergreens for decorations.
- Exit and fire doors must be unblocked at all times.
- Hallways and stairwells must be free of furniture and other belongings.
- Use of space heaters, halogen lamps, candles and sun lamps in College buildings is not allowed.

When the fire alarm is sounded, students MUST leave the building by the nearest exit and proceed quickly from the building.  Tampering with fire alarms and fire extinguishers is a misdemeanor and subjects the student to prosecution in the local court system and the student conduct process.

Roberts Wesleyan College is committed to the safety of our faculty, staff and students and providing a safe environment in which to live in, learn and work.  The safety of our students and fire safety is our highest priority.

- All buildings at Roberts Wesleyan College are equipped with automated fire alarm systems and monitored 24 hours a day by Simplex-Grinnell (an industry leader in fire detection and alarm capabilities).  When a fire alarm is received, Campus Safety is notified through our state-of-the-art alarm system, a text notification, and a telephone call from Simplex-Grinnell.  A Campus Safety Officer responds immediately and the appropriate Fire Department is notified to respond.
- Campus Safety has a policy in place for evacuation procedures.
- Fire Extinguishers are located in all hallways and common areas throughout our residential system.  There is an audible alarm and emergency egress directions for evaluation.  All exit doors are push open for a quick exit.
- $CO_2$ detectors are located on each dorm floor and heat detectors are located in all dorm kitchen areas.
- Fire Alarm Systems are inspected by an outside contractor on a regular basis. Sprinkler systems are tested on a regular basis.
- At the beginning of each school year, residents receive instruction on fire extinguisher operation, proper exiting and pathways, and other fire safety information.
- Each semester, Campus Safety performs two (2) fire drills in each dorm. One drill is done in the evening and one at night. Fire drills are timed and all residents are expected to participate and evacuate. No prior notification is given to the residents as to the timing of these drills. The purpose of these drills is to familiarize residents with evacuation procedures, the sound of the alarms, and the locations of all exits in an area.

**\*DAVISON HALL IS THE ONLY RESIDENCE HALL EQUIPPED WITH A FIRE SPRINKLER SYSTEM**

## EMERGENCY AND EVACUATION PROCEDURES

Treat all alarms as if they were life-threatening emergencies, even if you have been exposed to false alarms in your residence halls due to malfunctioning of smoke detectors or due to reckless acts.

- Upon hearing the alarm, remain calm and don't panic.  Close your room/apartment windows.
- Grab only the clothing necessary for the existing weather conditions.
- Do not attempt to salvage any personal belongings.
- Feel the door from bottom to top with the back of your hand to see if it is hot.
- If the door is hot, don't open it!  Go to your window, open it and yell for help if you can do it without letting smoke into the room, and if you are too far above the ground to climb out to safety.  Until help arrives, pack the cracks around the door and frame with wet towels or sheets if possible, to prevent smoke from migrating into your room.

- If the door is not hot, brace yourself behind the door and open it slowly just in case there is fire and heavy smoke in the corridor, which could blow open the door with an onrush of superheated air.
- If you are able to enter the hall, stay as close to the floor as possible (beneath the smoke and heat).  Smoke normally banks to knee level and hovers there even under severe conditions, so chances are that you'll be able to breathe and see across the hall if you stay low and crawl.
- Close your room but don't lock it.  There are three important reasons for this:
    1. Closing the door will provide barriers to the spread of smoke and heat and will help eliminate drafts, which might feed a fire.
    2. If your exits are blocked or are impassable due to smoke or heat, you may find it necessary to return to your room in order to exit from the building via window, or to remain there until you are rescued.
    3. Resident Advisors or Residence Life Professional Staff and fire fighters can check unlocked rooms faster to see that all occupants are out safely.
- Move quickly, but do not run down corridors or stairways.  Do not use elevators – you could become trapped or taken directly to the floor on fire due to heat-sensitive control buttons.
- Know two ways out!  Become familiar with all the fire exit locations in the buildings that you frequent.  If fire or smoke blocks your primary exit route, use your second way out.  All residents must exit directly to the outside of the building from the stairways, unless otherwise directed by staff in charge.  In any case, leave your floor via the nearest exit marked with an EXIT sign.
- Lingering in the building (even under drill conditions) is prohibited.
- Remain clear of the building by at least 50 feet.  Also, do not stand on roadways, in service areas, or in the middle of parking lot aisles.  The fire department will need to have these areas clear in which to work quickly and effectively.
- Re-enter the building only by permission after hearing from a Campus Safety Officer, a Residence Life Professional Staff person, or in the event of an actual fire, the Fire Chief.
- Persons with a physical disability may need assistance to evacuate from the building. Someone who is familiar with the special needs of a particular person with a physical disability should be prepared to assist him/her.
- Unauthorized use, abuse, or interference with fire protection equipment, fire-fighting personnel, alarm systems, EXIT sign, emergency lights, or any safety signage is strictly prohibited and may lead to a fine being imposed.
- Smoke detectors are sensitive devises.  Some sprays, powders, and heavy steam can set them off.  Being aware of this and being careful around them can help avoid needless evacuations.

## STUDENT PROPERTY AND BUILDING SECURITY

Each resident is responsible for assisting with building security.  Do not give door keys to any unauthorized individual.  You are encouraged to keep your room door locked when you are not present.  Any unnecessary cash or valuables should be kept secure.

Immediately report any theft or suspicious activities to a Campus Safety Officer and your Residence Life Professional Staff person.  Unauthorized strangers should be reported immediately.  **The**

College assumes no responsibility for theft from College rooms, including storage facilities. Propping open a door is a violation of dorm security and safety, and is a fineable offense.

ROOM SEARCH POLICY

The following statement outlines the basic relationships which exist between a student and Roberts Wesleyan College concerning the entry and search of residence hall rooms or college-owned housing.

It is the concern of all persons involved with student life to assure each student certain rights and privileges over his or her environment within the institution.  This does not imply that the student who rents a given area exercises all control over it.  The students' payments are for specified uses.

Although a student may live in College-owned property for the larger portion of the year, the student does not thereby assume the ownership of the bedroom area or suite to which she/he may be assigned.  Instead, the student agrees to pay a stipulated amount for the use of such facilities for studying, sleeping, eating, and recreation.  The student housing rental fee entitles the student to the use of these areas in the same manner as the student pays for the use of the dining room, library, etc.

**Entry of resident's room, suite, townhouse or apartment**

Only authorized personnel are generally permitted to enter the living area in the absence of the residents.  Authorized Roberts Wesleyan College personnel includes professional members of the Student Development staff, Residence Life Professional Staff, Resident Advisors, Security Officers, maintenance personnel and non-college personnel contracted to perform maintenance or repair services for Roberts Wesleyan College.

**Entry of room in absence or residents**

Only in the following situations will entry be made:  for emergencies, safety and maintenance inspections, verification of resident's presence or absence, or search for "cause."

In case of an emergency, the resident will be notified of entry upon return.  Notice of safety and maintenance inspections shall be given in advance whenever possible.

**Procedures for entry by authorized Roberts Wesleyan College personnel:**
- Knock and identify self – give resident ample time to open door.
- Request the door be opened.
- If the door is not opened or entry is refused:
  (a) Knock again and re-identify self.
  (b) State that College personnel will enter if the door is not opened.
  (c) Wait a reasonable period, then use key and enter.

**Search of resident's room, suite, townhouse or apartment:**
Living space and personal belongings of the resident may not be routinely searched.

General situations that lead to a search are listed below:
- Clear indication that health or safety regulations are being violated.
- Emergency situations endangering life, health, or property.  In these cases, the typical procedures for search do not need to be followed.

44

- Search for "cause." A reasonable cause to believe that a federal, state, or civil law or a Roberts Wesleyan College regulation is being violated.

Procedures for search:

- At least two staff members should be present and one of them must be from the Student Development professional staff .
- The search must be approved by the Dean of Students or Residence Life Professional Staff person.
- The resident will be asked to open all drawers, closets, refrigerator, luggage, etc., during the search.
- If the occupant is not present during the search, the resident(s) will be notified of the entry and search and the reason for the entry and search upon return.

Search and seizure:

- Items which may be seized without prior consultation of the owner:
  - (a) Those specifically prohibited.
  - (b) Those that pose immediate danger to the health and/or safety of the residents.
- Residents will be promptly notified of the removal.
  - (a) Residents will be given a notice for all belongings removed.
  - (b) These belongings may be claimed by the student when lawful to do so, after the disposition of the case by the appropriate College or civil authorities.
- Recourse:
  A student who believes the policy has been violated or his/her rights disregarded may appeal in writing to the Vice President for Student and Organizational Development or Dean of Students.

## LAUNDRY SERVICE

Laundry facilities are located in each of the residence halls. The machines are free for resident student use. Off-campus students may not use the on campus facilities. Students should report any breakdown of machines to their Resident Advisors or Residence Life Professional Staff person. Unreasonably long repair time should be reported to the Office of Student Life.

45

# CAMPUS SAFETY

Campus Safety provides 24-hour service each day.  The phone number, 585.594.7777 or ext. 7777, is posted at various locations on campus. Security cameras are in use to assist in protecting the campus. Some services provided are:

- Partroling Campus, Safe escort from one building to another (or car, etc.)
- Entry to locked room or vehicle, jump start for vehicles
- Writing crime or incident reports, investigating crime or fire reports
- Responding to first aid calls
- Issuing of student ID Cards

The Roberts Wesleyan College annual security and fire safety report, also known as the Clery Report, is available for review.  This report is required by federal law and contains policy statements and crime statistics for the school.  The policy statements address the school's policies, procedures and programs concerning safety and security.  This report is filed annually with the U.S. Department of Education, and contains three years' worth of statistics for certain types of crimes that were reported to have occurred on campus, in or on off-campus buildings or property owned or controlled by the school and on public property within or immediately adjacent to the campus.

The Campus Safety and Security Department will provide upon request, all campus crime statistics as reported to the United States Department of Education.  Crime statistics may be obtained at the Campus Safety Office located at the Voller Athletic Center, Room 270; by sending a written request to Roberts Wesleyan College Campus Safety Department: 2301 Westside Dr, Rochester, NY 14624; or by calling the Campus Safety Office at 585-594-7777.  Crime statistics are also located on the Roberts Campus Safety website roberts.edu/student-experience/campus-safety under Clery Report, and are available through the United States Departemnt of Education (http://ope.ed.gov/Security/ )

Blue light emergency phones may be used to report any emergency or to request assistance.  There is no need to dial.  Calls are automatically answered and the location of the caller is identified.

## CAMPUS PARKING

All RWC students operating a motor vehicle on campus must have a permit issued by the College. All permits can be obtained in the Campus Safety Office in the upper Voller Athletic Center. Commuting students are charged automatically on their Student Account. Parking regulations are also provided.  These regulations are strictly enforced for everyone's safety and convenience.  In general, these regulations include, but are not limited to, the following:

- Unregistered or unlicensed cars may be towed at any time without warning.  These cars are considered by the administration as abandoned.

- Only authorized maintenance vehicles are permitted on campus walkways.

- Separate parking tickets are issued for separate violations.  Appeals to parking tickets can be made in writing to a Parking Appeals Committee through Campus Safety within five working days of the ticket issue date.  No appeals will be considered after the deadline.

- Visitor's parking permits are required and are available through the Campus Safety Office.
- Permits are issued for designated lots, failure to comply will result in a ticket.

# COMMUNITY LIFE

## STUDENT ASSOCIATION

The Student Association (SA) is comprised of all students matriculated in a traditional undergraduate program at Roberts Wesleyan College and exists to forward the ideals and standards of Roberts Wesleyan College as they pertain to student scholarship, spiritual formation, and service. The purpose of the Student Association Leadership Team is to represent student opinion, to represent the students in College matters, and to promote a solid Christ-centered co-curricular program through social, recreational, educational, spiritual, and cultural events and activities. It promotes a sense of group responsibility and plays the critical role of student representation for all aspects of community life.  The Student Association Constitution can be found at www.roberts.edu/student-experience/student-association . The Student Association Leadership Team is comprised of elected and appointed students involved in the planning and integration of student activities so that students can have a full and balanced life outside the classroom.  The Director of Student Leadership and Engagement advises this body of student leaders. Elections for the positions of SA President, SA Vice President, SA Campus Ministry Director, as well as the Class Council officers, are held in the Spring Semester for the following year. The remaining Student Association leaders are hired by the Officers-Elect, in consultation with the Director of Student Leadership and Engagement. These positions include: Social Life Director, Intramurals staff, Publicity team and Beacon newspaper editors.

**Eligibility for Student Association Leadership Team:**
Student Association Leadership Team members are student representatives.  Part of their responsibility is to be the voice of the student body to the faculty and administration.

Students must be free of outstanding student conduct issues, as well as maintain a 2.5 minimum Grade Point Average, to be eligible to hold Student Association Leadership Team positions of leadership.  Students holding office may be required to resign if found responsible for student conduct violations.

## STUDENT PUBLICATION

*The Beacon*, the student newspaper, is a student publication produced and maintained by students. It serves to inform and enlighten the Roberts Wesleyan College community through the publication of campus, regional, and national news, in addition to articles pertaining to current activities and issues on campus.

## STUDENT ACTIVITIES

The Student Association Leadership Team and the Office of Student Life oversee a number of student activities throughout the year, both on campus, as well as off campus.

## STUDENT ORGANIZATIONS

Getting involved in activities outside the classroom is one of the most rewarding aspects of college life. The College, recognizing that student life is a valuable part of the college experience, encourages participation in student organizations. The Student Association Leadership Team has chartered over

47

30 organizations including academic/pre-professional, cultural, ethnic, music/performing arts, and ministry/special interest groups. Every organization has a faculty sponsor who functions as advisor.

**Student Organization Policies:**

- Charters for approved new student organizations will be granted by the Student Association Leadership Team.

- Every organization of students within the College is required to have a faculty advisor. Meetings are not to be called without the knowledge and presence of the advisor. The faculty advisor will assist with the activities at the organization and accompany the organization on any trips or retreats.

- No group may print, solicit, or distribute any literature without first receiving permission from the Office of Student Life.

- All fund-raising activities must be approved and scheduled through the Office of Student Life and the Advancement Office.

- Only chartered organizations may reserve campus facilities and request College vehicles.

- All student organizations should check with the College Events Calendar to avoid conflicts in scheduling. www.roberts.edu/calendar

- No student group, club, or class may enter into contractual agreement with off-campus agents or vendors. Such contracts and agreements must be signed by an authorized agent of the College in the Office of Student Life.

- Students interested in starting a student organization should contact the Office of Student Life.

## HEALTH CENTER

Good health is important to students' academic success. RWC, therefore, maintains a well-equipped, professionally staffed Health Center offering a basic level of medical treatment.

The Health Center is located in the upper Voller Athletic Center. The office is staffed by a physician's assistant or nurse practitioner and a coordinator. Health care is available by appointment Monday through Friday during the office hours posted. The Health Center is not a walk-in clinic; however, most appointments can usually be scheduled on a same day basis.

During the hours the Health Center is closed, an ill or injured resident student should contact a Resident Advisor or Residence Life Professional Staff person for assistance. In any life-threatening situation, call 911, campus security at 585-594-7777, and then notify the resident staff.

Insurance

**Proof of health insurance during the academic year is mandatory for these following groups:**

- Athlete Students
- Nursing Students
- International Students
- Students attending school-sponsored overnight trips or mission trips

48

With the passing of the Affordable Healthcare Act, all citizens are now required to obtain some form of medical health insurance.  The regulations made it cost prohibitive for students to afford the college's annual insurance premiums. Therefore, the College no longer offers its students a health insurance plan.

**NCAA regulations require** *student-athletes and international student-athletes* **have health and accident coverage during college sports participation.** Students should find a policy that will cover accidents, emergencies, health complaints, prescription drugs, and doctors' visits. Roberts Wesleyan College is NOT responsible for any medical expenses incurred by the student-athlete.

Please visit: www.roberts.edu/student-experience/health-center/healthmedical-insurance/ for suggestions on how to obtain a health insurance policy.

## Health Records

A Health History Form is required for admission to Roberts Wesleyan College.  The form can be obtained online.  All information is kept in confidential files in Health Center.

## Immunization

New York State has stringent requirements for its public health law regarding immunization.  Proof in the form of an official copy of immunization dates from a medical provider, previous school or college or military service must be on file in Health Center by a student's first week of school.  New York State Public Health Law 2165 requires all students born after January 1, 1957 to show proof of immunity against measles, mumps, and rubella.  Proof of immunity can be demonstrated in the following ways: documentation of two doses of measles vaccine and one dose each of mumps and rubella vaccine (documentation must show month, day, and year), OR physician documented history of the disease, OR serologic evidence of immunity.  Exception is made only for those where immunization would be detrimental to the person's health.  Students failing to provide adequate documentation will be denied attendance at any New York State college or university.  Students enrolled in certain programs, such as nursing, may also need to provide evidence of Hepatitis B immunity.

## Allergic and Medical Reactions

Students with known allergic reaction (i.e. penicillin, insect bites, diabetes, etc.) may find it a good practice to alert a close friend, Residence Hall Staff, or member of Health Services as a precautionary measure.  This is particularly important for any off-campus activities in which a student may participate.

## Counseling and Medical Support Fee

Students taking at least 7.5 hours are charged a Counseling and Medical Support Fee.  This fee covers all of the following expenses while a student is at RWC:
- Any and all visits to the College nurse practitioner. (Lab fees, diagnostic procedures, medical and prescription drugs will be an additional fee.)

- Short-term counseling by College counseling staff.

- A basic accidental medical policy which covers injuries on and off campus. All full time students are covered by a Medical Accidental policy. Students can request a current insurance brochure for limits to coverage.

- Allergy shots may be administered by the nurse practitioner (serum not included). The student's allergist must supply the injection material and dosage schedule. It is the student's responsibility to schedule appointments to maintain the proper dosage interval. Health Services will not adjust dosages and reserves the right to refuse administration of the medication to those students who do not keep the proper dosage schedule.

- Limited supplies of some drugs. Health Services maintains a supply of a few commonly used drugs. When available, a start dosage of these medications is free of charge. Beyond this, it is the student's responsibility to purchase the medication at a pharmacy.

- Numerous health care brochures and other vital information.

It is college policy that only in extreme illness should a residence hall visit be requested. The supplies and equipment needed to assist a student in illness are kept in the Health Center Office. Therefore, the best care can be given in the clinic location.

## Class Passes for Illness/Injury

Health Center does not supply class passes for illness. A professor may contact the Health Center to verify a student's visit with the Health Center. However, the nature of the illness or contact will not be disclosed. The Health Center notifies Student Life when a student is expected to miss multiple days of class. Student Life sends formal email notice to the student's faculty to notify of absence.

## Dietary Accommodations

Certain special accommodations for dietary needs are possible. The student, nurse practitioner, and the Director of Food Services will collaborate and set-up provision of the proper foods. Alternately, if needs cannot be met in our dining center, the student may be referred to the Director of Services for Students with Disabilities.

The Health Center staff operates under protocols acceptable to the quality assurance standards required for ambulatory outpatient care.

## COUNSELING SERVICES

The Roberts Counseling Center provides psychological counseling services to students taking 7.5 credits or more in a semester. Services are time limited, with most students coming for ten sessions or less. Services are provided by licensed therapists, adjunct counselors, or graduate interns. Appointments for the Counseling Center can be made here: https://rwc.roberts.edu/counseling-center/ . Questions may be directed to the Wellness Center by phoning 594-6882.

The College provides additional opportunities for students to secure both formal and informal counseling. Students in need of pastoral counseling should contact the Office of Spiritual Life. Students interested in vocational or placement counseling should contact the Career Development Office.

Student confidentiality will be maintained in all student contacts in accordance with applicable legal and ethical standards.

## STUDENTS IN DISTRESS

Students may occasionally attempt or threaten suicide or self-harm, or may find they are unable to function in school due to serious psychological difficulties. In these cases, it is necessary for RWC to appropriately care for the student to minimize the primary risk of harm to self, as well as the secondary risk of the student negatively impacting other students, faculty, and staff because of the self-destructive behavior.

Self-destructive behavior is defined as:
- Attempt(s) on the part of an individual to end his/her life
- Infliction of serious bodily harm to oneself capable of ending one's life purposely or inadvertently (e.g., ingesting medications in unusually large quantities, cutting, burning, etc.)
- Threats to inflict bodily self-harm and/or end one's life
- Severe difficulties in the academic life, such as missing multiple classes or exams due to psychosis, severe depression, extreme anxiety, or substance abuse and its effects (which will be assessed on a case-by-case basis) that might cause imminent risk or harm to self or others

If a credible report is received stating that a student's behavior meets one or more of the above requirements the following actions will be taken:
1. The person who witnessed the behaviors should contact Campus Safety as quickly as possible. Campus Safety will notify the Dean of Students.
2. One of the outcomes may be a referral of the student to the Counseling Center* for a Risk Assessment (as described below). Other outcomes may include hospitalization, off-campus treatment, etc. Any student who agrees to this assessment will be required to sign a Release of Information Form, which allows the Counseling Center to report back to the Dean of Students the results of the assessment, and further recommendations. Any student who fails to comply with the assessment process may be subject to a Non-Academic Involuntary Withdrawal from RWC.
3. The Risk Assessment Process consists of a visit to the Counseling Center to meet with and be assessed by a trained therapist to determine level of danger to self or others and needs for treatment. The student must establish contact with the Counseling Center within one week after being notified by the Dean of the need for assessment. The student must then meet with a therapist. During this session, the counselor will make the incident, its roots, and implications, a significant focus in order to compile a thorough assessment of the student's risk status, making additional referrals as appropriate.
   Students are required to participate only in an assessment of their past and current suicidality or self-destructive behaviors. Students are not required to engage in counseling or therapy. A student may elect to go beyond the required assessment and participate in counseling or therapy, only after the professional secures the student's permission through verbal consent.
4. During this process the Dean may also take other steps; including contacting the student's parents and/or other significant others in the event of a potentially lethal suicide attempt or in the event of repeated suicide attempts.
5. At the end of the risk assessment process, the Counseling Center will send the Dean a written report regarding the student's attendance at the assessment session, status at the end of assessment, and recommendations for treatment, as well as willingness to comply with treatment. Based on this report, the Dean will determine, in consultation with the student, whether treatment recommendations will be voluntarily followed or whether the student

requires another type of action (e.g., disciplinary action, suspension or referral to the Non-Academic Involuntary Withdrawal process.

6. If the student disagrees with this decision he/she will have an opportunity to write a formal appeal to the Vice President for Student and Organizational Development (or Chief Academic Officer if appropriate); this written appeal should be completed within three days.

7. The VP for Student and Organizational Development will review all relevant information and make a final decision regarding the appeal.

If the student is amenable and wishes to remain in school, s/he will be given a deferred suspension, meaning that continued enrollment is contingent upon adhering to a behavioral contract. The Counseling Center Director (or other appropriate Counseling Center personnel) will consult with the Dean regarding the specifics of the contract, which typically includes the following elements:

- The student will not engage in any further self-destructive behavior.
- If self-destructive feelings arise, the student will seek assistance from a list of options (including the Counseling Center, appropriate Residence Life personnel, campus security, emergency care in the community, or 911).
- The student should not rely on other students for help with the self-destructive urges/feelings, but instead should immediately seek professional help.
- The Dean may contact others for information (not constrained by FERPA), should safety concerns recur.
- Other specific recommendations, as appropriate to the particular situation, may be added to the contract, as well.

If, at any point in the assessment period, the Counseling Center determines that the student requires immediate care (e.g., hospitalization, off campus treatment, etc.) that the CC is not able to provide, the Dean will be immediately notified. The Dean will also be notified immediately if the student fails to attend the assessment session.

*Students may also obtain this Risk Assessment from a private practitioner with comparable credentials.  Students choosing this option must:

- Do so at his or her own expense
- Sign a Release of Information form allowing that practitioner to communicate with the appropriate RWC personnel.
- Provide the practitioner with independent sources of information regarding the suicidal incident (e.g., suicide notes, police reports, emergency room reports, eye witness accounts etc.), if such reports exist, before the first meeting
- Private practitioners will also be required, during the period in which the three session assessment occurs, to provide the RWC Counseling Center with reports of instances in which the student threatened or attempted suicide, engaged in efforts to prepare to commit suicide, or expressed a preoccupation with suicide.

## STUDENT FINANCIAL SERVICES

Student financial questions and concerns are handled by the Student Financial Services office on the lower level of the Rinker Building.  Common topics of interest are financial aid forms, billing issues and refund checks.  Student bills are generated and due before the beginning of each semester.

## CAMPUS INFORMATION SOURCES

**SOCIAL MEDIA** provides information on upcoming student activities and important dates for RWC students. The most popular sites include Facebook, Twitter, and Instagram.

**LCD Message Boards** with current events and announcements are placed through various departments and areas of campus.

**Chapel Announcements** are another means of communicating important campus news. Check with the Office of Spiritual Life for details and deadlines. All announcements should be typewritten or neatly printed.

**Bulletin Boards** are placed throughout campus and contain recent notices, departmental news, safety and security alert posters, and general information. Students must receive permission from Student Life before posting any items on these bulletin boards.

**Mailboxes.** The mailroom is located on the upper level of the Voller Athletic Center. A variety of services are offered including UPS and next day delivery services. Each residential student is assigned a campus mailbox that is shared with another student. Mailboxes are available to commuting students upon request. Courtesy demands that the rights of privacy of a box-mate be respected. Any difficulties with the mail should be reported to the mailroom personnel. Stamps are available in the Bookstore across the hall.

Each student should check the mailbox daily. Special announcements, communication from faculty and staff, and schedule changes are often placed in student mailboxes.

## VOLLER ATHLETIC CENTER

The Voller Athletic Center is a multi-purpose facility which accommodates many special events, such as concerts, conferences, and athletic events in addition to being available for student use. Part of the education at RWC includes learning to maintain an acceptable level of physical fitness and developing lifetime habits of quality recreation. Students are encouraged to utilize all of the resources of the Voller Athletic Center.

While every effort will be made to preserve ample space for student use, students need to remember that the Voller Athletic Center is large enough to be shared with others -- community members, as well as faculty and staff, may also be present. Students are always asked to represent the College well when using the Voller Athletic Center resources.

In order to ensure enjoyment for all and to preserve the quality of the facilities, policies must be followed. A complete manual of the Voller Athletic Center policies is available at the Front Desk. A few of the most important rules are listed below:

- Upon entering the lower level of the building, students must swipe their ID card to enter.

- A student's parents or legal guardians may use the facilities for free when visiting the student. If they use the facilities on a regular basis, a usage fee will be charged. Friends and siblings of a student will be charged a fee.

53

- Equipment may be checked out from the front desk in exchange for a student ID or member ID card.  In addition to this, there are rental fees for some equipment.

- Voller Athletic Center staff has the authority to enforce rules and handle disputes.

- Food and drink are allowed in designated areas only.  No glass containers are allowed in the locker rooms.

## COLLEGE BOOKSTORE

The campus bookstore is located on the upper level of the Voller Athletic Center.  The bookstore is the students' headquarters for textbooks, college supplies, Roberts apparel, stamps, and miscellaneous items.  If you don't see what you need, ask an attendant.  All things in stock are not necessarily displayed and many things can be ordered.  Bookstore hours are posted.  Watch for special promotions and sales throughout the year.

## CAMPUS FOOD SERVICES

Garlock Dining Commons is the primary site for meals on campus.  Hours of service are posted. Residential students must be on the residential meal plan: Gold (275 meals+$50 flex), Silver (225 meals+$100 flex), or Bronze (180 meals+$200 flex). Townhouse and Beeson apartment residents have an additional option for an 'apartment' meal plan (120 meals/semester+$100 flex). Commuting students also have the option to purchase a Basic (25 meals) or Plus (50 meals) plan with greater flexible dollars, or put money for a declining balance on their ID card.  Campus guests may pay cash at the door for a meal.

## CHECK CASHING

The Cashier's Office, in lower Rinker Building, will cash checks up to $50.  Office hours are posted.

Two ATMs are available and located in the upper and lower levels of the Voller Athletic Center.

## SERVICES FOR PERSONS WITH DISABILITIES

RWC strives to provide services and accommodations to students with disabilities, in order to promote academic growth and enhance their learning environment on campus. Disability support is determined based on individual needs; therefore, it is necessary to contact the Coordinator of Services for Students with Disabilities in the Learning Center (585-594-6270).

## OFFICE OF INTERNATIONAL ENGAGEMENT

The Office of International Engagement, located in the Student Life suite, brings together people with global mindsets for academic and experiential purposes. We support international students during their educational experience in the US and facilitate connections between international students and the Roberts community.

- International students are responsible for keeping all immigration documents current. A Designated School Official (DSO) can assist with matters related to immigration and I-20 changes or endorsements.

- International students have unique needs when adjusting to life and education in the United States. The International Student Support Coordinator can assist with a variety of personal, cultural, and educational needs as well as direct students to local services.
- International students must submit a Health History form completed by a primary medical provider. Documentation of immunizations required by New York State must be submitted with the Health History form. Students are also required to have and provide proof of health insurance prior to arrival in the United States.
- International students are only allowed to work on campus for a maximum of 20 hours per week during the semester (40 hours per week between semesters) as stipulated by F-1 immigration law. Off campus employment is NOT allowed without prior authorization. Internships and cooperative experiences are the only exceptions and must be approved by a Designated School Official (DSO) before engaging in such employment.

## CAREER DEVELOPMENT

Located in lower Rinker, the Office of Career Development offers resources to help students identify academic programs and formulate career plans. The Career Development Office is equipped to help students identify goals and obtain relevant employment by offering the following services:

### Career Services & Programs

**Online Career Assessments –** The Myers Briggs Type Indicator and the Strong Interest Inventory are available for students to take online. These assessments provide a wealth of information in regards to the career decision making process.

**Individual Career Advisement-**Individual appointments may be made with the Director of Career Development to discuss issues and concerns.

- **Resume/Cover Letter Review-**Individual appointments may be made with the Director of the Career Development Specialist to review resumes and cover letters written in preparation for job hunting.

- **Workshops-**A variety of workshops are held throughout the academic year on career-related topics.

- **Graduate School Information-The Peterson's Guides to Graduate Schools are located** adjacent to the office of the Director of Career Development.

- **Career Shadowing-**Arrangements may be made for students to shadow career professionals for a day.

- **Job Listings/Opportunities Board-**Part-time, full-time, and summer openings are posted through "Handshake," accessible via our web site Career Development.

- **On-Campus Employment Interviewing-**Periodically, organizations come to campus to conduct one-on-one recruitment interviews.

**Career Development Website –** This site includes a link to career assessment tools, job & internship postings and a calendar of events as well as links to other career related Internet sites. You can find it at:
https://www.roberts.edu/student-experience/career-development/.

**Internship and Career Fair** -- An event in the spring semester features organizations seeking college students for internships and college graduates for full-time employment.

**Rochester Area Colleges' Recruitment Events:** (held in the Rochester area throughout the school year)

        **-Graduate School Day(s), including Law School Night**
        **-Teacher Recruitment Day**

More information may be obtained by calling the Office of Career Development at 594-6539.